IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| POWERTECH TECHNOLOGY, INC., | No. C 11-6121 CW |
| Plaintiff, | ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 352-2, 407) |
| v. | |
| TESSERA, INC., | |
| Defendant. | |

_____/

AND ALL RELATED CLAIMS AND
COUNTERCLAIMS
_____/

Plaintiff Powertech Technology, Inc. (PTI) sued Defendant Tessera, Inc. for breach of contract and other contract-related claims. Tessera countersued, asserting similar claims against PTI and Counterclaim Defendant Macrotech Technology Inc. (MTI). Before the Court are the parties' cross motions for summary judgment. Both sides urge the Court to grant summary judgment on their affirmative claims as well as their opponent's claims. The Court held oral argument on December 12, 2013. Having considered the papers and arguments of counsel, the Court GRANTS Tessera's motion and GRANTS PTI's motion in part.

BACKGROUND

I.   TCC License Agreement

On October 20, 2003, PTI and Tessera entered into the Tessera Compliant Chip License Agreement (TCC License). Docket No. 1, Appendix A. The TCC License Agreement allows PTI to use Tessera's patents to assemble integrated circuit packages and use or sell

them world-wide.  TCC License §§ I.A., II.A.  In return, PTI must make certain royalty payments to Tessera.  <u>See</u> TCC License § III.

The TCC License contains a "Governing Law" provision, which provides that the contract is governed by California law, and "any disputes, controversies, claims or difference which may arise from, under, out of or in connection with this Agreement" shall be adjudicated in the state or federal courts of California.  <u>Id.</u> § XIV.A.  The same provision states that notwithstanding any provision herein, after the sixty-day notice of termination and cure period set forth in Section VIII.B, "either party may bring an action in the U.S. International Trade Commission (ITC)."  <u>Id.</u>

The scope of PTI's rights as a licensee are summarized in Section II of the License.  <u>See id.</u> § II.  This section contains an "Exclusion from License" (EFL) provision, which states that the licensee is "licensed only for TCC Licensed Products for which it pays royalties hereunder."  <u>Id.</u> § II.D.  Tessera may, however, notify the licensee that it believes a product made, used, sold, imported, or offered for sale by the licensee is a Licensed Product under the TCC License.  <u>Id.</u>  If the parties cannot agree whether the licensee's product is a Licensed Product, the parties may commence litigation after a sixty-day period.  <u>Id.</u>

The TCC License also contains an "Indemnification Clause," which provides that the licensee "agrees to defend, indemnify and hold Tessera harmless from and against any and all damages, liabilities, costs and expenses (including reasonable attorney's fees and expenses) arising out of or related to Licensee's use of Tessera Patents."  The Indemnification Clause does not apply to

any "obligation or expense of defending the validity of any Tessera patent."

II.   ITC Investigation

In December 2007, Tessera initiated ITC Investigation No. 337-TA-630 (the 630 Investigation), accusing PSC, ProMos, Nanya, Elpida, and fourteen other companies of infringing a number of Tessera's patents, including the 5,663,106 patent (the '106 patent), through the importation and sale of wBGA and uBGA products.  Mills Decl., Ex. Q, 630 Investigation Compl.  PTI was not named as a respondent in the ITC action.  See id.  The 630 Investigation Complaint explicitly excluded any properly-licensed products manufactured by respondents.  Id. at ¶ 9.

On December 28, 2007, Elpida sent PTI a letter about the 630 Investigation.  Mills Decl., Ex. U.  Elpida attached the complaint and asked PTI for Tessera licensing information as well as indemnification from the suit pursuant to their manufacturing agreement.  Id.  On January 2, 2008, PTI responded to Elpida, representing that PTI had a license with Tessera for all products packaged for Elpida.  Mills Decl., Ex. T.  PTI further stated that it would "legally honor [its] indemnity obligations and defend Elpida."  Id.

In May 2008, PTI and Elpida entered into a common interest agreement to facilitate discussions about the 630 Investigation.  See Mills Decl., Ex. K, Lin Depo. at 56:1-4, 60:18-25.  PTI and Elpida discussed "whether Elpida was liable to Tessera based on any products supplied by PTI."  Lin Depo. at 56:1-4, 57:7-58:13, 60:18-61:25.  PTI and Elpida remained in close communication during the 630 Investigation, with PTI sending Elpida evidence of

its royalty payments to Tessera. See Mills Decl., Exs. Z, AA, AB, AC, AD, AE, AF.

In June and November 2008, PTI made two catch-up royalty payments to Tessera. Mills Decl., Exs. AG, AI. PTI stated in an email that it had discovered through an internal audit that it was delinquent on royalty payments dating back to 2005. See id.

In August 2009, the Administrative Law Judge (ALJ) in the 630 Investigation issued an initial determination. The ALJ held that Tessera failed to demonstrate that the accused wBGA and uBGA products infringed the '106 patent. Tessera, Inc. v. Int'l Trade Comm'n, 646 F.3d 1357, 1363 (Fed. Cir. 2011) cert. denied, 132 S. Ct. 2707 (2012) (summarizing the ALJ's conclusions). The ALJ additionally found that "Tessera's patent rights are exhausted as to those accused products purchased from Tessera's licensees," precluding any liability based on those products. Id. On January 4, 2010, the ITC issued its final determination in the 630 Investigation, reversing the ALJ's finding that uBGA products did not infringe, but affirming the ALJ's finding of patent exhaustion, and affirming the ALJ's finding that wBGA products did not infringe. Id.

On May 23, 2011, the Federal Circuit affirmed in part the ITC's final determination in the 630 Investigation and reversed it in part. Id. The Federal Circuit affirmed the ITC's finding that the wBGA products did not infringe the '106 patent. Id. at 1366-67. The Federal Circuit also upheld the finding of patent exhaustion with respect to the infringement accusations against the uBGA products, stating that because "Tessera's licensees were authorized to sell the accused products" at the time of sale

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

without reservation, Tessera could not subsequently assert its patent rights against the licensees' customers.  Id. at 1369-71. In so holding, the court rejected Tessera's argument that its licensees' sales to their customers were initially unauthorized until the time that the licensee remitted the related royalty payment to Tessera which, under the licensing agreements' payment schedules, may not have happened for months after the products were sold.  Id. at 1370.  On August 30, 2011, the Federal Circuit denied Tessera's petition for rehearing en banc.

III. PTI Shifts Elpida Business to MTI and Sends Letter
     Terminating TCC License

    In May 2011, Elpida wrote a letter to PTI suggesting using "MPTI(?) to avoid a royalty."  Mills Decl., Ex. AK at 2.  MTI is PTI's wholly-owned subsidiary.  PTI responded saying it would "build wBGA in MTI."  Id. at 1.  Over the next several months, PTI and Elpida continued to communicate about transferring Elpida business to MTI.  See, e.g., Mills Decl., Exs. AM, AK.  In September 2011, MTI voted not to be bound by the TCC License.  See Guy Decl., Ex. 10.  On September 22, 2011, Elpida began placing orders directly with MTI.  Mills Decl., Ex. V.

    On October 6, 2011, PTI sent a letter notifying Tessera that PTI considered the 630 Investigation a breach of the TCC License Governing Law provision.  Guy Decl., Ex. 80.  PTI also informed Tessera that, pursuant to the terms of the TCC License, it intended to terminate the contract unless Tessera "cured" the breach within sixty days by reimbursing PTI for all royalties paid since December 7, 2007.  Id.  Because Tessera did not do so, PTI

considered the TCC License terminated as of June 30, 2012.
See id.

IV.  PTI 1

On March 5, 2010, several months after the ITC issued its final determination in the 630 Investigation, PTI filed an action for declaratory relief in this Court.  See Powertech Technology, Inc. v. Tessera Inc., C 10-00945-CW (N.D. Cal.) (PTI 1), Docket No. 1.  In that case, PTI sought declarations of non-infringement and invalidity of the '106 patent and maintained that it faced an imminent threat of injury because Tessera had accused PTI's customers of infringement based on PTI-packaged products.  On April 1, 2010, Tessera moved to dismiss the case for lack of subject matter jurisdiction because "PTI is a licensee in good standing and it and its customers therefore enjoy protection against any suit accusing its licensed products of infringement of the '106 patent or any other licensed patent."  PTI 1, Docket No. 14 at 6.  In June 2010, this Court dismissed the action for lack of subject matter jurisdiction, finding that there was no Article III case or controversy between the parties because Tessera had explicitly excluded licensed products from its enforcement actions.  Powertech Technology, Inc. v. Tessera, Inc., 2010 U.S. Dist. Lexis 53621, at *7-8 (N.D. Cal.).  Further, the Court found MedImmune distinguishable because, under the TCC License, PTI's obligation to pay royalties was not based on a finding of infringement.  Id. at *4.  The Federal Circuit reversed, holding that PTI need not be in breach of the TCC License in order to bring a declaratory judgment to define the terms of the contract.

1  Powertech Tech. Inc. v. Tessera, Inc., 660 F.3d 1301, 1308 (Fed.
2  Cir. 2011).

3      On March 31, 2013, the Court granted Tessera's motion for
4  summary judgment and dismissed the case for lack of subject matter
5  jurisdiction.  PTI 1, Docket No. 233 at 45.  The Court based its
6  decision on Tessera's unconditional covenant not to sue PTI for
7  infringement of the '106 patent, which Tessera filed in October
8  2012.  Id.  Because of the close relationship between that case
9  and the instant case, however, the Court delayed entry of judgment
10 until judgment could be entered in both cases simultaneously.  Id.
11 at 47.

12 V.  PTI 2

13     On December 6, 2011, PTI brought the present suit against
14 Tessera.  Docket No. 1.  In the original complaint, PTI asserted
15 claims for: (1) declaratory judgment that PTI may terminate the
16 TCC License; (2) breach of contract; and (3) breach of the implied
17 covenant of good faith and fair dealing.  On October 11, 2012,
18 with leave from the Court, PTI filed the operative Fourth Amended
19 Complaint, adding: (4) fraud and deceit; (5) declaratory judgment
20 for patent misuse; (6) declaratory judgment interpreting the TCC
21 License as requiring patent infringement before royalties are due.
22 See Docket No. 176 ¶¶ 108-14.

23     Tessera asserted counterclaims for (1) breach of contract
24 against PTI, (2) breach of the implied covenant of good faith and
25 fair dealing against PTI, (3) fraud and deceit against PTI,
26 (4) fraudulent transfer against PTI, (5) negligent
27 misrepresentation against PTI, (6) intentional interference with
28 prospective economic advantage against PTI and MTI, (7) negligent

interference with prospective economic advantage against PTI and MTI, (8) declaratory judgment of indemnification against PTI, (9) declaratory judgment regarding termination of the contract against PTI, (10) inducing breach of contract against MTI, (11) constructive trust against MTI.  See Docket No. 253-1.

LEGAL STANDARD

Summary judgment is appropriate only where the moving party demonstrates there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case, as defined by the framework of the underlying substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for either party.  Id.

The moving party bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a disputed issue of material fact. Celotex, 477 U.S. at 323.  In opposing the motion, the non-moving party may not rely merely on allegations or denials of its pleadings, but must set forth "specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248 (citing Fed. R. Civ. P. 56(e)).

The court must construe the evidence in the light most favorable to the non-moving party, making all reasonable inferences that can be drawn.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1289 (9th Cir. 1987).

## DISCUSSION

The parties' cross-motions for summary judgment contain many overlapping arguments targeting both their own claims and their opponent's claims. The Court addresses the parties' motions according to the claims in each party's complaint in turn.

I. PTI's Complaint

A. PTI's Claim for Declaratory Judgment that PTI Has the Right to Terminate the Contract

PTI brings a claim for declaratory judgment stating that PTI had a contractual right to terminate the TCC License as of December 7, 2011, when Tessera brought the 630 Investigation, or alternatively June 30, 2012, after Tessera took action against PTI-packaged products in the 630 Investigation. Both PTI and Tessera seek summary judgment on this claim.

The TCC License has an express termination clause. If a contract has a termination clause, the clause controls and a party to the contract may only terminate in accordance with the terms specified. See Kuffel v. Seaside Oil Co., 11 Cal. App. 3d 354, 368 (1970); Mad River Lumber Sales, Inc. v. Willburn, 205 Cal. App. 2d 321, 324 (1962). The termination clause reads:

Termination for Breach. Either party may terminate this Agreement due to the other party's breach of this Agreement, such as failure to perform its duties, obligations, or responsibilities herein (including, without limitation, failure to pay royalties and provide reports as set forth herein). The parties agree that such breach will cause substantial damages to the party not in breach. Therefore, the parties agree to work together to mitigate the effect of

any such breach; however, the non-breaching party may terminate this Agreement if such breach is not cured or sufficiently mitigated (to the non-breaching party's satisfaction) within sixty (60) days of notice thereof.

TCC License § VIII.B.

PTI's theory is that Tessera breached the TCC License's Governing Law provision by bringing the 630 Investigation, giving PTI the right to terminate. As noted previously, the Governing Law provision requires in relevant part:

. . . Both parties shall use reasonable efforts to resolve by mutual agreement any disputes, controversies, claims or differences which may arise from, under, out of or in connection with this Agreement . . . Notwithstanding any provision herein, after the sixty (60) day cure period set forth in Paragraph VIII.B and notice of termination of this Agreement by one of the parties, either party may bring an action in the U.S. International Trade Commission.

TCC License § XIV.A. According to the plain language of this clause, before either party brings an ITC action regarding a dispute or controversy arising from, under, out of or in connection with the Agreement, it must first terminate the contract.

PTI argues that although Tessera did not explicitly name PTI as a respondent in the 630 Investigation, Tessera sought to exclude PTI-packaged products by targeting PTI's customers. PTI presents two pieces of evidence in support of its contention. First, PTI cites Tessera's briefing in the 630 Investigation, where Tessera requested the ITC grant a General Exclusion Order (GEO) against all infringing and unlicensed articles, regardless of source. See generally Guy Decl., Ex. 11. PTI argues that if it had been granted, the GEO would have affected PTI-packaged

United States District Court
For the Northern District of California

products.  Second, PTI submits that Tessera experts opined on whether PTI-packaged products infringed Tessera's patents.[1]

But even if PTI is correct that Tessera breached by bringing the 630 Investigation, that in and of itself does not give PTI the right to terminate the contract.  Only a non-breaching party may terminate the TCC License.  Although the first sentence of the termination clause is broad -- "Either party may terminate this Agreement due to the other party's breach" -- the language of the clause as a whole makes clear that only a non-breaching party may terminate.  See id.; Zalkind v. Ceradyne, Inc., 194 Cal. App. 4th 1010, 1027 (2011) (contracts must be interpreted in light of the entirety).  The termination clause refers to a "breaching party" and a "non-breaching party" in every sentence after the first: "The parties agree that such breach will cause substantial damages to the party not in breach . . . the non-breaching party may terminate this Agreement if such breach is not cured . . . to the non-breaching party's satisfaction []."  Id.  Without reading the first sentence out of context, the clause requires the party seeking to terminate for the other party's purported breach to be substantially in compliance with its own obligations first.

---

[1] The Federal Circuit, considering the same two points, remarked in a footnote in the related case PTI 1:

"[W]e have no doubt that PTI's customers and products were specifically targeted in [the 630 Investigation.]  For example, witnesses for Elpida testified that the accused products in the ITC . . . were licensed from several licensees, including PTI. Indeed, Tessera's infringement expert in the ITC action focused part of his analysis on an Elpida wBGA chip that was clearly packaged by PTI and identified with a PTI model number."

Powertech Tech., Inc. v. Tessera Inc., 660 F.3d at 1307.

11

United States District Court
For the Northern District of California

It is undisputed that PTI was not a "non-breaching party" when Tessera purportedly breached, when PTI attempted to terminate, or even now. PTI was not in compliance with the TCC License terms at the time that Tessera brought the 630 Investigation. PTI admits that it had been delinquent on royalty payments, making millions of dollars of catch-up payments a few months after the 630 Investigation began. Mills Decl., Exs. AG, AI. Although the catch-up payments put PTI current with its royalty payments, PTI began withholding royalties again. When PTI sent its notice of termination of the TCC License on October 6, 2011, and ultimately terminated in June 2012, PTI also was not in compliance with its royalty obligations. PTI does not deny that it stopped paying royalties for some licensed uBGA and wBGA products in 2010. See Mills Decl., Ex. BG. Because PTI ceased paying royalties altogether in 2012, PTI does not have the right to terminate even now.

PTI argues that it substantially complied with the TCC License because it paid "millions of dollars to Tessera in royalties" between 2008 and 2012. See Docket No. 352-2, at 15. "What constitutes substantial performance is a question of fact, but it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for." Posner v. Grunwald-Marx, Inc., 56 Cal. 2d 169, 187 (1961). The fact that PTI paid millions of dollars in royalties does not take away from the fact that it owed Tessera many millions more. PTI's president, Ping Chung Liao, admitted he intentionally withheld a substantial

percentage of royalty payments.  <u>See</u> Mills Decl., Ex. E, Liao Depo. 170:15-21, 171:1-23.  As a "willful departure from the terms of the contract," this withholding of royalty payments cannot constitute substantial performance.  <u>Posner</u>, 56 Cal. 2d at 187.

Because it is undisputed that PTI was not a "non-breaching party" under the terms of the TCC License, PTI cannot prove that it had a right to terminate the TCC License.  Accordingly, the Court DENIES PTI's motion for summary judgment and GRANTS Tessera's motion for summary judgment on this claim.

B.   Breach of Contract

PTI also brings a breach of contract claim against Tessera, alleging that Tessera breached the TCC License by bringing the 630 Investigation.  Both PTI and Tessera move for summary judgment on this claim.  The "essential elements" of a breach of contract claim are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  <u>Reichert v. General Ins. Co.</u>, 68 Cal. 2d 822, 830 (1968).  Having found that PTI cannot prove that it performed its obligations under the TCC License, which is also an essential element of PTI's breach of contract claim, the Court could end its inquiry there and enter summary judgment in favor of Tessera.  Nevertheless, it is important to note that PTI's breach of contract claim fails for the additional, independent reason that PTI has not provided any evidence that it suffered damages as a result of Tessera's alleged breach.  <u>CDF Firefighters v. Maldonado</u>, 158 Cal. App. 4th 1226, 1239 (2008).

PTI does not point to any expenses that it was forced to pay due to Tessera bringing the 630 Investigation, such as lost sales

United States District Court
For the Northern District of California

or the costs of indemnifying Elpida.  Instead, PTI presents a somewhat indirect theory that, had PTI known about Tessera's breach, PTI would have terminated the contract and ceased paying royalties immediately.  PTI's claimed damages are the unnecessary royalty payments made after Tessera's breach.  When asked at oral argument, PTI's counsel could identify no other theory of damages.

The undisputed evidence negates PTI's assertion that it would have terminated the TCC License immediately had it known about Tessera's breach.  PTI knew that its products were targeted in the 630 Investigation much earlier than October 6, 2011, but did not try to terminate the TCC License until then.  In December 2007, Elpida sent PTI a letter informing PTI that PTI-packaged products were at issue in the 630 Investigation and attaching the complaint.  PTI knew that its indemnity obligation applied only to products that PTI packaged.  Mills Decl., Ex. F, Liao Depo. at 224:15-225:2, 228:16-229:8.  On April 22, 2010, about eighteen months before PTI purported to terminate, PTI's chairman and CEO, D.K. Tsai, submitted a declaration in PTI 1 stating that he knew that PTI-packaged products were implicated by the 630 Investigation:

> [T]he assertion of the claims of the '106 patent in the 630 Investigation and the Texas action implicates PTI because PTI performs the chip encapsulation step in the manufacturing process for some of the companies named as alleged infringers of the '106 patent.
>
> . . .
>
> Hundreds of millions of units of PTI products per year are potentially at stake in the 630 Investigation and the Texas Action.
>
> . . .

> Sales of accused products to Elpida, PSC, ProMos and Kingston represent over 80% of PTI's annual volume.  Upon information and belief, a majority of these products are ultimately destined for the United States market . . . and thus could be subject to exclusion in the 630 Investigation.

Mills Decl., Ex. BV ¶¶ 3, 6.  Despite demonstrating knowledge of Tessera's purported breach, PTI did nothing until much later.  PTI therefore cannot show that Tessera's purported breach caused it to suffer additional royalty payments.  PTI's motion on its breach of contract claim is DENIED and Tessera's motion on the same claim is GRANTED.

    C.   Fraud

    PTI has two main bases of its fraud allegations.  The first is that Tessera falsely reassured PTI that it was not targeting PTI-packaged products in the 630 Investigation.  Tessera attacks this claim as time-barred.  Under California law, fraud has a three year statute of limitations.  Cal. Civ. Code § 338(d).  The statute of limitations begins to run from the date a party had actual or constructive notice of the facts constituting the alleged fraud.  Robuck v. Dean Witter & Co., 649 F.2d 641, 644 (9th Cir. 1980).  Constructive notice occurs when a reasonably prudent person would be suspicious of fraud.  Id.  Because PTI first filed its fraud claim on June 1, 2012, the cutoff date for notice of any fraud claim would be June 1, 2009.  In other words, if PTI received actual or constructive notice of the basis of any of its fraud claims before June 1, 2009, then PTI's claim is time-barred.

    Tessera argues that PTI knew or had constructive notice of the facts underlying its fraud claim by at least July 2008.  In December 2007, Elpida sent PTI a letter informing PTI that PTI-

United States District Court
For the Northern District of California

packaged products were at issue in the 630 Investigation and attaching the complaint. PTI acknowledged the letter by promising to honor its indemnity obligations to Elpida. This letter and PTI's response indicated that PTI was on notice that PTI-packaged products might be implicated, giving PTI every reason to track the 630 Investigation. The fact that Elpida and PTI kept in communication about the 630 Investigation demonstrates that PTI did so.

PTI counters that Tessera obscured its position by reassuring PTI that the 630 Investigation only targeted "unlicensed subcontractors." Guy Decl., Ex. 4. But PTI cannot in good faith argue that PTI relied upon Tessera's statement when PTI admitted that it had been secretly and willfully withholding royalties since 2005, and later made catch-up payments to Tessera to make up the difference. PTI also argues it did not know Tessera was targeting PTI because Tessera kept many 630 Investigation files under seal. By July 2008, however, parties to the 630 Investigation had filed several public documents discussing Tessera's previous position that if no royalty had been paid, a product was not licensed and might be infringing. Mills Decl., Ex. BX and attachments (several public 630 Investigation filings, including an Elpida filing stating that "Tessera, however, also contends that no products are licensed until the royalties are paid").

In sum, the undisputed facts show that PTI received at least constructive notice by at least July 2008. Despite Tessera's reassurances that PTI was not targeted in the 630 Investigation, a reasonable person in PTI's position would have been put on notice

United States District Court
For the Northern District of California

by Elpida's letter and the public filings and would have been suspicious that Tessera's reassurances were false.  This constitutes evidence of constructive notice of the bulk of PTI's fraud claims.  <u>See</u> Docket No. 176 ¶ 109 (fraud allegations a., b., c., and e. centered around Tessera representations that PTI-packaged products were not at issue in the 630 Investigation).  PTI's allegations that it received no actual notice, i.e., it did not actually discover Tessera's 630 Investigation arguments until discovery in the present case, are irrelevant.

PTI's second basis for its fraud claim is that Tessera misrepresented that PTI received a "somewhat lower" royalty rate than other DRAM manufactures.  Tessera argues that this fraud claim is untenable because it is a "generalized, vague and unspecific assertion[], constituting mere 'puffery' upon which a reasonable consumer could not rely."  <u>Glen Holly Entm't, Inc. v. Tektronix Inc.</u>, 343 F.3d 1000, 1015 (9th Cir. 2003).  PTI does not respond directly to this point at all, focusing on bolstering the specificity of the facts of its fraud claim, when Tessera has actually attacked the specificity of Tessera's statement itself.

The Court need not decide whether the "somewhat lower" statement is unactionable as a matter of law, however, because PTI failed to produce any evidence that it suffered legally cognizable damages in relying on the "somewhat lower" royalty rate statement.  Fraud is only actionable when the plaintiff demonstrates that the defendant's misrepresentation put the plaintiff in a different or worse position.  <u>Conrad v. Bank of America</u>, 45 Cal. App. 4th 133, 160 (1996).  PTI's counsel confirmed at oral argument that the statement was made after the contract was already in effect.  D.K.

United States District Court
For the Northern District of California

Tsai, Chairman and CEO of PTI, stated that PTI believed the statement and "continued paying royalties" to Tessera. Supplemental Guy Decl., Ex. 107, Tsai Decl. ¶ 9.  This does not constitute a legally cognizable theory of damages because Tessera's alleged statement, even if misleading, did not change PTI's duty to pay royalties under the TCC License.  Cf. Reyes v. Wells Fargo Bank, N.A., 2011 WL 30759, at *1-2 (N.D. Cal.).  PTI does not -- and cannot -- argue that the statement, which if made was made after the contract was signed, altered its apparent assent to be bound by the TCC License.  Wildman v. Pac. Coast Indep. Brokerage, Inc., 16 F. App'x 741, 743 (9th Cir. 2001) ("plaintiffs must show their apparent assent to the contracts . . . is negated by fraud").  Upon discovering the royalty rate disparity, PTI would have no justification for terminating the TCC License.  See, generally, TCC License (no terms or conditions relying on the lack of a royalty rate disparity).  PTI thus cannot claim that Tessera's allegedly fraudulent statement caused it to overpay royalty payments that it otherwise would have avoided.

Because the first basis of PTI's fraud claim is time-barred, and its second basis fails substantively, the Court GRANTS Tessera's motion for summary judgment on PTI's fraud claim.

> D.   Patent Misuse and Declaratory Judgment that Royalty Obligations are Limited to TCC Licensed Products that Infringe an Unexpired, Licensed Patent

PTI's fifth and sixth claims essentially seek a declaration that Tessera's use of the TCC License to require PTI to pay royalties on TCC Licensed Products until the expiration of the last licensed patent is patent misuse and that PTI is only obliged

to continue paying for Licensed Products that infringe a currently effective patent.  On March 31, 2013, the Court granted summary judgment in favor of Tessera on those same issues in PTI 1.  See PTI 1, Docket No. 233.

In its decision, this Court reasoned, "Courts have approved of contract provisions such as these when an agreement was entered into voluntarily, and PTI has offered no evidence that it was coerced into entering the license agreements or that Tessera had refused to enter into an agreement with it unless it agreed to pay royalties on products that did not practice the patented technology."  See id. (citing Beckman Instruments Inc. v. Technical Dev. Corp., 433 F.2d 55, 61 (7th Cir. 1970)).  "If convenience of the parties rather than patent power dictates the total-sales royalty provision, there is no misuse of the patents."  Zenith Radio Corp v. Hazeltine Research, 395 U.S. 100, 138 (1969).  Because this case involves the same parties' use of the same TCC License, the same reasoning applies here.  The Court finds no reason to depart from its ruling in PTI 1.  PTI has presented no new legal authority or evidence indicating that it entered into the TCC License because of some coercive behavior on Tessera's part.  See Docket No. 413-3 at 19; Mills Decl., Ex. EL.  Accordingly, Tessera's summary judgment motion on these causes of action is GRANTED.

II. Tessera's Claims

    A.    Breach of Contract

    With respect to its first counterclaim, Tessera argues that PTI breached the TCC License by (1) failing to pay royalties on products covered by the contract, and (2) purporting to terminate

**United States District Court**
For the Northern District of California

19

the contract. Both parties move for summary judgment on Tessera's breach of contract claims.

As discussed previously, a breach of contract claim requires the plaintiff to prove "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." Reichert, 68 Cal. 2d at 830.

Regarding the first ground for Tessera's breach of contract claim, beginning in 2010 PTI stopped paying royalties for certain wBGA and uBGA products. See Mills Decl., Ex. BG. Tessera's position is that PTI must pay for any products described as "Licensed Products" under the TCC License Definitions for the duration of the contract. TCC License § I.A. Tessera further contends that products are authorized by the contract before royalties are paid by the grant clause, which states: "Tessera hereby grants Licensee a world-wide, non-exclusive, non-transferable, non-sublicensable, limited license to the Tessera Patents to assemble ICs into TCC Licensed Products and use or sell such License Products." TCC License § II.A.

PTI disagrees, arguing that the EFL provision mandates that, as the licensee, it can choose which products to license by making royalty payments for them. The EFL provision states: "Licensee is licensed only for TCC Licensed Products for which it pays royalties hereunder." Id. § II.D. PTI contends the EFL provision means that the licensee can unilaterally decide which products to license by paying a royalty payment. As the licensee, PTI can decide unilaterally to stop licensing a product simply by not making any more royalty payments. See Docket No. 352-2 at 17.

**United States District Court**
For the Northern District of California

The Federal Circuit expressly rejected this interpretation of the EFL provision in its decision on the 630 Investigation. Considering the same license agreement between the same parties, the Federal Circuit rejected an argument that sales are only authorized once royalty payments have been made.  <u>Tessera</u>, 646 F.3d at 1370.  The TCC License's grant clause authorizes licensed products to be sold even before royalty payments are made on a periodic basis.  <u>Id.</u>  That some licensees fall behind in their payments "does not convert a once authorized sale into a non-authorized sale."  <u>Id.</u>  Holding otherwise would lead to an absurd result -- one would never be able to determine whether a particular product was authorized or not, clouding each product sale with uncertainty.  <u>See id.</u>  The Court will not interpret contract clauses in a way that would result in an "absurdity." <u>Wright v. Coberly-W. Co.</u>, 250 Cal. App. 2d 31, 36 (1967); Cal. Civ. Code § 1638.

Aside from urging the Court to adopt its view of the plain meaning of the EFL provision, PTI also argues that the Court should hold Tessera to the arguments it made before the ITC in the 630 Investigation.  Tessera's argument was that products are not licensed until they are paid for.  Tessera can no longer take this position because it is inconsistent with the Federal Circuit decision.  The doctrine of judicial estoppel is inapplicable against Tessera here.  PTI cites <u>Bailey v. Outdoor Media Grp.</u>, 155 Cal. App. 4th 778, 790 (2007), which is inapposite because it

**United States District Court**
For the Northern District of California

refers to equitable estoppel, not judicial estoppel.[2]   Judicial

estoppel prevents a party, who assumed a certain position in a

legal proceeding and prevailed, from later assuming a

contradictory position in a later proceeding just because its

interests have changed.   New Hampshire v. Maine, 532 U.S. 742, 749

(2001).[3]  Although the doctrine is not strictly formulaic, several

factors can inform a court's decision to invoke judicial estoppel:

(1) whether the party's later position is "clearly inconsistent"

with its earlier position, (2) whether the party succeeded in

persuading the court to accept the party's earlier position such

that there would be a danger of inconsistent results, and (3)

whether the party seeking to assert the inconsistent position

would derive an unfair advantage or impose an unfair detriment on

the opposing party if not estopped.   Id. at 750-51.   Because

Tessera did not succeed in persuading the ITC or the Federal

---

[2] Equitable estoppel focuses on the relationship between the
parties and requires the elements of privity, reliance, and
prejudice.  Swahn Grp., Inc. v. Segal, 183 Cal. App. 4th 831, 841
(2010).  Judicial estoppel is focused on the relationship between
the litigant and the judicial system and does not require the
above elements.  Id.

PTI has not explained why equitable estoppel is appropriate
here and how the elements are satisfied.  The elements are "(1) a
representation or concealment of material facts (2) made with
knowledge, actual or virtual, of the facts, (3) to a party
ignorant, actually and permissibly, of the truth, (4) with the
intent, actual or virtual, that the latter act upon it, and
(5) the party must have been induced to act upon it."  Bailey, 155
Cal. App. 4th at 790.

[3] Federal law governs judicial estoppel in federal court,
even in diversity actions, because the forum court has the
greatest interest in protecting itself from manipulation.
Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 603
(9th Cir. 1996).

Circuit of its argument that products are not licensed until they are paid for under the EFL provision, and because Tessera will gain no unfair advantage in taking its current position, the Court will not invoke the judicial estoppel doctrine against Tessera.

The second ground for Tessera's breach of contract claim concerns PTI's attempt to terminate the TCC License because Tessera brought the 630 Investigation. As already discussed in regards to PTI's composite breach of contract claim, PTI had no right to terminate the contract because PTI itself was in breach. Accordingly, PTI's attempt to terminate the contract and cease paying royalties in June 2012 was a breach of the TCC License.

The Court therefore DENIES PTI's motion and GRANTS Tessera's motion for summary judgment on Tessera's breach of contract claim, and holds that PTI breached both by failing to pay royalties and attempting to terminate the contract without good cause. As Tessera acknowledged during oral argument, the exact amount of damages in unpaid royalties must still be proved.

B.   Counterclaims against MTI -- Alter Ego Theory

PTI argues that the Court should grant summary judgment as to Tessera's claims against MTI because Tessera cannot prove that MTI is an alter ego of PTI. PTI misses the mark. Tessera's theories of liability against MTI do not rely upon a claim that MTI was PTI's alter ego. Rather, Tessera merely claims that PTI and MTI acted together in violation of the law to transfer to MTI PTI's long-term business relationship with Elpida. Tessera does not seek to hold MTI liable solely for PTI's actions, or vice versa, so an alter ego theory is inapplicable.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

C.   Implied Covenant of Good Faith and Fair Dealing

Tessera claims PTI violated the implied covenant by transferring the Elpida packaging business to its wholly-owned subsidiary, MTI, to avoid paying royalties to Tessera.  PTI now challenges the viability of this claim.

PTI challenges that Tessera's implied covenant theory attempts to vary the terms of the TCC License.  PTI is correct that the implied covenant of good faith and fair dealing applies only to the parties to a contract and additionally cannot be used to vary the express terms of the agreement.  See Carma Developers, Inc. v. Marathon Dev. California, Inc., 2 Cal. 4th 342, 374 (1992).  MTI did not agree to be bound under the TCC License, and so by definition is not a "License Affiliate" under the contract.  See TCC License § I.H (stating that a "License Affiliate" is one who has more than fifty percent of its stock controlled by Licensee and agrees to be bound by the terms of the contract).  PTI contends that because the TCC License impliedly allows for subsidiaries that are not "License Affiliates," Tessera is attempting to alter the contract by holding PTI liable for funneling business through MTI.

But Tessera's theory that PTI breached the implied covenant does not seek to contradict any express terms.  Instead, Tessera's theory seeks the benefit of its express right under the contract to receive royalty payments.  This falls squarely under the law of the implied covenant, which requires that a party refrain from doing anything that would deprive the other party of the benefits of the contract.  April Enter., Inc. v. KTTV, 147 Cal. App. 3d 805, 816 (1983).  In cases where one party has a discretionary

**United States District Court**
For the Northern District of California

right under a contract, the implied covenant applies with particular force and requires that the party exercise its discretionary right in good faith.  <u>Carma Developers, Inc.</u>, 2 Cal. 4th at 372.  While the act of redirecting business to a subsidiary does not necessarily violate an express term of the TCC License, it could be a violation of the implied covenant if it was done with the intent to deprive the other party of the benefits of the contract.  PTI's motion on this issue is DENIED.

D.  Fraudulent Transfer

Another of Tessera's claims is that PTI fraudulently transferred the Elpida business to MTI.  Under California's Fraudulent Transfer Act, "a transfer is fraudulent, both as to present and future creditors, if it is made '[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.'"  <u>Mejia v. Reed</u>, 31 Cal. 4th 657, 664 (2003) (quoting Cal. Civ. Code § 3439.04(a)).

PTI argues that its business relationship with Elpida cannot be property because the relationship was not guaranteed by contract, meaning Elpida could terminate at any time and go elsewhere.  For purposes of fraudulent transfer, an "asset" is "property of a debtor," and property means "anything that may be the subject of ownership."  Cal. Civ. Code § 3439.01(a) and (h).

The Ninth Circuit has specifically stated that bankruptcy case law may be persuasive in considering California statutes that are substantially similar, including California's fraudulent transfer statute.  <u>See In re AFI Holding, Inc.</u>, 525 F.3d 700, 703 (9th Cir. 2008).  Tessera cites a number of bankruptcy cases ruling that intangibles not guaranteed by contract can be

United States District Court
For the Northern District of California

fraudulently transferred assets, such as a "book of business,"
corporate goodwill, or ongoing business concerns.  See In re
Bellingham Insurance Agency, Inc., 702 F.3d 553, 571 (9th Cir.
2012) (holding that the "transfer of an ongoing business concern"
in the form of the insurance firm's biggest client constituted a
fraudulent transfer).  See also In re Watman, 301 F.3d 3, 12 (1st
Cir. 2002) ("There is substantial support in bankruptcy case law
for the proposition that such intangible assets as goodwill and
overall going concern are valuable"); Hunt v. Phinney, 177 Cal.
App. 2d 212, 216 (1960) ("It has been repeatedly held that the
goodwill of a business is property and as such will be protected
by the courts.").  PTI's recurring business relationship is
similar to a book of business or a large client; even though
Elpida could go elsewhere at any time, having that relationship is
undoubtedly an asset to PTI's business.  See In re Bellingham
Insurance Agency, Inc., 702 F.3d at 571.  Although in many of the
cases cited by Tessera, a substantial portion of the debtor's
customer base or industry was transferred, there is evidence that
the Elpida relationship represented a large percentage of PTI's
business.  Accordingly, the Court DENIES PTI's motion on Tessera's
fraudulent transfer claim.

     E.   Intentional and Negligent Interference with Prospective
           Economic Advantage

     PTI argues that Tessera's interference claims must fail
because the relationship with Elpida was not an "economic
advantage" and Tessera cannot prove that PTI engaged in a wrongful
act other than the act of interference itself.

United States District Court
For the Northern District of California

PTI argues without citation to legal authority that contract negotiations cannot constitute an economic relationship for purposes of Tessera's claims for intentional and negligent interference with prospective economic advantage.  As Tessera points out, however, Elpida and Tessera were in licensing negotiations while PTI was collaborating with Elpida.  Mills Decl., Ex. CD, Tsai Depo. at 128:7-20; Ex. DH, Kota Takemura Depo. at 22:25-23:16, 33:12-34:8, 93:7-15.  Courts have recognized that the "possibility of an economic relationship," with the "probability of economic benefit," or "business discussions" with a prospective customer, can form grounds for an interference claim.  <u>Centigram Argentina, S.A. v. Centigram Inc.</u>, 60 F. Supp. 2d 1003, 1005, 1013 (N.D. Cal. 1999); <u>Silicon Labs Integration, Inc. v. Melman</u>, 2010 WL 890140, at *2 (N.D. Cal.); <u>Impreva Labs, Inc. v. Sys. Planning Corp.</u>, 2012 WL 3647716, at *6 (N.D. Cal.).

It is also well-established that as part of an interference claim, the plaintiff must prove the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself."  <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1153 (2003).  To satisfy this element, Tessera points to its analysis in the fraudulent transfer section.  <u>See</u> Docket No. 407 at 36.  Making all inferences in favor of Tessera, the Court takes this to mean that the alleged independent, wrongful act is that PTI fraudulently transferred business to MTI in order to dodge TCC License obligations, giving it an unfair advantage in competing with Tessera for a relationship with Elpida.  This raises a disputed issue and the Court therefore

DENIES PTI's motion for summary judgment on the interference
claims.

     F.   Indemnification Claim

    PTI seeks summary judgment on Tessera's claim that, under the
TCC License Indemnification Clause, PTI must reimburse Tessera for
litigation fees and costs expended in bringing the 630
Investigation.  The Indemnification Clause provides:

> Licensee agrees to defend, indemnify, and hold Tessera
> harmless from and against any and all damages, liabilities,
> costs and expenses (including reasonable attorneys [sic] fees
> and expenses) arising out of or related to Licensee's use of
> Tessera Patents.  Notwithstanding, Licensee shall not bear
> the obligation or expense of defending the validity of any
> Tessera Patent.  Tessera shall have sole control over and
> bear the expense for so defending the validity of the Tessera
> Patents.

TCC License § XIII.A.

    First, Tessera cannot have it both ways.  Tessera argues in
regards to the parties' breach of contract claims that the 630
Investigation did not implicate PTI-packaged products.  Now, in
its indemnification claim, Tessera switches positions and asserts
the 630 Investigation "arises out of or relates to" PTI's use of
the Tessera patents.  This is patently inconsistent.

    Second, the Indemnification Clause protects Tessera from
third-party claims generated by PTI's use of Tessera's patents.
This is evidenced by the clause's use of the phrase, "Licensee
agrees to defend, indemnify, and hold Tessera harmless," all of
which emphasizes defensive action.  It does not address a separate
suit initiated by Tessera itself to protect its own patent rights
and obtain royalty payments.  This is in line with the typical
construction of indemnification claims, which refer to defending

United States District Court
For the Northern District of California

28

third-party actions.  See Myers Bldg. Indus., Ltd. v. Interface Tech., Inc., 13 Cal. App. 4th 949, 962 (1993).  Tessera's interpretation departs both from the plain language of the contract and the courts' interpretation of similar indemnification clauses.  As such, the Court GRANTS PTI's motion on Tessera's indemnification claim.

> G.   Declaratory Judgment that "Testing-Only" Products are Subject to Royalty

Some products are packaged by MTI or others and then tested by PTI.  PTI and Tessera disagree over whether these products are covered by the TCC License.  Regarding Tessera's declaratory judgment claim on this issue, PTI asserts it is entitled to judgment as a matter of law because only products which PTI "assembles" are licensed.

PTI argues that, according to its language, the TCC License covers only the right "to assemble ICs into TCC Licensed Products and use or sell such TCC Licensed Products."  TCC License § II.A.  However, Tessera has raised in response at least a triable issue of fact on the scope of the license grant.  Tessera first notes that testing may fall within PTI's broad usage of the TCC Licensed Products, "whether sold, transferred or used internally."  Id. § III.B.  Further, a factual dispute exists regarding whether "assembly" can be understood in the field to include "testing." Tessera presents evidence indicating that it does.  See Mills Decl., Ex. DM, Bravman Depo. at 157:21-158:3, Ex. DN, Gwinnell Depo. at 245:20-25.  There are triable issues regarding the TCC License's scope and so PTI's motion on this point must be DENIED.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

CONCLUSION

Regarding PTI's claim for declaratory judgment that it has the right to terminate the contract, the Court GRANTS summary judgment in favor of Tessera.  Regarding Tessera's identical declaratory judgment action that PTI has no right to terminate the contract, the Court also GRANTS summary judgment in favor of Tessera.

The Court GRANTS summary judgment in favor of Tessera on PTI's breach of contract claim.

The Court GRANTS Tessera's motion for summary judgment on PTI's fraud claim.

The Court GRANTS Tessera's motion for summary judgment on PTI's claims for patent misuse and for declaratory judgment that the TCC License requires infringement for royalty obligations to accrue.

On Tessera's breach of contract claim, the Court GRANTS summary judgment in favor of Tessera.  The issue of the exact amount of damages remains.

The Court DENIES PTI's motion for summary judgment on Tessera's claim for breach of the implied covenant of good faith and fair dealing.

The Court DENIES PTI's motion for summary judgment on Tessera's claim for fraudulent transfer.

The Court DENIES PTI's motion for summary judgment on Tessera's interference claims.

The Court GRANTS PTI's motion for summary judgment on Tessera's claim for declaratory judgment of indemnification.

United States District Court
For the Northern District of California

1    The Court DENIES PTI's motion that testing-only products be

2  excluded from the breach of contract damages.

3    The Court DENIES PTI's motion to preclude Tessera's claims

4  based on lack of an alter ego theory.

5    No summary judgment motion was made on Tessera's claim for

6  breach of the implied covenant of good faith and fair dealing and

7  PTI's claims for fraud and negligent misrepresentation.

8    In sum, of PTI's complaint, only its claim for breach of the

9  implied covenant of good faith and fair dealing remains.  Of

10  Tessera's complaint, its claims for breach of the implied covenant

11  of good faith and fair dealing, fraud, fraudulent transfer,

12  negligent misrepresentation, intentional and negligent

13  interference with prospective economic advantage, inducing breach

14  of contract, and constructive trust survive.  The issue of

15  Tessera's contract damages remains to be adjudicated.

16    The parties shall attend a settlement conference with Judge

17  Grewal within sixty days of the issuance of this order.  The

18  parties are directed to contact Judge Grewal's courtroom deputy to

19  schedule a date for the settlement conference.

20

21    IT IS SO ORDERED.

22

23  Dated: 1/15/2014

24                     CLAUDIA WILKEN
                      United States District Judge

25

26  cc: MagRef; PSG

27

28

31