U.S. Patent Office has granted Apple's application, Judge Wilken denied the motion to stay (at Docket # 63), finding that the patent re-examination process may take an average of 36 months and then more if a party appeals, and that the delay would be prejudicial to Affinity.

The parties were referred to private mediation, and a stipulated protective order was entered. Judge Wilken also denied Affinity's motion to admit evidence of depositions taken in its lawsuit against BMW, finding that Affinity failed to present evidence that the deponents would be unavailable for deposition in this case. (Docket # 92). Judge Wilken denied Apple's motion to file a first amended answer, affirmative defenses and counterclaims, on grounds that Apple had failed to satisfy the requirements  [*7] of FRCP 16. (Docket # 122).

Discovery was referred to this Court (Docket # 124, 129). The parties had a number of discovery disputes regarding depositions which this Court handled on an expedited bass, and Affinity sought discovery from non-parties AT&T Mobility and Facebook, who filed motions for protective order, which were resolved partly by the parties and partly by this Court. This motion to compel the deposition of Apple CEO Steven P. Jobs was initially filed on letter briefs but the Court ordered the parties to submit formal briefing.

### III. Discovery in Dispute

#### A. Affinity Notices the Deposition of Apple CEO Steve Jobs

#### 1. Anticipated Testimony

Plaintiff Affinity Labs of Texas, LLC ("Affinity") seeks an Order compelling a deposition of Steven P. Jobs, CEO of Defendant Apple Inc. Affinity seeks Mr. Jobs' deposition because he has unique, first-hand knowledge of facts that are relevant to the central issues in this case. Affinity recognizes that Mr. Jobs is the CEO and that Apple would like to shield him under the "apex doctrine." However, that [HN1]doctrine does not apply to individuals with firsthand knowledge of relevant information. Another court in this district addressed this very issue  [*8] on March 21, 2011, and is requiring Mr. Jobs to sit for a deposition because of his firsthand knowledge of issues in that case. *Apple iPod iTunes Antitrust Litigation*, C.A. No. C05-00037 JW (HRL), 2011 U.S. Dist. LEXIS 33174, D.I. 543 (N.D. Cal. Mar. 21, 2011).

In the present patent infringement case, Affinity accuses Apple's iPhone, iPod, iPad, iTunes Store, iTunes software, and App Store of infringing three Affinity patents that broadly cover these products and date back to March 2000. Generally, the infringement claims are based on Apple's portable electronic devices (the iPod) and cell phones (the iPhone) that wirelessly download items such as such as music and feature-rich applications. Accordingly, one of the central issues in this case is the value to Apple of its iTunes Store and App Store - i.e., the value of a patent that fundamentally covers the ability of consumers to wirelessly download music and applications to a portable cell phone or MP3 player. Another feature is the software in these devices that allow third-party accessories to control them (e.g., a car stereo that can connect to and control an iPod). Likewise, Apple has asserted that Affinity's patents covering these features are obvious, that  [*9] these features were not innovative as far back as March 2000.

Affinity argues that Mr. Jobs' public statements about the importance of the technology at issue go to the heart of the damages and patent validity issues. Mr. Jobs used such phrases as "innovative," "revolutionary," and "ground breaking" to publicly describe iTunes and the App Store and other accused technology in numerous statements, and did so years after Affinity filed its patents. Affinity characterizes these statements as confirming that the patents certainly would not have been obvious at the early date when they were filed. In addition, Mr. Jobs has made statements about the importance of patents that cover smartphones such as the iPhone, and Apple's views of patents when enforcing its own intellectual property. He has also provided public commentary about a widely reported $100 million patent license that Apple entered into for a single patent on related technology. That patent post-dates the Affinity patents and Affinity claims it is objectively less valuable than Affinity's patents. Apple has told Affinity that it has no documents or analysis of the specific value of any of these claimed features. Affinity argues  [*10] that Mr. Jobs has firsthand knowledge of these critical issues, as he is the only witness who actually made the specific statements to the public, and that therefore he should be subject to deposition by Affinity.

#### 2. Steve Jobs' role at Apple

Apple is a leading provider of personal computers, mobile communication and media devices, and portable digital music players, and it sells a variety of related software, services, peripherals, networking solutions, and third-party digital applications and content. Glasser Declaration, Ex. 1 at 1. Apple's innovative products are sold in more than 100 countries, and Apple employs more than 45,000 people worldwide. *Id.* at 10.

Apple's success has also attracted unwanted attention. Apple is a frequent target for litigation, including patent litigation by non-practicing entities. PatentFreedom.com-a website devoted to research related to patent enforcement actions-recently identified Apple as the

most "relentlessly pursued" operating company by non-practicing entities between 2008 and 2010. Glasser Declaration Ex. 4. Between 2006 and 2010, Apple was named as a defendant in 70 separate lawsuits filed by non-practicing entities. *Id.*

Mr. Jobs co-founded Apple [*11] in 1976 and is now its CEO and a director. After leaving Apple in 1986, Mr. Jobs returned in 1997 to lead Apple's historic recovery. As CEO, Mr. Jobs is responsible for the management and oversight of Apple's complex global operations. Mr. Jobs also co-founded Pixar Animation Studios, which created several of the most successful feature-length animated films of all time, including Toy Story, Monsters, Inc., and The Incredibles. Ex. 2. He served as Pixar's CEO from 1986 until 2006, when Pixar merged with The Walt Disney Company. Mr. Jobs is now a member of Disney's board of directors and serves on a six-person steering committee that oversees Pixar. Ex. 3. His time is a critical asset for Apple and Disney, and he carefully manages his schedule to ensure that he can devote the necessary energy, attention and focus to his duties and responsibilities for the benefit of shareholders, customers and employees.

Given his leading roles at Apple and Pixar/Disney, Mr. Jobs has become one of the most recognizable CEOs in the world, and he is regularly quoted regarding Apple and its many product offerings. For instance, he has historically provided the keynote presentation at the annual Worldwide [*12] Developers Conference, which is one method for Apple to showcase its new software and technologies for developers.

## B. The Parties Meet and Confer

Affinity and Apple met and conferred multiple times, but were unable to resolve this issue. Fact discovery in this case closed on March 21, 2011. (Docket # 128). Affinity filed under seal a full motion to compel this deposition on March 24, 2011 (Docket # 147, 148). If the Court orders Mr. Jobs' deposition, Apple will not oppose scheduling it after the close of fact discovery. (Gaudet Decl. ¶24, February 3, 2011 email from Glasser to Gaudet).

## C. Discovery at Issue

### 1. Mr. Jobs' Statements

Affinity seeks to depose Mr. Jobs on these public statements:

### (a) Statements about the accused App Store

"The App Store is a grand slam, with a staggering 10 million applications downloaded in just three days. Developers have created some extraordinary applications,

and the App Store can wirelessly deliver them to every iPhone and iPod touch user instantly." (Gaudet Decl. 8).

Describing the App Store as follows: "This is the biggest launch of my career." (Gaudet Decl. 9).

"The App Store revolutionized mobile apps." (Gaudet Decl. 10).

"I would now like to talk about [*13] the App store for a few minutes. One area we completely changed the value proposition from mobile devices is the app store. Customers will download the 200 millionth application from the App store tomorrow. Only 102 days since its launch on July 11th. The 200 millionth App. We've never seen anything like this in our careers. There are now over 5,500 applications offered on the App store in 62 countries around the world, and the rate of new applications being submitted is increasing every week. Competitors are scrambling to keep our App store, but it's not as easy as it looks, and we are far along in creating the virtuous cycle of cool applications begetting more iPhone sales, thereby creating an even larger market, which will attract even more iPhone software development. It is clear that customers are not attracted to iPhone if[sic]only for its amazing functionality and revolutionary multi-touch user interface, but also for its unique ability to let users easily purchase, download, and use thousands of different applications, raining[sic] from free games to financial planning and health management. All of this in only 102 days." (Gaudet Decl. 11).

"These devices need to work, and you [*14] can't do that if you load any software on them. That doesn't mean there's not going to be software to buy that you can load on them coming from us. It doesn't mean we have to write it all, but it means it has to be more of a controlled environment." (Gaudet Decl. 12).

### (b) Statements about the accused Wireless Music Store

The Apple press release regarding the Wireless iTunes Store, stating: "With the iTunes Wi-Fi Music Store, music fans can start enjoying their music purchases immediately on their iPod touch or iPhone with no computer required. . . If users have only partially downloaded a song or album onto their iPod touch or iPhone their computer will complete the download automatically." . . .In the next paragraph, Mr. Jobs states:

"The iTunes Wi-Fi Music Store is really fun - you can browse, search, freely preview, buy and instantly download music right onto your iPod touch or iPhone. Innovative products like this keep iTunes at the forefront of the digital music revolution." (Gaudet Decl. 13).

**(c) Statements about the accused iTunes software application**

"Wouldn't it be awesome if people could buy high-quality audio tracks via the internet and load them directly into iTunes instead [*15] of going to the store to buy CDs to rip?" (Gaudet Decl. 14).

"For years, the primary technology was the [marking mechanism] inside a CD or a DVD player. But we became convinced that software was going to be the primary technology, and we're a pretty good software company. So we developed iTunes." (Gaudet Decl. 15).

**(d) Statements about the accused iPod**

"Apple has invented a whole new category of digital music player that lets you put your entire music collection in your pocket and listen to it wherever you go. Isn't this cool?" (Gaudet Decl. 14).

"With iPod, listening to music will never be the same again." (Id.).

**(e) Statements about the first product that used the allegedly infringing protocol in an iPod that allows an accessory device (such as an automobile stereo) to control a iPod or iPhone**

"One of the next frontiers for a seamless digital music experience is the car. We all spend a lot of time driving, and now this elegant solution lets iPod users enjoy their entire music collection in their BMW or MINI." (Gaudet Decl. 16).

"Apple chief executive Steve Jobs called the product a groundbreaking move . . . 'They're pretty ugly and they all require you to take your hands off the steering [*16] wheel to control them. This adapter is really the first big step to marry an iPod to an automobile.'" (Gaudet Decl. 17).

"Apple and BMW have outpaced the industry around the innovation curve. This elegant solution enables auto enthusiasts to carry with them and enjoy their entire music collection everywhere they go, heightening their ultimate driving experience." (Gaudet Decl. 18).

**(f) Statements about iTunes**

"Software is the user experience. As the iPod and iTunes prove, it has become the driving technology not just of computers but of computer electronics." (Gaudet Decl. 19).

"The mobile phone market - with 1.5 billion subscribers expected worldwide by the end of 2004 - is a phenomenal opportunity to get iTunes in the hands of even more music lovers around the world and we think Motorola is the ideal partner to kick this off." (Gaudet Decl. 20).

**(g) Statements about the importance of patents in the iPhone marketplace**

"We can sit by and watch competitors steal our patented inventions or we can do something about it. We've decided to do something about it." (Gaudet Decl. 21).

"We think competition is healthy, but competitors should create their own original technology, not steal ours." [*17] (Id.).

It is these types of statements - made personally by Mr. Jobs - on which Affinity seeks to depose Mr. Jobs. Affinity claims it has jumped through a series of hoops with other witnesses at Apple's insistence. Affinity argues that these witnesses have confirmed a very basic rule of evidence: the person who makes the statement is the person who has firsthand knowledge of that statement and the facts underlying it, and is therefore the person who should be examined regarding the statement.

**2. Apple claims Affinity has not sought any discovery on seven of the public statements.**

According to Apple, Affinity has not pursued any discovery related to seven of the 18 public statements that form the basis for its request to depose Mr. Jobs. See Def. Motion at Appx. A; PS3, PS5, PS7-10, and PS14. Each of these seven statements was published and available to Affinity before it deposed its first Apple witness in this case on January 25, 2011. Id. Affinity's failure to seek any written or deposition discovery on these seven statements before moving to compel Mr. Jobs' deposition should bar Affinity from deposing Mr. Jobs about those public statements.

Courts regularly require interrogatories, [*18] requests for admission, and depositions of lower level employees before allowing the deposition of an apex witness. In *Celerity, Inc.,* 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, a patent infringement action, defendants claimed plaintiff's corporate officers possessed personal knowledge regarding the chain of title to the patents-in-suit, the decision to acquire certain intellectual property, and the valuation of plaintiff's intellectual property. 2007 U.S. Dist. LEXIS 8295, [WL] at *4. This Court agreed that the acquisition of the intellectual property was a "legitimate" area of inquiry, but it granted plaintiff's motion for protective order because defendants failed to show those executives possessed "unique personal knowledge . . . unavailable from less intrusive discovery, including interrogatories and the depositions of lower-level employees." *Id.*

Similarly, in *Mehmet v. Paypal, Inc.*, 2009 U.S. Dist. LEXIS 131011, 2009 WL 921637, at *2 (N.D. Cal. Apr. 3, 2009), the court granted a protective order barring the depositions of Paypal executives, noting that [HN2]"[c]ourts generally refuse to allow the immediate deposition of high-level executives, the so-called 'apex deponents,' before the depositions of lower level employees with more intimate knowledge of the case." And [*19] in *First Nat'l Mortgage Co. v. Fed. Realty Inv. Trust*, 2007 U.S. Dist. LEXIS 88625, at *6-7 (N.D. Cal. Nov. 19, 2007), the court required that depositions of lower-level employees must first be taken to establish whether there was a need to depose high-level executives.

Because it failed to seek any discovery regarding these seven statements, Apple argues that Affinity's Motion to compel should be denied, and Apple's Motion for protective order should be granted with respect to PS3, PS5, PS7-10, and PS14 identified in Appendix A.

### 3. Apple's other witnesses

After Apple suggested there were other witnesses who could testify about what Mr. Jobs meant when he made his statements, Affinity deposed the various "substitute" witnesses Apple identified. According to Affinity, those witnesses attempted to dilute the importance of this technology and to re-characterize the statements made by Mr. Jobs, confirming the need to depose Mr. Jobs. In fact, those witnesses merely disagreed with Affinity's paraphrasing or interpretation of Jobs' statements, not with the statements themselves.

Much of this testimony was filed with this Court under seal, as containing highly confidential information. Accordingly, [*20] although this Court carefully read all the testimony submitted, it does not repeat it here, nor does it identify the witnesses by name.

### a. Witness A -

During one witness's deposition, Affinity characterized his testimony as discounting Jobs' statements regarding the first product that used the allegedly infringing protocol to allow an accessory device to control an iPod. Many of Jobs' statements were part of documents that were on the exhibit list in a jury trial on related patents that Affinity claims to have won in October 2010 in the Eastern District of Texas. (This is the same trial where witnesses were deposed and Judge Wilken in this case denied Affinity's request to submit the witnesses's deposition testimony as evidence in this case because Affinity failed to show that the witnesses would be unavailable to testify.) That trial was against car manufacturers that offered iPod and iPhone adapters that allowed car users (BMW and Mini) to play and control their Ap-

ple devices through their car stereos. (Gaudet Decl. 27). In those statements, Mr. Jobs referred to this technology as "groundbreaking" (among other laudatory statements), described the " innovative" nature of the BMW iPod [*21] adapter (which was the first iPod accessory product to make use of the accused functionality), and specifically criticized the prior art in this area. To demonstrate the high probative value of such statements, the Court in the Eastern District of Texas trial specifically cited these types of statements as strong evidence supporting the jury verdict of non-obviousness in denying defendants' JMOLs following the jury verdict. (Gaudet Decl. 28). Indeed, one defendant who settled just before trial put Mr. Jobs on their "may call list" for live trial testimony. (Gaudet Decl. 29, Ex. B to Pretrial Order).

The witness was therefore examined on the following three sets of statements by Mr. Jobs:

**6/21/04 Press Release:** "Apple and BMW have outpaced the industry around the innovation curve," said Steve Jobs, Apple CEO. "This elegant solution enables auto enthusiasts to carry with them and enjoy their entire music collection everywhere they go, heightening their ultimate driving experience." (Gaudet Decl. 18).

**6/23/04 Australian IT:** "Apple chief executive Steve Jobs called the product a groundbreaking move - one he hopes will lead to more integrated products between the auto industry and Apple's [*22] hot-selling iPod portable music player. Current iPod owners usually resort to third-party products, ranging from FM transmitters and cassette adaptors, to use their iPods in their cars. 'They're pretty ugly and they all require you to take your hands off the steering wheel to control them,' Mr. Jobs said in an interview. 'This adapter is really the first big step to marry an, iPod to an automobile.'" (Gaudet Decl. 17).

**6/24/04 Canadian Automotive Network:** "'One of the next frontiers for a seamless digital music experience is the car,' said Steve Jobs, Apple's CEO. 'We all spend a lot of time driving, and now this elegant solution lets iPod users enjoy their entire music collection in their BMW or MINI.'" (Gaudet Decl. 16).

According to Affinity, at his deposition the witness attempted to completely change the meaning of these statements. Affinity argues that the witness testified that the BMW iPod adapter was neither innovative, groundbreaking, nor the next frontier of anything. In fact, this Court finds that the witness merely disagreed with Affinity's paraphrasing and interpretation of Jobs' statements.

Affinity tries to criticize the witness's testimony in two contradictory ways: First [*23] it claims that he disagrees with Jobs' statements and then it claims that he didn't hear Jobs make the statements in exactly the same

words as Affinity is quoting. The Court finds that this type of quibbling over manufactured differences does not justify deposing Mr. Jobs.

**b. Witness B -**

Affinity questioned this witness on Jobs' public comments on Apple's $100 million patent license with Creative. The Creative agreement involved a patent license in which Apple paid $100 million for a license to an iPod-related patent with a 2001 priority date (i.e., a year later than Affinity's priority date). This was the press release about that license:

> CUPERTINO, California and SINGAPORE - August 23, 2006 - Apple® and Creative Technology, Ltd. today announced a broad settlement ending all legal disputes between the two companies. Apple will pay Creative $100 million for a paid-up license to use Creative's recently awarded patent in all Apple products. Apple can recoup a portion of its payment if Creative is successful in licensing this patent to others. In addition, the companies announced that Creative has joined Apple's "Made for iPod" program and will be announcing their own iPod® accessory products [*24] later this year.
>
> "Creative is very fortunate to have been granted this early patent," said Steve Jobs, Apple's CEO. "This settlement resolves all of our differences with Creative, including the five lawsuits currently pending between the companies, and removes the uncertainty and distraction of prolonged litigation."

(Gaudet Decl. 31).

According to Affinity, the witness by his testimony effectively disavowed the second sentence in the press release. When Affinity confronted the witness with the direct quote from Jobs about the basis for the value of that single patent that the press release identified, according to Affinity, he again attempted a swift retreat (Affinity's characterization) from Mr. Jobs' statements. Then, according to Affinity, the witness finally admitted that his testimony did not even rise to the level of hearsay because he never heard Mr. Jobs say the words that Mr. Lutton was attributing to him.

This Court finds that, in this line of questioning, Affinity tries to induce Witness B to say that Jobs either never told him what he meant by "early," or else told him

something different from what Affinity contends Jobs meant by "early," but instead, Witness B testifies that [*25] "early" in this press release refers to more than one patent, and not just the patent that Affinity claims is relevant, and also that, since he worked closely with Jobs on drafting the language of the press release, Witness B knew what "early" meant without Jobs' telling him directly, "Hey, this is what I mean by 'early.'"

**c. Witness C**

Like the other two witnesses, Witness C, according to Affinity, took great pains to "explain away" Mr. Jobs' statement, in a press release that says the following:

> With the iTunes Wi-Fi Music Store, music fans can start enjoying their music purchases immediately on their iPod touch or iPhone with no computer required. . . If users have only partially downloaded a song or album onto their iPod touch or iPhone their computer will complete the download automatically. (Gaudet Decl. 13)

In the next paragraph, Jobs stated that "Innovative products like this keep iTunes at the forefront of the digital music revolution." (*Id.*).

Affinity interprets Witness C as disputing even brief, straightforward statements made by Mr. Jobs about the App Store, for which Affinity argues the only remedy is to examine the source of the statements, Jobs himself. In fact, after reading [*26] the transcript of his testimony, this Court finds that Witness C is merely pointing out to Affinity that two concepts were presented in two different sentences and that the statement about innovative products refers to products encompassed in the "whole press release."

Affinity goes on to point to what it considers to be another example: when discussing the launch of the App Store, Jobs was quoted as saying "[t]his is the biggest launch of my career." (Gaudet Decl. 9). Affinity questioned Witness C about this statement in an attempt to elicit a disagreement with the substance of what Jobs was saying. In fact, after reviewing the testimony, this Court finds that the witness is disagreeing with Affinity's interpretation and paraphrasing of Jobs' statement, not Jobs' statement itself.

None of these three witnesses contradict Mr. Jobs' statements, rather they merely disagree with Affinity's paraphrasing and interpretation of the statements and resist Affinity's attempts to manipulate and distort their own testimony.

**4. Affinity has not shown that Mr. Jobs has unique, non-repetitive, firsthand knowledge of the remaining 11 statements.**

**a. Affinity failed to take written discovery**

Affinity argues [*27] that it would be entitled to take Mr. Jobs' deposition regardless of the content of the witnesss's testimony because - by definition - Mr. Jobs has firsthand knowledge about what he meant about his numerous statements on highly relevant, hotly contested issues. Affinity claims that Apple's witnesses' attempts to explain away and water down Mr. Jobs' statements about these critical issues highlight its need for the deposition.

Affinity cannot show that Mr. Jobs has unique, non-repetitive, firsthand knowledge of relevant facts regarding the other 11 public statements or that Affinity has exhausted, without success, less burdensome means to obtain the same information.

Affinity's sole support for its claim that Mr. Jobs has unique, non-repetitive, firsthand knowledge is that he must know about the statements because he made them. Motion at 17. None of the cases cited by Affinity, however, support the broad proposition that the requisite knowledge can be established by public statements alone. Even if Mr. Jobs has personal knowledge of the years-old statements and even if they were relevant to this case -- and as shown below, they are not -- Apple's other witnesses testified fully and consistently [*28] with the 11 statements on which Affinity's Motion is based.

Affinity also failed to serve any written discovery to obtain the information it seeks, thus failing to exhaust less burdensome means to obtain it. Affinity concedes that it has not served any written discovery on these 11 statements. Motion at 21, fn7.

Written discovery could have provided the information it now allegedly seeks. For instance, Affinity could have served interrogatories seeking the reasons why Mr. Jobs made the statements and the identification of Apple witness(es) with equal or better personal knowledge of those statements. And if Affinity needed to confirm that Mr. Jobs made any statements, requests for admissions are far less burdensome than the deposition of Mr. Jobs. Affinity did not attempt to learn any of those facts through written discovery, as the rule requires, See, e.g., *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985).

Affinity attempts to excuse its failure to pursue written discovery by claiming it deposed Apple's lower-level witnesses near the close of fact discovery and, as a result, it did not have time to serve interrogatories after those depositions were concluded. Motion at 21, [*29] fn. 7. But most of the statements on which Affinity seeks to depose Mr. Jobs have been known to Affinity for years. Affinity could have -- and should have under the apex doctrine -- served interrogatories well before the close of fact discovery. Affinity's delay in taking depositions does not excuse its failure to serve interrogatories.

When Affinity chose to pursue discovery regarding the public statements, it consistently obtained the information to which it is entitled. As shown below, Affinity received deposition testimony from other Apple witnesses on the public statements (regardless of relevance) in each of the categories Affinity identifies. This deposition testimony confirms that Mr. Jobs does not possess any unique or non-repetitive knowledge on relevant topics that justifies his deposition.

**b. Affinity received sufficient testimony regarding Mr. Jobs' statements about the release of the BMW iPod Adapter (PS11-13).**

The statements attributed to Mr. Jobs relating to the 2004 release of BMW's iPod Adapter (PS11-13) are not relevant to any claims at issue in this case. To support its claim of relevance, Affinity points to Judge Clark's comment following a trial in the Eastern District [*30] of Texas that the "buzz" surrounding the introduction of the BMW Adapter weighed in favor of non-obviousness of Affinity's '833 Patent. Motion at 9-10, fn2-3. Apple was not a party to that litigation and the '833 Patent is not at issue here. Unlike the patents at issue in the case before Judge Clark, the patents at issue in this case do not claim an automobile sound system. [HN3]Any obviousness analysis must relate to the claims of the Patent-in-Suit. *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004). In addition, to prove commercial success, which can be an example of secondary considerations of non-obviousness, a "nexus must be established between the merits of the claimed invention and evidence of commercial success before that evidence may become relevant to the issue of obviousness." *Id.* Mr. Jobs' statements have nothing to do with the narrow and specific claims of the patents at issue, but instead relate generally to a product released by third party BMW.

Even if Mr. Jobs' statements were relevant, Affinity has already obtained complete testimony from Witness A, who confirmed that Jobs does not have unique, non-repetitive knowledge about the statements. [*31] Affinity alleges that Witness A attempted to discount Jobs' statements regarding the innovative nature of BMW's iPod Adapter when he testified. This Court finds that the witness's statements are entirely consistent with those of Mr. Jobs, who was quoted as saying that other, less elegant, solutions existed before the BMW iPod Adapter:

> They're pretty ugly and they all require you to take your hands off the steering wheel to control them...

This adapter is really the first big step to marry an iPod to an automobile.

Ex. 27.

This case is unlike *Paice, LLC v. Toyota Motor Corp.*, C.A. No. 2:07-CV-180 DF, Dkt. #117, 2009 U.S. Dist. LEXIS 131021 (E.D. Tex. July 21, 2009), an unpublished decision from 5th Circuit in which the plaintiff argued that Toyota witnesses took positions "directly counter to numerous statements made by [executive] Mr. Press." Witness A's testimony is entirely consistent with Mr. Jobs' statements regarding the BMW iPod Adapter. Affinity is unable to point to any disavowals or contradictory statements by Witness A suggesting that Mr. Jobs has unique, firsthand knowledge of the statements regarding the release of the BMW iPod Adapter.

Attempting to manufacture a conflict where none exists, Affinity states   [*32] in a footnote that Witness A disagreed with a statement by Mr. Jobs that the iTunes Music Store "revolutionized the way people legally buy music." Motion at 11-12, fn11. But Affinity does not identify this statement as one of the 18 on which it seeks to depose Mr. Jobs. See Appx. A. And Apple never suggested that Witness A would be an appropriate witness to depose on statements regarding iTunes. Witness A's responsibilities at Apple have consistently related to Apple's portable products. Ex. 22 at 12:25-14:2. Regardless, Witness A did not disagree with the statement; he simply testified that the iTunes and iTunes Music Store personnel were "very hopeful that they could provide, again, a better experience for our customers." Id. at 45:6-46:1.

**c. Affinity received sufficient testimony regarding Mr. Jobs' statement about Apple's settlement with Creative Labs (PS18).**

Affinity deposed Witness B, regarding a lone public statement about Apple's 2006 settlement with Creative Labs: "Creative is very fortunate to have been granted this early patent." Affinity is incorrect that the settlement with Creative is relevant to this litigation, and it is wrong that Witness B's testimony somehow justifies   [*33] Affinity taking Mr. Jobs' deposition.

Controlling Federal Circuit precedent confirms that the Creative settlement is not relevant to the damages calculus in this case. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). In *ResQNet.com*, the court vacated a damages award where the plaintiff's expert relied on prior licenses, some of which had no discernible link to the claimed invention at issue in the dispute between ResQNet.com and Lansa. *Id.* at 870. Affinity has similarly failed to allege a link between the claims of the patents in this litigation and any rights Ap-

ple obtained under the Creative Labs settlement. The fact that a Creative Labs patent had a priority date after Affinity's does not supply that link because, as Witness B explained, the priority dates say nothing about their respective subject matter. Ex. 23 at 107:16-111:4. Moreover, as confirmed by Witness B during his deposition, the Creative Labs settlement is not a simple license: it created a bi-lateral business relationship that resolved five lawsuits between Apple and Creative Labs (significant competitors) and-contrary to Affinity's suggestion-involved literally hundreds of patents. Ex. 23 at 64:14-65:4,   [*34] 67:16-72:3. Notably, even Affinity's own damages expert, Walter Bratic, stated in his April 1, 2011 expert report that he did not rely on the Creative Labs settlement in forming his opinions because he did not find it relevant. Ex. 28, Expert Report of Walter Bratic at 163-66.

Regardless, Witness B provided sufficient testimony about the Creative Labs settlement. He explained, in detail, that the settlement granted Apple, among other things, a broad portfolio license. Ex. 23 at 64:18-65:4.

This case thus differs from the situation in *Kennedy v. Jackson Nat'l Life Ins. Co.*, 2010 U.S. Dist LEXIS 47866, at *4-5, *7-8 (N.D. Cal., Apr. 22, 2010), a case cited by Affinity, where a limited deposition of the CEO was permitted because other witnesses identified the CEO as having unique knowledge. Witness B substantively answered all of Affinity's questions, and he never indicated that Mr. Jobs had unique knowledge that this witness could not provide. The fact that Witness B may not have provided the answers that Affinity wanted is not a basis to depose Mr. Jobs. As this Court noted in *Doble*:

> Although Plaintiffs have perhaps not obtained the answers they wanted from lower level employees, that   [*35] failure does not automatically justify their reaching higher, without the requisite showing of the higher-level official's unique personal knowledge.

*Doble v. Mega Life and Health Ins. Co.*, 2010 U.S. Dist. LEXIS 56190, 2010 WL 1998904 at *4 (N.D.Cal., 2010).

**d. Affinity received sufficient testimony regarding Mr. Jobs' statement about iTunes and iTunes WiFi Music Store (PS6, 15).**

Affinity in its Motion does not even try to explain how Mr. Jobs' general statement about the innovative nature of iTunes and the iTunes WiFi Music Store is relevant to this case. None of the Patents-in-Suit broadly covers these applications. Instead, the asserted claims --

even as broadly construed by Affinity -- address specific aspects of cellular phones that perform particularized functions, such as streaming audio to cellular devices or previewing songs on the iTunes Store. Ex. 9 at A5-6, A11-12, A14-16, A20-28.

Affinity's Motion also fails to explain how other witnesses' testimony about these public statements justifies Mr. Jobs' deposition. Although it argues that Witness C "took great pains to explain away Mr. Jobs' statement," Affinity does not identify any disavowal or contradictory testimony by Witness C. For instance, Affinity questioned [*36] Witness C about a press release regarding, among other things, the iTunes WiFi Music Store and a custom ringtone maker, in which Mr. Jobs stated that "Innovative products like this keep iTunes at the forefront of the digital music revolution." Ex. 24 at 124:11-127:20. Witness C never testified that he disagreed with Mr. Jobs' statement. *Id.* Rather, he correctly noted that because "innovative products" is plural, it likely refers to the Wi-Fi Music Store as well as to other products and features also mentioned in the press release, such as custom ring tones and the added capabilities for watching movies and TV shows. *Id.* at 124:17-127:20. Even if Witness C's testimony was not sufficient (which it is), Affinity neglects to mention that it also asked another witness the specific question about the WiFi Music Store and received a sufficient response, as this Court discerned from its reading of the witness's testimony.

And although Affinity contends it needs to depose Mr. Jobs about his statement regarding iTunes (Appx. A; PS15), Affinity's Motion fails to mention that this same witness agreed with Mr. Jobs' statement that the mobile phone market was an opportunity to get iTunes in the hands [*37] of music lovers. Ex. 25 at 176:22-177:15.

**e. Affinity received sufficient testimony regarding Mr. Jobs' statements about the App Store (PS1, 2, 4).**

Affinity also accuses Witness C of (1) downplaying Mr. Jobs' statement (PS1) that the App Store was a "grand slam" and (2) disputing Mr. Jobs' "straightforward" comment (PS2) that the App Store "is the biggest launch of my career." Motion at 16. Affinity's selective quotation from the witness's deposition misleadingly obscures that his testimony fully answered Affinity's questions and was completely consistent with Mr. Jobs' statements. Affinity does not explain how the testimony about Mr. Jobs' statement is deficient, let alone why it justifies Affinity taking Mr. Jobs' deposition. Affinity also fails to mention that when asked why Mr. Jobs said the App Store was a "grand slam," another Apple witness also provided testimony consistent with Mr. Jobs' statement, as confirmed by this Court's reading of that testimony.

And far from disputing Mr. Jobs' comment (PS2) that the App Store was the biggest launch of Mr. Jobs' career, the witness simply corrected Affinity's mischaracterization and clarified that Mr. Jobs said, "[t]his is the biggest [*38] launch of my career" and not, "The App Store is the biggest launch of my career."

Affinity also argues that a deposition of Mr. Jobs is necessary because the witness suggested that the quote might not be accurate. Motion at 16, fn 5. But if Affinity ever had any doubt about the accuracy of any of Mr. Jobs' statements, it could have propounded requests for admissions. Affinity failed to exercise this less intrusive method of discovery. Despite claiming that Mr. Jobs statement is solely relevant to the damages issue of whether the App Store drives sales of the iPhone, Affinity did not ask Apple's Rule 30(b)(6) witness on financial topics a single question about Mr. Jobs' statements.

Affinity also argues that it needs to depose Mr. Jobs about a statement (PS4) made during Apple's October 2008 earnings call regarding the App Store. Motion at 6. Witness C, however, already answered Affinity's question about the statement, and furthermore, Affinity's Motion fails to identify any deficiency in the witness's testimony about the statement, let alone a disavowal or contradiction of Mr. Jobs' statement.

**f. Affinity received sufficient testimony regarding Apple's litigation against HTC (PS16-17).**

Affinity [*39] does not attempt to show that other discovery has been insufficient on Mr. Jobs' two statements regarding Apple's litigation against HTC, although Affinity maintains its request to depose Mr. Jobs on those statements. Motion at 19. Nor does Affinity offer any explanation of how such statements might be relevant to this litigation. These statements were made when Apple filed actions on March 2, 2010 in the U.S. International Trade Commission and in Delaware against cell phone competitor HTC for infringing a total of 20 Apple patents. If a general statement about patent rights could be used as the basis to depose a CEO, the apex rule would be meaningless with respect to technology companies, whose executives often make statements about the importance of protecting their intellectual property.

Witness B's testimony differs dramatically from the testimony presented in *Paice*, in which Toyota witnesses denied any involvement in crafting the public statements or press releases of the COO and took positions that directly contradicted the statements by their COO. The situation is also different than the one in *First United Methodist Church of San Jose v. Atlantic Mutual Ins. Co.*, 1995 U.S. Dist. LEXIS 22469, 1995 WL 566026, at *2-3 (N.D. Cal., Sept 19, 1995). [*40] In *First United Methodist*, the court permitted the deposition of Atlantic

Mutual's president based on the president's personal knowledge of the plaintiff's insurance program and personal involvement in the decision to stop insuring plaintiffs. In this case, however, there is no suggestion that Mr. Jobs has any knowledge of Affinity, its owners or the Patents-In-Suit.

Most importantly, Affinity's Motion fails to identify any additional information it needs from Mr. Jobs that it has not already learned from the depositions of Apple witnesses, or that it could have learned through written discovery.

## IV. Analysis

[HN4]"A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." *Websidestory, Inc. v. Netratings, Inc.,* C06cv408, 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567 *2 (S.D.Cal., Apr.6, 2007).* When a party seeks the deposition of a high-level executive (a so-called "apex" deposition), the court may exercise its discretion under the federal rules to limit discovery. See *id.*; Fed. R. Civ. P. 26(b)(1)-(b)(2). In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of facts at issue in the case [*41] and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. *Websidestory, Inc.,* 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567 at *2.* Absent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition. *Id.* Additionally, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *Id.* A claimed lack of knowledge, by itself, is insufficient to preclude a deposition. *Id.* "Moreover, the fact that the apex witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *Id.*

That said,[HN5] "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Celerity, Inc. v. Ultra Clean Holding, Inc.,* No. C05-04374 MMC (JL), 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067 *3 (N.D.Cal., Jan.25, 2007).*

For that reason, parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and (2) that other [*42] less intrusive means of discovery, such as interrogatories and depositions of other employees, have been exhausted without success. *Salter v. Upjohn Co.,* 593 F.2d 649, 651 (5th Cir. 1979). "Where a high-level

decision maker 'removed from the daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *Id.* (quoting *Baine v. General Motors Corp.,* 141 F.R.D. 332, 334 (M.D.Ala.1991)). "This is especially so where the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue." *Id.*

Affinity misstates the standard for deposing a CEO, claiming it is sufficient to show that Mr. Jobs has "firsthand knowledge of relevant information." Affinity relies on a decision from the San Jose division of this district, in the *Apple iPod iTunes Antitrust Litigation,* C.A. No. C05-00037 JW (HRL), 2011 U.S. Dist. LEXIS 33174, D.I. 543 (N.D.Cal. Mar. 21, 2011). However, Magistrate Judge Howard R. Lloyd designated the decision as "Not for Citation," under Civil Local Rule 3-4(e).

Civil Local Rule 3-4(e), Prohibition [*43] of Citation to Uncertified Opinion or Order provides:

> [HN6]Any order or opinion that is designated: "NOT FOR CITATION," pursuant to Civil L.R. 7-14 or pursuant to a similar rule of any other issuing court, may not be cited to this Court, either in written submissions or oral argument, except when relevant under the doctrines of law of the case, res judicata or collateral estoppel.

Affinity fails to indicate how its citation falls into any of the designated exceptions. Although Jobs' deposition was at issue in the *Apple iTunes Antitrust Litigation,* that is not enough to make the decision to permit a limited deposition of Mr. Jobs in that case does not amount to law of the case, res judicata, or collateral estoppel in this case. Accordingly, the Court finds that Affinity improperly cited this decision, which doesn't really help its cause anyway. Judge Lloyd expressly rejected the same theory which Affinity proffers in this case: that a CEO's firsthand knowledge of his own public statements justifies the CEO's deposition.

Here, Affinity cannot meet its burden to show that Mr. Jobs has "unique" and "non-repetitive" knowledge regarding any relevant topic that is not available through less burdensome [*44] means. Affinity does not even try to contend that Mr. Jobs has any knowledge of Affinity, its patents, the inventors of those patents, or infringement by Apple products. Instead, based only on Mr. Jobs' public statements regarding Apple products or other patents or lawsuits, Affinity asks the Court to con-

clude that Mr. Jobs has relevant firsthand knowledge that entitles Affinity to depose him. But Apple has never denied that Mr. Jobs made the statements attributed to him in Apple press releases or presentations. And Apple has produced witnesses with firsthand knowledge of the statements Affinity has identified and the surrounding circumstances. Nor has Affinity even claimed that Jobs' statements run counter to the statements of Apple's witnesses, as discussed in the *Paice* case, on which Affinity relies to justify Jobs' deposition. *Paice, LLC v. Toyota Motor Corp.*, C.A. No.2:07-CV-180 DF (E.D.Tex. Sept. 6, 2006) (Ex. 42 to Declaration of Matthew Gaudet).

In the course of his questioning Affinity tried to maneuver the witnesses into contradicting Jobs' statements, but they didn't do it. What the witnesses may have done is disagree with Affinity's interpretation or paraphrasing of Jobs' [*45] statements. That does not amount to justification for deposing Jobs and then arguing with him over what he meant, the way Affinity's counsel did with the Apple witnesses.

The mere fact that Jobs made public statements, even on issues that Affinity considers relevant to its claims, are insufficient to justify his deposition. [HN7]Courts have repeatedly denied apex depositions even on a showing that the executive made public statements on relevant issues. *Mulvey, id.*, 106 F.R.D. at 366 (rejecting plaintiffs' request to depose Lee Iacocca based on public statements he made relevant to Chrysler's liability, and instead requiring plaintiffs to submit written interrogatories in the first instance); *Salter*, 593 F.2d at 651 (5th Cir. 1979) (upholding district court's decision to vacate the deposition date of Upjohn's president, Dr. William Hubbard, where Dr. Hubbard had given testimony before the United States Senate concerning the testing, marketing and use of the drug on which the plaintiff's claim was based); *Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995) (granting a protective order barring the deposition of IBM chairman John Akers even though he allegedly "authored an IBM policy designed [*46] to discriminate against older employees."); see also *Celerity, Inc.*, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, at *5 (refusing to permit deposition to go forward based on plaintiffs' claims that executives "participated" in relevant events where knowledge was not unique to those executives).

Apple also contends that Mr. Jobs' deposition should not be allowed because Affinity has used all of its allot-

ted deposition time. (Opp. p.24). Affinity opposes this contention on grounds that Apple forced Affinity to depose multiple "substitute witnesses" as a predicate to deposing Mr. Jobs, and now that Affinity has done so, Apple argues that "time is up." Affinity denies that it exceeded its deposition time limits, and even if it did, then additional time would be appropriate specifically for this deposition. (Footnote 12 to Affinity's Reply brief restates the argument it previously made before this Court). This Court expressly found that it could not render a decision on the merits of Apple's arguments relating to Affinity's use of deposition hours, which Affinity disputed. (D.I. 134 at p.2 (". . . [T]his dispute exceeds the scope of the referral to this Court.")). The Court noted that "[t]he parties' appropriate course [*47] of action is to seek a decision by Judge Wilken whether the deposition cap has been exceeded. . . ." (*Id.*). Apple never sought a decision from Judge Wilken because the parties entered into a stipulation allowing Affinity to conduct additional depositions. (D.I. 139). Thus, a decision on whether Affinity exceeded its allotted deposition hours has not been made.

Finally, Affinity argues that Apple incorrectly alleges that Affinity deposed Creative. (Opp. p.25). In fact, Affinity claims it was Apple who scheduled the Creative Deposition. (Gaudet Decl. II ¶8). Affinity simply attended Apple's deposition and cross-examined the witness.

## V. Conclusion and Order

In this case, Affinity fails to show that Steve Jobs has unique and personal knowledge of facts relevant to this litigation, which cannot be obtained through less intrusive discovery, for example, interrogatories, requests for admissions, or other depositions. Accordingly, Affinity's motion to compel the deposition of Steve Jobs is denied and Apple's motion for protective order is granted.

IT IS SO ORDERED.

DATED: May 9, 2011

/s/ James Larson

JAMES LARSON

United States Magistrate Judge

**<u>Citation #2</u>**
**2010 U.S. Dist. LEXIS 108391**

LEXSEE



Caution
As of: Jun 07, 2013

**PEOPLE OF THE STATE OF CALIFORNIA AND THE CITY OF SAN DIEGO,
Plaintiffs, v. KINDER MORGAN ENERGY PARTNERS, L. P., et al., Defendant.**

**Civil No. 07-1883-MMA(WVG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
CALIFORNIA**

**2010 U.S. Dist. LEXIS 108391**

**October 12, 2010, Decided
October 12, 2010, Filed**

**SUBSEQUENT HISTORY:** Objection overruled by California v. Kinder Morgan Energy Partners, L.P., 2011 U.S. Dist. LEXIS 43655 (S.D. Cal., Apr. 20, 2011)

**PRIOR HISTORY:** People v. Kinder Morgan Energy Partners., L.P., 569 F. Supp. 2d 1073, 2008 U.S. Dist. LEXIS 15640 (S.D. Cal., 2008)

**CORE TERMS:** disclosure, attorney-client, log, work product doctrine, confidential, settlement, potential claims, contamination, settlement negotiations, in camera, legal advice, negotiations, hire, causes of action, legal service, public policy, pertinent part, confidential communications, anticipation of litigation, confidentiality, retaining, discovery, characterization, mediation, ethical, embody

**COUNSEL:** [*1] For People of the State of California, The City of San Diego, The City of San Diego, Plaintiffs: Daniel F Bamberg, LEAD ATTORNEY, Office of the City Attorney, San Diego, CA; Rene Pierre Tatro, Steven Russell Tekosky, LEAD ATTORNEYS, Tatro Tekosky Sadwick LLP, Los Angeles, CA.

For Kinder Morgan Energy Partners, L.P., Defendant: Gregory T Broderick, LEAD ATTORNEY, Downey Brand, Sacramento, CA; Michael Sean Tracy, LEAD ATTORNEY, DLA Piper LLP (US), San Diego, CA; M Ray Hartman , III, DLA Piper Rudnick Gray Cary, San Diego, CA.

For Kinder Morgan Energy Partners, L.P., Kinder Morgan Management, L.L.C., SFFP, L.P., Kinder Morgan Operating, L.P. "D", Kinder Morgan G.P., Inc., Santa Fe Pacific Pipelines., Inc., Scott Martin, Defendants: Gregory T Broderick, LEAD ATTORNEY, Downey Brand, Sacramento, CA; Michael Sean Tracy, LEAD ATTORNEY, DLA Piper LLP (US), San Diego, CA; M Ray Hartman , III, DLA Piper Rudnick Gray Cary, San Diego, CA.

**JUDGES:** Hon. William V. Gallo, U.S. Magistrate Judge.

**OPINION BY:** William V. Gallo

**OPINION**

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND DISCLOSURE OF INFORMATION RELATED TO SHELL OIL COMPANY'S ATTORNEY MARC R. GREENBERG

(Doc. No. 101)

    Defendants [*2] Kinder Morgan Energy Partners, L.P., et al. , (hereafter "Defendants") have filed a Motion to Compel Production of Documents And Disclosure Of Information Related to Shell Oil Company's Attorney Marc R. Greenberg (hereafter "Motion"). Plaintiffs People of the State of California and the City of San Diego (hereafter "City" or "Plaintiffs") have filed an Opposition to the Motion. Defendants have filed a Reply to Plain-

tiffs' Opposition. The Court, having reviewed the Motion, Opposition, the Reply, having heard oral argument on the motion, and having reviewed *in camera* the documents that are the subject of Defendants' Motion, and GOOD CAUSE APPEARING, HEREBY GRANTS in part and DENIES in part Defendants' Motion.

I

FACTUAL BACKGROUND

In 2003, Shell Oil Company (hereafter "Shell") entered into settlement negotiations to resolve potential litigation with Plaintiffs in which Plaintiffs would claim that Shell had liability for the clean-up of contamination that Shell acknowledged emanated from its operations. Shell was represented by Marc R. Greenberg (hereafter "Greenberg").

During the settlement negotiations, Greenberg was employed by the law firms Baker & Hostetler, and later, Keesal, Young & [*3] Logan. The City was represented by Grace Lowenberg (hereafter "Lowenberg") and Frank Devaney (now Judge Devaney)(hereafter "Devaney").

During the negotiations between the City and Shell regarding Plaintiffs' potential claims against Shell, Greenberg offered to represent the City in litigation against Defendants.

In order to determine whether the City would retain Greenberg to pursue litigation against Defendants, the City sought from Greenberg oral and written legal advice regarding potential claims against Defendants for Defendants' alleged contamination of 166 acres under and surrounding Qualcomm Stadium (hereafter "the Property"). On October 24, 2004, the City and Shell entered into a Settlement Agreement regarding Shell's liability for contamination at the Property.

Defendants seek production of nine documents that the City has withheld from production based on the attorney-client privilege and work product doctrine. These documents are communications between Greenberg and Lowenberg and/or Devaney and/or other employees of the City who were working with Lowenberg and/or Devaney. The Court has reviewed the documents *in camera.*

II

ANALYSIS

A. California Law Applies to Plaintiffs' Assertion [*4] of the Attorney-Client Privilege

Plaintiffs' First Amended Complaint contains causes of action for Public Nuisance, pursuant to <u>California</u> <u>Code of Civil Procedure § 731</u>, and <u>California Civil Code §§ 3479</u> and <u>3480</u>; Private Nuisance pursuant to <u>California Civil Code §§ 3479</u>, <u>3480</u> and <u>3481</u>; Trespass, Negligence, Violation of <u>California Health & Safety Code §25249.5</u> (Drinking Water and Toxic Enforcement Act of 1986); Violation of <u>California Business & Professions Code § 17200, et seq.</u>; and Declaratory Relief.

<u>Federal Rule of Evidence 501</u> states in pertinent part:

> . . . (I)n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Here, Plaintiffs' causes of action arise under California law. Therefore, pursuant to <u>Fed. R. Evid. 501</u>, the City's assertion of the attorney-client privilege is determined in accordance with California law.

B. Attorney-Client Privilege

It well settled under California law that the attorney-client privilege applies to confidential communications during preliminary [*5] negotiations with an attorney even if employment of the attorney is declined. <u>Rosso, Johnson & Ebersold v. Superior Court, 191 Cal. App. 3d 1514, 1518, 237 Cal. Rptr. 242 (1987)</u>[citing <u>Estate of Dupont, 60 Cal. App. 2d 276, 287-288, 140 P.2d 866 (1943)</u>]. "The fiduciary relationship existing between lawyer and client extends to preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result." <u>People ex. rel. Department of Corps, v. Speedee Oil Changes Systems, 20 Cal. 4th 1135, 1147-1148, 86 Cal. Rptr. 2d 816, 980 P.2d 371 (1999)</u>[citing <u>Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 (7th Cir. 1978)</u>]. This legal principle is further supported by <u>California Evidence Code § 951</u>, which states in pertinent part: "...(C)lient means a person who, directly or through an authorized representative, consults a lawyer for the purpose of *retaining the lawyer* or securing legal service or advice from him in his professional capacity..." (emphasis added).

Here, Lowenberg states in her Declaration that in order to determine whether she would recommend retaining Greenberg's legal services, the City needed to evaluate its claims against Defendants, as well as Greenberg's and his experts' [*6] qualifications. Therefore, the City sought from Greenberg, and Greenberg

provided, verbal and written legal advice regarding the City's potential claims against Defendants for Defendants' alleged contamination of the Property and potential damages arising therefrom. The City also sought and received from Greenberg legal advice regarding the potential for Dr. Richard Jackson [1] to be the City's expert environmental consultant. Further, Lowenberg states that the City expected and understood that its communications to Greenberg, and Greenberg's communications to it, regarding potential claims against Defendants, were made in confidence and protected by the attorney client privilege. Similarly, Greenberg states in his Declaration that at the time his communications were made to Lowenberg and Devaney, the City was evaluating who to retain to pursue its claims against Defendants. Further, Greenberg states that he had several meetings with Devaney in which Defendants' liability was discussed as well as various possible fee arrangements that he could offer the City should the City retain him for its suit against Defendants. Ultimately, the City hired another attorney to represent it in its   [*7] suit against Defendants (this litigation). Additionally, Greenberg states that many of the documents at issue in this Motion were communications between him and the City when the City was evaluating its case against Defendants and whether to retain him to pursue litigation against Defendants. Finally, Greenberg states that some of the documents at issue are his work product.

> 1   Although not entirely clear from the papers submitted by counsel, Dr. Jackson appeared to have been Judge Robert Altman's technical advisor in a mediation Judge Altman conducted in the dispute between Shell and Defendants.

Defendants assert that the documents are not protected by the attorney-client privilege, based upon the dates of the documents provided on the City's privilege log, and upon statements made by attorneys for the City. Further, Defendants contend that many of the communications at issue occurred during the time that Greenberg identified himself as attorney for Shell (prior to, during and after the mediation before Judge Altman). Additionally, Greenberg and the City entered into an agreement that released Shell from claims that the City had against Shell arising from the contamination at the Property. [*8] Therefore, Defendants contend that any such assertion of the attorney-client privilege is implausible because if Plaintiffs' explanation is accepted, Greenberg committed ethical violations, which appears to be unlikely. [2]

> 2   The Court does not express an opinion regarding whether Greenberg committed ethical violations.

The Court agrees in part with the City regarding its characterization of the documents at issue. It is clear that during the negotiations between the City and Shell regarding the City's potential claims against Shell, Greenberg offered to represent the City in potential litigation against Defendants. The City's attorneys sought and received oral and written legal advice from Greenberg on several matters pertaining to potential claims against Defendants in order to determine whether the City should retain Greenberg. The City's attorneys considered the communications to be confidential. Greenberg's characterization of the communications reveal that the communications were intended to be confidential and were made at a time when the City was evaluating whether to hire him for litigation against Defendants. Therefore, the Court concludes, after *in camera* review, that some, but  [*9] not all, of the documents are protected from disclosure by the attorney-client privilege. Specifically, document numbers 116, [3] , 191, 192, 193, 282 and PLF Privilege Log Entry 121 are protected from disclosure.

> 3   All references to document numbers are to the Working Group Privilege Log, as noted at page 5 of Defendants' Points and Authorities in Support of the Motion to Compel (Doc. # 101-1), unless otherwise noted.

C. Work Product

Plaintiffs argue that document numbers 104, 113 and 116 are protected from disclosure by the work product doctrine. Plaintiffs contend that these documents were prepared by Greenberg in anticipation of litigation against Defendants in connection with the City's evaluation of whether to hire Greenberg to represent it in an action against Defendants. Therefore, the City concludes that pursuant to Fed. R. Civ. Pro. 26(b)(3), the documents are protected from disclosure.

Defendants argue that Plaintiffs can not claim the documents in issue are protected from disclosure by the work product doctrine because they did not have an attorney-client relationship with Greenberg.

Fed. R. Civ. Pro. 26(b)(3)(A) and (B) state in pertinent part:

> (A) Ordinarily, a party may not discover   [*10] documents... that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney...
>
> (B) If the court orders discovery of those materials, it must protect against disclosure of the mental impressions,

conclusions, opinions or legal theories of a party's attorney or other representative concern ing the litigation.

The Court disagrees with Plaintiffs' assertion that document numbers 104, 113 and 116 are protected from disclosure by the work product doctrine. The documents were not prepared by Greenberg in anticipation of the City's litigation against Defendants. Instead, the documents are merely Greenberg's responses to the City's inquiries in connection with the City's evaluation whether to hire Greenberg for litigation against Defendants. Therefore, the Court concludes, after *in camera* review, that document numbers 104, 113 and 116 are not protected from disclosure by the work product doctrine.

D. Confidential Settlement Discussions

Neither Plaintiffs nor Defendants discuss whether the documents in issue may be protected from disclosure because they embody confidential communications made with respect to settlement  [*11] negotiations.

Communications made in furtherance of settlement negotiations are protected from third party discovery because of the public policy favoring confidentiality of such communications. Phoenix Solutions v. Wells Fargo Bank, 254 F.R.D. 568, 583 (N.D. Cal. 2008)[citing Goodyear v. Chiles Power Supply, 332 F.3d 976, 980 (6th Cir. 2003)]. There is a well-established privilege relating to settlement discussions. Cook v. Yellow Freight, 132 F.R.D. 548, 554 (E.D. Cal. 1990) overruled on other grounds in Jaffee v. Redmond, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996). A strong public policy exists that favors the confidentiality of attempts to resolve disputes. U.S. v. Contra Costa County Water Dist., 678 F.2d 90, 92 (9th Cir. 1982).

Here, some of the documents in issue are communications between Greenberg and the City regarding Shell's potential liability to the City for contamination of the Property. These documents embody some of the settlement negotiations that occurred between Greenberg, on behalf of Shell, and the City's attorneys. Therefore, the Court concludes, after *in camera* review, that some of the documents in issue are settlement communications that are confidential and protected from disclosure  [*12] to third parties. Specifically, document numbers 190, 191, 192 and 193 are protected from disclosure.

As a result of the foregoing, the Court ORDERS:

1. With respect to Working Group Privilege Log, document number 104, the document is not protected from disclosure and shall be produced.

2. With respect to Working Group Privilege Log document number 113, the document is not protected from disclosure and shall be produced.

3. With respect to Working Group Privilege Log document number 116, the document is not protected from disclosure by virtue of the work product doctrine but is protected from disclosure by the attorney-client privilege and shall not be produced.

4. With respect to Working Group Privilege Log document number 190, the document is protected from disclosure because it is a confidential settlement communication, and shall not be produced.

5. With respect to Working Group Privilege Log document number 191, the document is protected from disclosure, because it is in part a confidential settlement communication, and in part, by the attorney-client privilege, and shall not be produced.

6. With respect to Working Group Privilege Log document number 192, the document is protected from [*13] disclosure because it is in part a confidential settlement communication, and in part by the attorney-client privilege, and shall not be produced.

7. With respect to Working Group Privilege Log document number 193, the document is protected from disclosure because it is in part a confidential settlement communication, and in part by the attorney-client privilege, and shall not be produced.

8. With respect to Working Group Privilege Log document number 282, the document is protected from disclosure by the attorney-client privilege, and shall not be produced.

9. With respect to PLF Privilege Log entry number 21, the document is protected from disclosure by the attorney-client privilege, and shall not be produced.

On or before October 26, 2010, Plaintiffs shall produce to Defendants Working Group Privilege Log document numbers 104 and 113. IT IS SO ORDERED.

DATED: October 12, 2010

/s/ William V. Gallo

Hon. William V. Gallo

U.S. Magistrate Judge

**Citation #3**
**2010 U.S. Dist. LEXIS 143607**

LEXSEE



Analysis
As of: Jun 07, 2013

**CARNIVAL CORPORATION, CARNIVAL PLC and CUNARD LINE, LTD,
Plaintiffs, vs. ROLLS-ROYCE PLC, ROLLS-ROYCE AB, ROLLS-ROYCE
NORTH AMERICAN HOLDINGS, INC., ROLLS-ROYCE COMMERCIAL MA-
RINE, INC., CONVERTEAM SAS f/k/a ALSTOM POWER CONVERSION SA,
CONVERTEAM, INC. f/k/a ALSTOM POWER CONVERSION, INC.,
ROLLS-ROYCE AB and CONVERTEAM SAS, jointly and severally, d/b/a THE
MERMAID CONSORTIUM, Defendants.**

**CASE NO. 08-23318-CIV-SEITZ/O'SULLIVAN**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
FLORIDA**

**2010 U.S. Dist. LEXIS 143607**

**April 22, 2010, Decided
April 22, 2010, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by
Carnival Corp. v. Rolls-Royce PLC, 2010 U.S. Dist.
LEXIS 43611 (S.D. Fla., May 3, 2010)

**PRIOR HISTORY:** Carnival Corp. v. Rolls-Royce
PLC, 2009 U.S. Dist. LEXIS 107261 (S.D. Fla., Nov. 17,
2009)

**CORE TERMS:** deposition, executive officer, Declara-
tion, Supporting Memorandum of Law DE#, pod, entity,
customer, declaration stating, underlying facts, subject
matter, high-ranking, propulsion, chairman, depose,
deposition testimony, correspondence, involvement, pro-
file, attend

**COUNSEL:** [*1] For Carnival Corporation, Plaintiff:
Arthur J. England, LEAD ATTORNEY, Greenberg
Traurig, Miami, FL; Maria Isabel Hoelle, LEAD AT-
TORNEY, Fowler Rodriguez, Coral Gables, FL; Alan-
son T. Chenault, PRO HAC VICE, Fowler Rodriguez &
Chalos, New Orleans, LA; Antonio J. Rodriguez, George
J. Fowler, III, Henry J. Rodriguez, PRO HAC VICE,
Fowler Rodriguez Valdes-Fauli, New Orleans, LA.

For Carnival plc, and, Cunard Line, Ltd., Plaintiffs: Ar-
thur J. England, LEAD ATTORNEY, Greenberg Trau-
rig, Miami, FL; Maria Isabel Hoelle, LEAD ATTOR-

NEY, Fowler Rodriguez, Coral Gables, FL; Antonio J.
Rodriguez, George J. Fowler, PRO HAC VICE, Fowler
Rodriguez Valdes-Fauli, New Orleans, LA.

For Rolls-Royce PLC, Rolls-Royce AB, Defendants:
Larry Allen Stumpf, LEAD ATTORNEY, Roy Eric
Black, Black Srebnick Kornspan & Stumpf, Miami, FL;
Jared M. Lopez, Miami, FL.

For Rolls-Royce North American Holdings, Inc.,
Rolls-Royce Commercial Marine, Inc., Defendants: Lar-
ry Allen Stumpf, LEAD ATTORNEY, Black Srebnick
Kornspan & Stumpf, Miami, FL; Jared M. Lopez, Mi-
ami, FL.

For Converteam SAS, formerly known as Alstom Power
Conversion SA, Converteam, Inc., Rolls-Royce AB and
Converteam SAS, jointly and severally, doing business
as [*2] The Mermaid Consortium, formerly known as
Alstom Power Conversion, Inc., Defendants: Anthony
Peter Strasius, Wilson Elser Moskowitz Edelman &
Dicker, Miami, FL.

**JUDGES:** JOHN J. O'SULLIVAN, UNITED STATES
MAGISTRATE JUDGE.

**OPINION BY:** JOHN J. O'SULLIVAN

**OPINION**

**ORDER**

THIS MATTER is before the Court on Carnival's Motion to Compel the Deposition of Sir John Rose, Chief Executive Officer and Director of Rolls-Royce, PLC and Supporting Memorandum of Law (DE# 173, 4/16/10).[1] Having reviewed the applicable filings and the law and having heard from the parties at the April 14, 2010 informal discovery conference, it is

> 1    On April 14, 2010, the Court issued an Order (DE# 172) granting the parties leave to brief this issue.

ORDERED AND ADJUDGED that Carnival's Motion to Compel the Deposition of Sir John Rose, Chief Executive Officer and Director of Rolls-Royce, PLC and Supporting Memorandum of Law (DE# 173, 4/16/10) is **DENIED** for the reasons stated herein.

Carnival seeks to depose Sir John Rose, the Chief Executive Officer of Rolls-Royce Group, PLC, the parent company of the Rolls-Royce entities. See Declaration of Sir John Rose (DE# 178 at 5, 4/20/10). As the party seeking to compel the deposition of a high-ranking executive, Carnival [*3] has the burden of showing that Mr. Rose's deposition is necessary. See Little League Baseball, Inc. v. Kaplan, No. 08-60554-CIV, 2009 U.S. Dist. LEXIS 124777, 2009 WL 426277, * 2 (S.D. Fla. Feb. 20, 2009) (noting that the "[d]efendant ha[d] failed to satisfy his burden of showing that it [wa]s necessary to compel the deposition of [plaintiff's] chairman."). "A protective order precluding the deposition of a high-ranking executive officer will be granted where the officer possesses no unique knowledge regarding the underlying facts of the action and files a declaration stating his or her lack of knowledge." McMahon v. Presidential Airways, Inc., No. 6:05-cv-1002-Orl-28JGG, 2006 U.S. Dist. LEXIS 4909, 2006 WL 5359797, at * 2 (M.D. Fla. Jan. 18, 2006). Here, Mr. Rose submitted a sworn declaration stating that he "ha[s] no direct or personal knowledge of any of the facts relating to the subject matter of the Carnival Case," that he "was not involved in any of the commercial or legal aspects relating to claims advanced against the Rolls-Royce defendants" and that he "had no contacts or communications with Carnival [or any other entity] . . . regarding the use of the Mermaid propulsion system on the Queen Mary 2." See Declaration of Sir John Rose [*4] (DE# 178 at 5, 4/20/10).

As evidence of Mr. Rose's involvement in the case, Carnival cites to a letter signed by Mr. Rose dated October 28, 2003 See Carnival's Motion to Compel the Deposition of Sir John Rose, Chief Executive Officer and Di-

rector of Rolls-Royce, PLC and Supporting Memorandum of Law (DE# 173, 4/16/10). However, Mr. Rose has explained that "[t]he letter was largely prepared by others and was sent . . . primarily 'to acknowledge receipt of' [Carnival's CEO's] October 24, 2003, letter . . . addressed to . . . the chairman of the Board of Rolls-Royce." See Declaration of Sir John Rose (DE# 178 at 5, 4/20/10). Carnival responds that "[a]s an executive of a multinational corporation, Sir John Rose is presumed to be familiar with, and knowledgeable of, the matters contained in correspondence which he personally signs and sends to customers of the company" and that "[a]t a minimum, Carnival is entitled to discover who the 'others' [who wrote the October 28, 2003 letter] are and what knowledge they possess." See Carnival's Reply in Support of Its Motion to Compel the Deposition of Sir John Rose, Chief Executive Officer and Director of Rolls-Royce, PLC, and Supporting Memorandum [*5] of Law (DE# 180 at 3, 4/21/10). Carnival further argues that it should be allowed to depose Mr. Rose because Mr. Rose "was presumably involved with dealing with former Rolls-Royce executives . . . regarding problems with the Mermaid pods and bearings installed on the QM2." Id. (emphasis added; footnote omitted).

Carnival has not persuaded the Court that Mr. Rose possesses unique knowledge of the factual issues in this case and as such, his deposition should not be compelled. The October 28, 2003 letter merely acknowledged receipt of correspondence from Micky Arison, Carnival's CEO, addressed to another individual, Evan Baird, who at the time was traveling. See Letter of October 28, 2003 (DE# 173-1, 4/16/10). In the October 28, 2003 letter, Mr. Rose does not attempt to respond to the issues raised by Mr. Arison's letter. Instead, the October 28, 2003 letter states that another individual would be responding to Mr. Arison's concerns. Id. The October 28, 2003 letter further referenced a future meeting to take place on November 3, 2003 between the shipyard and teams from Carnival and Rolls-Royce. Id. The letter does not indicate that Mr. Rose would be attending this meeting and in fact, [*6] Mr. Rose did not attend the meeting. See Declaration of Sir John Rose (DE# 178 at 5, 4/20/10) (stating that he "did not attend any meetings with any of the Carnival entities regarding the Mermaid propulsion systems."). In sum, the October 28, 2003 letter does not establish that Mr. Rose has direct or unique knowledge regarding the instant case.

In addition to the October 28, 2003 letter, Carnival cites to a fax in which the naval architect for the Queen Mary 2 requests that someone speak to Mr. Rose regarding sharing all the data collected from the sea trial (Exhibit B), "numerous emails" which Carnival does not attach, letters between Mr. Arison and Mr. Robbins (Exhibits C and D), Rolls-Royce's Global Code of Business

Ethics executed by Mr. Rose (Exhibit E) and the deposition of Duncan Forbes, a Rolls-Royce executive, taken in another case wherein Mr. Forbes testified that he was "quite sure that Sir John [Rose] would have been aware of [the problems of the Mermaid pod]. He's very conscious of any issues that may have had a high profile that could be impacting on a customer and so through the various reports that we do internally he would've been aware, yes." See Exhibit F (DE#173-1 [*7] at 19, 4/16/10). The documents cited by Carnival do not establish that Mr. Rose had any unique knowledge of the issues in this case. Although Mr. Fobes deposition testimony, at first glance, would appear to support the argument that Mr. Rose had unique knowledge, it does not state this for a fact. Mr. Forbes merely assumes that Mr. Rose was aware of the Mermaid pod problems because Mr. Rose is aware of "any" high profile issues affecting customers and Mr. Rose would have learned of the problems through reading internal reports. Id. There is nothing in these documents to suggest that "[Mr.] Rose has direct knowledge regarding Rolls-Royce's concealment of material facts from Carnival" regarding the Mermaid pods. See Carnival's Motion to Compel the Deposition of Sir John Rose, Chief Executive Officer and Director of Rolls-Royce, PLC and Supporting Memorandum of Law

(DE# 173 at 34, 4/16/10). The documents cited by Carnival, including Mr. Forbes' deposition testimony, are not sufficient to overcome the detailed and specific affidavit submitted by Mr. Rose regarding his lack of involvement in the facts giving rise to the instant case.

"An officer at the apex of the corporation can only be [*8] deposed if he or she has unique knowledge or the subject matter requested in deposition was pursued unsatisfactory through less intrusive means." McMahon, 2006 U.S. Dist. LEXIS 4909, 2006 WL 5359797 at *2. Carnival's allegations of Mr. Rose's knowledge regarding the underlying facts in the instant case are at best speculative. Accordingly, Carnival's Motion to Compel the Deposition of Sir John Rose, Chief Executive Officer and Director of Rolls-Royce, PLC (DE# 173, 4/16/10) is **DENIED.**

DONE AND ORDERED, in Chambers, at Miami, Florida, this **22nd** day of April, 2010.

/s/ John J. O'sullivan

JOHN J. O'SULLIVAN

UNITED STATES MAGISTRATE JUDGE

**Citation #4**
**2007 U.S. Dist. LEXIS 8295**

LEXSEE

⚠
Caution
As of: Jun 07, 2013

**CELERITY, INC, Plaintiff, v. ULTRA CLEAN HOLDING, INC, ET AL., Defend-
ants.**

**No. C 05-4374 MMC (JL)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2007 U.S. Dist. LEXIS 8295**

**January 24, 2007, Decided
January 25, 2007, Filed**

**SUBSEQUENT HISTORY:** Request granted, Motion
granted by, in part, Motion denied by, in part, Motion
denied by Celerity, Inc. v. Ultra Clean Holding, Inc., 476
F. Supp. 2d 1159, 2007 U.S. Dist. LEXIS 18307 (N.D.
Cal., Feb. 28, 2007)

**CORE TERMS:** deposition, discovery, personal
knowledge, protective order, interrogatories, lower-level,
depose, lower level, chain, high-level, intrusive, notice,
patent, apex, intellectual property, patent-in-suit, repeti-
tive, firsthand, giving rise, lawsuit, corporate officers,
non-repetitive, involvement, deposing, founder, in-
fringement, acquisition, deposition testimony, deposition
transcript, oral argument

**COUNSEL:** [*1]  For Celerity, Inc., Plaintiff: Keith L.
Slenkovich, LEAD ATTORNEY, Chris Kao, Richard
Steven Swope, Robert E. Camors, Jr., Thelen Reid
Brown Raysman & Steiner LLP, San Jose, CA.

For Ultra Clean Holding Inc., Ultra Clean Technology
Systems & Service, Inc., Defendants: Paul J. Andre,
LEAD ATTORNEY, Amy Sun, Lisa Kobialka, Radhika
Tandon, Shreya N. Ramchandani, Perkins Coie LLp,
Menlo Park, CA.; Philip A. Rovner, LEAD ATTOR-
NEY, Potter Anderson & Corroon LLP, Wilmington,
DE.; James Hannah, Menlo Park, CA.

For Ultra Cleaning Holding Inc., Counter-claimant: Paul
J. Andre, LEAD ATTORNEY, Perkins Coie LLp, Menlo
Park, CA.

For Ultra Clean Technology System & Service, Inc.,
Counter-claimant: Paul J. Andre, LEAD ATTORNEY,
Perkins Coie LLp, Menlo Park, CA.; James Hannah,
Menlo Park, CA.

For Celerity, Inc., Counter-defendant: Keith L. Slenko-
vich, LEAD ATTORNEY, Richard Steven Swope, The-
len Reid Brown Raysman & Steiner LLP, San Jose, CA.

**JUDGES:** JAMES LARSON, Chief Magistrate Judge.

**OPINION BY:** JAMESLARSON

**OPINION**

**ORDER DENYING PROTECTIVE ORDER (Docket
# 83)**

**Introduction**

   Plaintiff's motion for protective order re depositions
of David Shimmon and John Murphy (Docket # 83)
came [*2]  on for hearing. Appearing for Plaintiff was
Richard Swope, THELEN, REID & PRIEST, LLP. Ap-
pearing for Defendant was Lisa Kobialka, PERKINS
COIE LLP.

   After hearing oral argument the Court ordered pro-
duction for *in camera* review of the transcript of the
deposition of Joseph Foster (filed under seal). After re-
viewing the deposition, the Court determines that there is
no indication that either Mr. Shimmon or Mr. Murphy
possess the requisite firsthand and non-repetitive

knowledge to justify their depositions. Therefore, the motion for protective order precluding their depositions at this time is granted.

UCT may renew its notice of deposition for Murphy and Shimmon only if other methods of discovery, including interrogatories and depositions of lower-level employees of Celerity, prove to be unsatisfactory.

**Background**

Subject matter jurisdiction is conferred on this Court under the national patent laws. 28 U.S.C. § 1331 & 1338(a). All discovery was referred by the district court (Hon. Maxine M. Chesney) as provided by 28 U.S.C. § 636(b) and Civil Local Rule 72.

Celerity's infringement allegations are based [*3] on its belief that Ultra Clean Holdings and Ultra Clean Technology are making, selling, or offering for sale products which infringe one or more of the patents in suit, specifically through their Predator product line. Ultra Clean Technology filed its Complaint for Declaratory Judgment in response to Celerity's allegations of infringement and aggressive efforts to eliminate all commercial activity by Ultra Clean Technology as a competitor in the field of gas delivery systems, which included making threats to Ultra Clean Technology's customers. Ultra Clean Technology's and Ultra Clean Holding's non-infringement and invalidity allegations are based on their belief that they do not infringe any valid claim of the asserted patents. Additionally, Ultra Clean Holdings asserts that it is a holding company that does not make, use, sell or offer for sale any products.

The discovery cut-off was December 22, 2006. Expert disclosures were due January 12, 2007 and expert discovery cut-off is February 16, 2007. An 8-10 day jury trial will commence June 4, 2007. A further status conference will be held March 9, 2007.

**This Motion**

On November 8, 2006, UCT noticed the depositions of John Murphy [*4] and David Shimmon. Swope Decl., PP 2-3. John Murphy is President, CEO, and COO of Celerity, Inc. Murphy Decl., P 1. Celerity contends that Mr. Murphy has only been an officer of Celerity, Inc., since September, 2005. Id., at P 2. Celerity also contends that he has no personal knowledge of the events giving rise to this litigation and his involvement in the litigation is limited to receiving status reports from counsel. Id., at PP 4-10. Mr. Murphy was not CEO of Celerity, Inc. at the time of the events giving rise to this dispute. Id., at P 4.

David Shimmon is Executive Chairman of the Board of Celerity, Inc. Shimmon Decl., P 1. Celerity contends that he has no personal knowledge of the events giving rise to this litigation and his involvement in the litigation is limited to receiving status reports from counsel. Id., at PP 5-11.

The parties met and conferred at various times, most recently on November 8, 2006 to attempt to resolve their dispute regarding UCT's notice of deposition. Celerity argues that Murphy and Shimmon are high level corporate officers, subject to the requirements for taking an "apex" deposition, and that UCT should not be permitted to depose them unless and until [*5] it demonstrates that less intrusive means of discovery, such as interrogatories and depositions of lower-level employees of Celerity, have failed.

The parties were unable to resolve their dispute and Celerity filed this motion for a protective order quashing the depositions of Murphy and Shimmon pursuant to Federal Rule of Civil Procedure 26(c)(1) on the grounds that neither Murphy nor Shimmon has superior or unique personal knowledge of discoverable information, that testimony of lower level employees with more intimate knowledge of the case have not yet been taken, and that Murphy's and Shimmon's testimony would be, at best, repetitive.

Celerity cites the most recent reported case in the Northern District of California to discuss the depositions of executives. Judge Seeborg in Google Inc. v. Am. Blind & Wallpaper Factory, Inc., 2006 U.S. Dist. LEXIS 67284, 2006 WL 2578277 (N.D. Cal. 2006) observed that high-level corporate officers can be protected from depositions when the officer has no first-hand knowledge of the facts of the case or where the officer's testimony would be repetitive.

Celerity argues that because both [*6] Murphy and Shimmon are high-level officers at Celerity, and neither have personal knowledge of the events giving rise to this litigation, and because the second-hand knowledge that Murphy and Shimmon do possess is almost by definition repetitive, they should be protected from having to give deposition testimony in this case unless UCT can show that either Murphy or Shimmon possess first-hand knowledge that cannot be obtained through other means.

UCT contends that Celerity has prejudiced its defense of this lawsuit by delaying depositions of Celerity's employees, permitting UCT to take only one 30(b)(6) deposition on June 5, 2006 and the deposition of Eric Redemann, one of the inventors of the patent-in-suit, on December 12, 2006. The remaining depositions are scheduled thus: Joseph Foster on December 15, 2006; David Somo on December 20, 2006. Celerity's counsel has confirmed that Shimmon and Murphy are available for deposition between December 19-21, 2006. (Kobialka Decl., Ex. (9).

UCT's purported reason for taking these depositions is:

> "Messrs. Shimmon and Murphy are involved in making important corporate decisions, including the decision to pursue this lawsuit, allege willful [*7] infringement and seek monetary damages and injunctive relief against Ultra Clean Holdings and Ultra Clean Systems and Services. For example, Messrs. Shimmon and Murphy played key roles with respect to the acquisition of Celerity, which included Celerity's intellectual property."

(Kobialka Declaration at Exhibit 7).

Celerity contends that a Mr. Foster, not Murphy, made the decision to pursue this litigation (Reply Memorandum at page 3).

Some of these subjects, such as the decision to pursue this lawsuit and what relief to seek, border on work product, representing as much legal strategy as corporate decision-making and as such could be improper questions at deposition. Others are legitimate areas of inquiry, for example the acquisition of Celerity and its intellectual property.

UCT also argues that Murphy and Shimmon possess unique personal knowledge of the chain of title to the patents-in-suit, through the various mergers Celerity has gone through. In addition, says UCT, Murphy, as a principal of TPG, evaluated Celerity's intellectual property, as part of the decision by TPG to acquire Celerity, which would be relevant to the amount of damages in this case. Shimmon, as a [*8] former principal of UNIT, has unique personal knowledge of the chain of title to the patents-in-suit.

**Analysis**

Virtually every court that has addressed deposition notices directed at an official at the highest level or "apex" of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment. *See, e.g., Mulvey v. Chrysler Corp.,* 106 F.R.D. 364 (D.C. RI 1985). Where a high-level decision maker "removed from the daily subjects of the litigation" has no unique personal knowledge of the facts at issue, a deposition of the official is improper. *Baine v. General Motors Corp.,* 141 F.R.D. 332, 334 (M.D. Ala. 1991); *see also, First United Methodist Church of San Jose, v. Atlantic Mutual Insurance Co.,* 1995 WL 566026 (N.D. Cal. 1995); *Salter v. Upjohn Co.,* 593 F.2d 649 (5th Cir. 1979). This is especially so where the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue. (*See, e.g., Salter,* 593 F.2d at 651.) [*9]

If this Court grants Celerity's motion for protective order, it need not absolutely preclude UCT from taking the depositions of Celerity's top two executives, but may merely postpone them until and if UCT can demonstrate that other less intrusive discovery methods, such as interrogatories and depositions of Celerity's lower level employees, are inadequate. As the court commented in the *Salter* case:

> It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error. See 4 J.Moore & J.Lucas, Moore's Federal Practice P 26.69 (3d ed. 1976); 8 C.Wright & A.Miller, Federal Practice & Procedure section 2037 (1970). We do not believe that this first order of the trial judge was such a complete prohibition, however. Although the court's order vacated plaintiff's notice to take the deposition of Dr. Hubbard, it is clear that the order merely required plaintiff to depose the other employees that Upjohn indicated had more knowledge of the facts before deposing Dr. Hubbard. The trial judge had indicated that if the testimony of the other employees was unsatisfactory, he would allow plaintiff [*10] to take Dr. Hubbard's deposition. *Salter,* 593 F.2d at 651.

UCT attempts to distinguish all the cases cited by Celerity as having to do with government officials, rather than corporate executives. The Court finds this distinction to be meaningless. UCT contends that Shimmon has personal knowledge regarding the chain of title to the patents in suit, that he participated in the acquisition of Celerity by Texas Pacific Group ("TPG") and thus has personal knowledge regarding the valuation of Celerity's intellectual property and that he has personal knowledge regarding the decision to sue Ultra Clean. Shimmon was also at Celerity before Murphy and thus would have knowledge regarding sales of Celerity's products that are covered by the patents-in-suit prior to Mr. Murphy's tenure.

UCT fails to show that this personal knowledge, if Shimmon has it, is "unique." This is an essential component of the standard for an apex deposition - unique per-

sonal knowledge by the high corporate official, unavailable from less intrusive discovery, including interrogatories and the depositions of lower-level employees.

UCT disparages Celerity's reliance on *Google v. American Blind,* 2006 U.S. Dist. LEXIS 67284, 2006 WL 2578277, [*11] because Judge Seeborg of this Court actually ruled that American Blind was entitled to depose Google founder and CEO Larry Page after learning from Google's designated 30(b)(6) witness that Page may have relevant firsthand information.

The Court in *Google* held:

> Accordingly, the motion will be granted with respect to the deposition of Larry Page. The deposition, however, shall be limited in scope to Page's knowledge of and involvement in the policy change and shall be limited to three hours. FN3

> 1. FN3. Google resists this deposition on procedural grounds, but also suggests that the deposition of Page, a busy, high-level executive, would be inappropriate even if it had been timely noticed. A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied, however "courts are sometimes willing to protect high-level corporate officers from depositions when the officer has no first hand knowledge of the facts of the case or where the officer's testimony would be repetitive." First United Methodist Church of San Jose v. Atlantic Mutual Ins. Co., 1995 WL 566026, at *2 (N.D.Cal.1995). Courts generally refuse to allow the immediate [*12] deposition of a high level executive, often given the sobriquet "apex deponent," before the testimony of lower level employees with more intimate knowledge of the case has been secured. See Salter v. Upjohn, 593 F.2d 649, 651 (5th Cir.1979) (granting protective order for executive where plaintiff had sought to depose the president of the company before deposing lower level executives); Baine v. General Motors Corp, 141 F.R.D. 332 (M.D.Ala.1991) (granting protective order for Vice President of General Motors where plaintiff had failed first to depose lower level employees). Here, American Blind is seeking to depose Page only after learning from Google's designated 30(b)(6) witnesses that he may have relevant first hand information.

*Google,* 2006 U.S. Dist. LEXIS 67284, 2006 WL 2578277, *3.

In the case at bar, UCT wants Shimmon to clarify the "murky" picture of the chain of title. Apparently Eric Redemann, one of the inventors of the patent-in-suit, testified at his own deposition that there had been numerous changes over the years with respect to the chain of title to Celerity and presumably to its intellectual property. His testimony UCT finds confusing with respect [*13] to UNIT and its relationship with Celerity (Kobialka Decl., Ex. 11 at 12:8-14:18). UCT hopes that Shimmon may have firsthand information to clear up the confusion.

The ruling by the court in the *Google* case does not really help UCT, since the "confusion" created by Eric Redemann may well be cleared up by another employee, and UCT presents no specific evidence that Redemann testified that only Shimmon could clarify the chain of title to the patent.

UCT may only depose Shimmon and Murphy after either interrogatories or the depositions of lower-level employees have failed to provide the discovery it seeks. UCT seems to believe that as long as it schedules the depositions of Shimmon and Murphy after the depositions of the lower level employees, that it has met its burden to justify these apex depositions according to the case law. This is not the law. Nor would it be proper for UCT to take half-hearted depositions of lower-level employees in order to set up an opportunity to depose Shimmon and Murphy. It must make a good faith effort to extract the information it seeks from interrogatories and depositions of lower-level Celerity employees.

During oral arguments before the Court [*14] on December 20, 2006, attorneys for Ultra Clean Technology Systems and Service, Inc. and Ultra Clean Holdings, Inc. (collectively, "UTC") suggested that the deposition testimony of Joseph Foster (whose deposition had just been taken) provided some evidence that either or both Shimmon and Murphy had first-hand and non-repetitive information that would require the Court to deny a protective order preventing the depositions of Shimmon and Murphy. See, e.g., *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.,* 2006 U.S. Dist. LEXIS 67284 (N.D. Cal. 2006) (allowing the deposition of one of Google's founders only after an evidentiary showing that implicated first-hand knowledge to the founder.). The Court ordered that the parties submit supplemental briefing as to whether Mr. Foster's deposition transcript provides a basis for deposing Shimmon or Murphy.

**Conclusion**

2007 U.S. Dist. LEXIS 8295, *

The Court reviewed the parties' briefing and the deposition transcript of Joseph Foster and found no indication that either David Shimmon or John Murphy possess firsthand and non-repetitive knowledge regarding issues relevant to this lawsuit. Accordingly, Celerity's motion for protective order is granted, [*15] pending the taking of less intrusive methods of discovery, including interrogatories and depositions of lower-level Celerity employees. UCT may renew its notice of depo-

sitions of Shimmon and Murphy should those means of discovery prove inadequate.

IT IS SO ORDERED.

DATED: January 24, 2007

JAMES LARSON

Chief Magistrate Judge

**Citation #5**
**2009 U.S. Dist. LEXIS 34496**

LEXSEE



Positive
As of: Jun 07, 2013

### CHICK-FIL-A, INC., Plaintiff, v. CFT DEVELOPMENT, LLC, PANDA RESTAURANT GROUP, INC., PANDA EXPRESS, Defendants.

#### Case No. 5:07-cv-501-Oc-10GRJ

#### UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, OCALA DIVISION

#### 2009 U.S. Dist. LEXIS 34496

#### April 3, 2009, Decided
#### April 3, 2009, Filed

**SUBSEQUENT HISTORY:** Motion denied by, Motion granted by, in part, Motion denied by, in part, Summary judgment denied by, Request denied by, As moot Chick-Fil-A, Inc. v. CFT Dev., LLC, 2009 U.S. Dist. LEXIS 53864 (M.D. Fla., June 17, 2009)

**CORE TERMS:** deposition, restrictive covenants, depose, lease, summary judgment, personally, discovery, restaurant, apex, site, protective order, direct knowledge, questioned, covenant, deposing, thorough, drafting, barring, deposed, property located, write a letter, relevance, disputed, marginal, chicken

**COUNSEL:** [*1] For Chick-Fil-A, Inc., Plaintiff: Adriana Riviere-Badell, LEAD ATTORNEY, Courtney Anne Caprio, Hunton & Williams, LLP*, Miami, FL; Matthew J. Calvert, LEAD ATTORNEY, Hunton & Williams, Atlanta, GA; Robert Quentin Williams, LEAD ATTORNEY, Williams, Smith & Summers, PA, Tavares, FL.

For CFT Development, LLC, Panda Express, Inc., Panda Restaurant Group, Inc., Defendants, Counter Claimants: Jeffrey E. Appleang, John J. Agliano, LEAD ATTORNEY, Williams, Schifino, Mangione & Steady, PA, Tampa, FL.

For Panda Restaurant Group, Inc., Defendant: Jeffrey E. Appleang, John J. Agliano, LEAD ATTORNEY, Williams, Schifino, Mangione & Steady, PA, Tampa, FL; Daniel Paul Dietrich, Williams, Schifino, Mangione & Steady, PA*, Tampa, FL.

For Chick-Fil-A, Inc., Counter Defendant: Matthew J. Calvert, LEAD ATTORNEY, Hunton & Williams, Atlanta, GA.

For CFT Development, LLC, Panda Restaurant Group, Inc., Panda Express, Inc., Counter Claimants: John J. Agliano, LEAD ATTORNEY, Williams, Schifino, Mangione & Steady, PA, Tampa, FL.

**JUDGES:** GARY R. JONES, United States Magistrate Judge.

**OPINION BY:** GARY R. JONES

**OPINION**

**ORDER**

Pending before the Court is Defendants/Counter-Plaintiffs' Motion To Compel Deposition of Daniel T. Cathy. (Doc. 63.) Plaintiff, [*2] Chick-Fil-A, Inc. has filed a memorandum in opposition and, accordingly, the matter is ripe for review. For the reasons discussed below, Defendants/Counter-Plaintiffs' Motion To Compel Deposition of Daniel T. Cathy is due to be **DENIED.**

**I. INTRODUCTION**

Defendants/Counter-Plaintiffs, CFT Develpments, LLC ("CFT"), Panda Restaurant Group, Inc., ("PRG"), and Panda Express, Inc. ("PEI")(collectively "Panda")

Page 1

request the Court to enter an order compelling Plaintiff/Counter-Defendant, Chick-Fil-A, Inc. ("CFA") to produce its President and Chief Operating Officer, Daniel T. Cathy ("Cathy") for deposition. During the discovery phase of this case, Panda unsuccessfully attempted to schedule the deposition of Cathy in Atlanta, Georgia - where Cathy resides and CFA maintains its corporate offices. Consequently, Panda unilaterally noticed the deposition of Cathy for December 30, 2008 the last day for fact discovery in this case. Prior to the commencement of the deposition CFA advised Panda in writing that it would not produce Cathy for deposition and consequently Panda filed the instant motion to compel. [1]

> 1   Typically, where, as here, a party resists producing an "apex" witness for deposition, the correct [*3] procedural mechanism is to file a motion for protective order, rather than refusing to produce the witness and thus forcing the party seeking to conduct the deposition to file a motion to compel. However, in this instance counsel for the parties recognized pragmatically that there was a fundamental dispute concerning whether Panda could depose Cathy and therefore the procedural vehicle in which the issue is presented to the Court does not effect the result. The Court's analysis of the issue is ultimately the same.

Panda raises several arguments in support of its position that Cathy possesses superior, first-hand or unique knowledge regarding CFA's intentions with respect to the restrictive covenants involved in this case as well as information relevant to the claims and defenses in this case. According to Panda, Cathy has specific knowledge with respect to: (1) a March 25, 2005 letter regarding property located in Seminole, Pinellas County, Florida; (2) the execution of a ground lease for property located on Ulmerton Road in Clearwater, Florida; and (3) various other issues in the case including the meaning of the words in the restrictive covenants, CFA's growth strategy, CFA's view [*4] of Panda as a competitor and CFA's knowledge of Panda's existence and operation.

CFA counters that some of the information sought by Panda is irrelevant and, as evidenced by the affidavit of Cathy, [2] he does not have superior or unique knowledge regarding the issues which Panda has identified as areas of inquiry at his deposition.

> 2   Doc. 65, Ex. 10.

## II. DISCUSSION

Requests to depose high level corporate officers, as here, are commonly referred to as "apex" depositions and there is a considerable body of jurisprudence addressing the circumstances concerning when it is appropriate to

depose the top executive in a company. Generally, because the CEO of a large corporation is familiar with the big picture of the operations of a company - and is not familiar with the day to day operations of a business - most courts have fashioned a test that requires the party seeking to depose a CEO to show that the executive has "unique or superior knowledge of discoverable information." *See, e.g.* Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979)(protective granted barring deposition of President of drug company because he lacked direct knowledge of the facts in dispute, and other employees [*5] had more direct knowledge); Lewelling v. Farmers Ins. Of Columbus, Inc., 879 F. 2d 212, 218 (6th Cir. 1989)(protective order barring plaintiffs from deposing their employer's CEO, who lacked knowledge about any relevant facts); Burns v. Bank of America, No. 03 Civ. 1685 RMB JCF, 2007 U.S. Dist. LEXIS 40037, 2007 WL 1589437, *3 (S.D.N.Y. June 4, 2007)(holding that unless it can be demonstrated that a corporate official has some unique knowledge of the issues in the case it may be appropriate to preclude a deposition of a highly placed executive while allowing other witnesses with the same knowledge to be questioned); Faro Technologies, Inc. v. Romer, Inc., No. 6:06-cv-13-Orl-19KRS, 2007 U.S. Dist. LEXIS 9792, 2007 WL 496615 *3 (M.D.Fla. Feb.12, 2007); Baine v. Gen. Motors Corp., 141 F.R.D. 332, 335 (M.D. Ala. 1991); *see also,* Folwell v. Hernandez, 210 F.R.D. 169, 173-174 (M.D.N.C. 2002)(discussing the standard for permitting an apex deposition).

While not dispositive of the Court's ruling on Defendants' motion, it is notable that there is no mention by Panda in its motion for summary judgment that it has been unable to fully present its position to the Court in the absence of the deposition of Mr. Cathy. The fact that Panda has been able to [*6] fully present its arguments and position in its motion for summary judgment without deposing CFA supports CFA's position that Cathy does not have knowledge of any relevant disputed facts, let alone superior or unique knowledge. The Court will, nonetheless, briefly address several of the areas Panda contends support their argument that the deposition testimony of Cathy is essential.

One of the areas identified by Panda about which they wish to depose Cathy relates to correspondence between CFA and Panda concerning a parcel of real estate in Seminole, Pinellas County, referred to as the "Seminole Location." According to Panda, Cathy did not respond to a March 2005 letter from a Mr. Davin. Apparently, over a period of seven months during 2004 Panda attempted without success to negotiate a release of a restrictive covenant applicable to the Seminole Location. Indeed, Panda refers to these events as part of its equitable estoppel argument in its motion for summary judg-

ment. Extensive discovery was taken and is relied upon by the parties in the motions for summary judgment concerning the Davin letter and CFA's responses. It is undisputed, however, that Cathy never personally responded to [*7] the Davin letter but rather responses were sent by CFA's Senior Vice President of Real Estate and General Counsel. The fact that Cathy did not personally write a letter in response to Mr. Davin's letter has little, if any, bearing on the disputed issues in this case and thus its relevance is marginal at best. Tto the extent that Panda wishes to attach significance to the fact that Cathy did not personally write a letter in response to the Davin letter it is free to make that argument without the need to depose Cathy. Simply because Cathy did not personally send a letter does not mean that Cathy has superior or unique knowledge regarding an issue such that he should be compelled to appear for a deposition.

Defendants also argue that they should be permitted to depose Cathy because he signed a lease on the restaurant site on Ulmerton Road in Clearwater, Florida which includes a restrictive covenant similar to the covenant on the Mt. Dora site. Apparently, Cathy was one of two officers to sign the lease more than nine years ago. According to the affidavit of Cathy, he does not have any recollection of even signing the Ulmerton lease and he has never negotiated, drafted or even approved [*8] a restrictive covenant. Panda has deposed representatives of CFA pursuant to Rule 30(b)(6) and made thorough inquiry with regard to the negotiation, drafting, purpose, intent and enforcement of the restrictive covenant. There is simply nothing to suggest that Panda has not been able to fully explore these issues without having to depose Cathy.

Defendants also suggest that they should be permitted to take Cathy's deposition to explore CFA's intentions and motivations relative to the Mt. Dora Covenant, as well as relative to other restrictive covenants. In addition, Defendants argue that they should be able to depose Cathy with regard to his definition of "chicken" as that term is used in the restrictive covenant in this case. Inquiry of Cathy regarding these issues would be of marginal relevance. The interpretation of the language in the restrictive covenant - and the meaning of the term "Chicken" - ultimately will be determined by the Court in interpreting the language in the restrictive covenant. Mr. Cathy's personal view or comments on these issues would not serve any useful purpose, particularly in view of the fact that Panda has not suggested Cathy was ever personally involved in [*9] negotiating, drafting or approving the Mt. Dora restrictive covenant or any of the other restrictive covenants in other CFA leases. As such,

Defendants' argument in this respect fails to identify any matter about which Cathy has any knowledge, let alone unique or superior knowledge.

Additionally, while Panda complains in its motion that there are other areas about which Cathy is knowledgeable, Defendants fail to point to any specific issues and instead simply point out that Cathy, as a member of the executive committee, must have knowledge about such things as CFA's growth strategy and where CFA looks to construct its restaurants. While this may be true - and it is not surprising that the CEO of a company would have knowledge about such issues - these issues are largely irrelevant to whether the restrictive covenant in this case is enforceable or not.

Lastly, Defendants suggest that they wish to make inquiry of Cathy with regard to CFA's recordkeeping and document retention practices and CFA's knowledge of Panda's existence and operation at other sites. These areas of inquiry have been thoroughly explored by Defendants in Rule 30(b) depositions. And while the Defendants contend that [*10] Panda has sought information from other witnesses, they fail to point to any specific issues where CFA witnesses were questioned and stated that Cathy, and not the deponent, would be the individual with unique or superior knowledge regarding the particular subject.

Accordingly, for all of these reasons, Defendants have failed to convince the Court that Cathy possesses any unique or superior knowledge concerning any information which is relevant and material to the issues in this case or that Defendants have been unable to obtain full and complete discovery from CFA representatives, already deposed in this case, concerning the matters identified in Defendants' motion to compel. In the Court's view - and as underscored by the thorough record presented to the Court in the recent summary judgment filings - there is simply no compelling reason for the taking of Cathy's deposition. Defendants/Counter-Plaintiffs' Motion To Compel Deposition of Daniel T. Cathy is, therefore, due to be **DENIED**.

**IT IS SO ORDERED**.

**DONE AND ORDERED** in Ocala, Florida, on April 3, 2009.

/s/ Gary R. Jones

**GARY R. JONES**

**United States Magistrate Judge**

**<u>Citation #6</u>**
**2010 U.S. Dist. LEXIS 56190**

LEXSEE



Positive
As of: Jun 07, 2013

**Richard Doble, et al., Plaintiffs, v. The Mega Life and Health Insurance Company,
Defendants.**

**No. C 09-1611 CRB (JL)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2010 U.S. Dist. LEXIS 56190**

**May 18, 2010, Decided
May 18, 2010, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at Doble
v. Mega Life & Health Ins. Co., 2010 U.S. Dist. LEXIS
81661 (N.D. Cal., July 14, 2010)

**PRIOR HISTORY:** Doble v. Mega Life & Health Ins.
Co., 2010 U.S. Dist. LEXIS 56147 (N.D. Cal., May 17,
2010)

**CORE TERMS:** deposition, handling, personal
knowledge, multi-state, protective, involvement, settle-
ment, order prohibiting, deposing, high level, negotia-
tions, personally, oversight, staff, executive officer, good
cause, lower level, high-level, discovery, final offer,
consumer, protective order, affirming, decision to termi-
nate, insurance claims, public statements, unreasonable-
ness, declaration, processing, incorrect

**COUNSEL:**  [*1] For Richard W. Doble, Jr., Rochelle
N. Doble, Plaintiffs, Counter-defendants: Michael Kai
Ng, LEAD ATTORNEY, H. Sinclair Kerr, Jr., Kerr &
Wagstaffe LLP, San Francisco, CA; Kelly Anne Corco-
ran, Kerr and Wagstaffe, San Francisco, CA.

For Mega Life and Health Insurance Company, Defend-
ant, Counter-claimant: Catherine La Tempa, LEAD
ATTORNEY, Andre Joseph Cronthall, Fred R. Puglisi,
Sheppard Mullin Richter & Hampton LLP, Los Angeles,
CA.

**JUDGES:** JAMES LARSON, United States Magistrate
Judge.

**OPINION BY:** JAMES LARSON

**OPINION**

**ORDER GRANTING DEFENDANT'S MOTION
FOR PROTECTIVE ORDER TO PREVENT DEP-
OSITION OF DEFENDANT'S CHIEF EXECUTIVE
OFFICER (Granting Docket # 66)**

**I. Introduction**

All discovery in this case has been referred by the
district court (Hon. Charles R. Breyer) under 28 U.S.C. §
636(b). This Court received the parties' Joint Statement
re Protective Order Prohibiting Plaintiff from Deposing
MEGA's CEO and President Phillip Hillebrand. The par-
ties are familiar with the factual and procedural back-
ground of this case and the Court need not reiterate them
here. The Court finds this matter suitable for decision
without a hearing, under Civil Local Rule 7-1(b).

Plaintiffs assert that Mr. Hillebrand is a percipient
witness  [*2] with personal, direct involvement in the
handling of the claims at issue in this case, the negotia-
tions between the Dobles and MEGA concerning poten-
tial resolution of those claims, and the decision to termi-
nate those discussions after making a "final offer." In
addition, Plaintiffs assert that Mr. Hillebrand is the key
fact witness to MEGA's purported reform of its claims
handling practices in response to the Multistate Market
Conduct Examination, including the very practices at
issue in this case.

MEGA contends that Plaintiffs are incorrect. Mr. Hillebrand has very little, if any, personal knowledge about the handling of Mrs. Doble's claims, nor is he the "key fact witness" concerning the Multistate Market Conduct Examination as he wasn't even employed by MEGA during the examination period, at the date the exam was delivered, the date of MEGA's response, or the date of the agreement settling the Multistate Market Conduct Examination. Thus, MEGA asks the Court to issue a protective order prohibiting Plaintiffs from deposing Mr. Hillebrand.

The parties met and conferred, but were unable to resolve their dispute.

## II. Analysis

"Upon a motion by any party . . . and for good cause shown," this [*3] Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the disclosure or discovery not be had." Fed. R. Civ. P. 26(c). This Rule protects an entity when it faces an "apex" deposition -- the deposition of its executive officer -- such as the one sought by Plaintiffs here. See, e.g., _Thomas v. Int'l Bus. Machs._, 48 F.3d 478, 483 (10th Cir. 1995) (affirming order precluding deposition of IBM executive who had no personal knowledge of pertinent facts); _Kyle Engineering Co. v. Kleppe_, 600 F.2d 226, 231-232 (9th Cir. 1979) (affirming district court's decision to limit deposition of a government agency head, and ordering answers to interrogatories instead). Plaintiffs attempt to distinguish this case as involving government officials rather than company executives; this distinction is meaningless. See _Celerity, Inc., infra_, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, *1; _Salter v. Upjohn Co._, 593 F.2d 649, 651 (5th Cir.1979) (granting protective order where plaintiff had sought to depose the president of the company before deposing lower level executives); _Celerity, Inc. v. Ultra Clean Holding, Inc._, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, *1 (N.D.Cal. 2007) [*4] (prohibiting depositions of high-level officers unless other methods of discovery prove unsatisfactory). See also _Liberty Mut. Ins. Co. v. Superior Court_, 10 Cal. App. 4th 1282, 13 Cal. Rptr. 2d 363 (1992) (prohibiting the deposition of high-level officer without a showing of good cause).

Defendant contends that Plaintiffs attempted to use their advocate, John Metz, director of JustHealth, a consumer advocacy group, to engage Mr. Hillebrand so that they could use that interaction later to justify taking Mr. Hillebrand's deposition. Defendant claims that, even though Mr. Metz was aware of the investigators who were actually responsible for handling these issues, he continually copied and contacted Hillebrand, in an effort to engage him directly in the dispute. Defendant argues that "this is a tactic sometimes used by consumer advocates and insureds' attorneys so that they can later argue that these officers were involved and seek their deposition."

In support of the motion for protective order, Mr. Hillebrand provided this declaration under penalty of perjury:

> 1. I am an adult resident of Tarrant County, Texas and over the age of twenty-one (21). I am the President and Chief Executive Officer ("CEO") of The [*5] MEGA Life and Health Insurance Company ("MEGA"). The facts set forth below are based on my personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

> 2. This declaration is submitted in support of MEGA's Motion for a Protective Order Prohibiting Plaintiffs from Deposing MEGA's CEO and President Phillip J. Hillebrand in the case entitled Doble v. The MEGA Life and Health Insurance Company, Case No. CV09-01611 CRB.

> 3. In June, 2008, I was appointed the President and CEO of MEGA. Prior to that time, I was employed by New York Life Insurance Company, retiring in 2008 as Vice Chairman.

> 4. My responsibilities do not involve handling, processing or making any decisions on claims submitted to MEGA.

> 5. During the latter part of 2008 and early 2009, the Dobles' consumer advocate, John Metz, telephoned or emailed me regarding Rochelle Doble's claims. I instructed my assistant to direct him and his emails to our senior staff and the individuals responsible for handling Mrs. Doble's claims and, on February 24, 2009, I sent an email requesting our senior staff to "make a final offer and hold our position." Nonetheless, I did not have any personal involvement [*6] in the handling, processing or decisions made on any claims submitted to MEGA by the Dobles.

> 6. I did not make any decisions on the Dobles' insurance claims. I have not personally reviewed the Dobles' insurance claims, and I have not personally assessed

whether the decisions made on the Dobles' claims were correct or incorrect.

7. I had no personal involvement in the Multi-State Market Conduct Examination for the period January 1, 2000 through December 31, 2005 ("Multi-State Market Conduct Examination") which was finalized in December 2007, before I became employed by MEGA. I was not and am not personally involved in any actions taken by MEGA arising from that examination other than at a high level management oversight. I was not and am not personally involved in any response by MEGA arising from the settlement of an examination by Massachusetts regulators other than at a high level management oversight.

8. I did not participate in MEGA's response to the Multi-State Market Conduct Examination also made in December 2007 before I was employed by MEGA. I did not and do not participate in MEGA's compliance with any requirements imposed by any regulator in connection with the Multi-State Market [*7] Conduct Examination other than at a high level management oversight. I did not and do not implement any changes to MEGA's claims handling practices made in connection with the Multi-State Market Conduct Examination other than at a high level management oversight.

Plaintiffs make much of Hillebrand's e-mail statement beginning with "Enough is enough!" And continuing: "Get the right people in the room and let's make a decision. Communicate to him what we are willing to accept and not accept and let him know that is our final offer." They rely on this as evidence of his personal involvement in the decision-making on the Dobles' claims. They also offer an e-mail in which he expresses exasperation to his staff: "everyone has worked extremely hard to resolve this [and] I can't believe we are still at it." Plaintiffs contend this is relevant to Hillebrand's personal decision to terminate negotiations with the Dobles. According to Plaintiffs, Hillebrand is the *only* person who can testify about why he decided "enough is enough," or why the time had been reached where MEGA was no longer willing to continue its negotiations. Plaintiffs argue that the lower level employees they have already

deposed [*8] are "unable to provide any information" concerning MEGA's decision to terminate negotiations. That leaves only Hillebrand.

This Court finds that a CEO's telling his staff to try harder or to stop trying is not the level of personal involvement which would justify deposition of the CEO. This kind of generalized motivational admonition is pure high-level management, and not the type of hands-on action which demonstrates the unique personal knowledge required to compel a deposition of a CEO.

With respect to the multi-state examinations and settlement process, Plaintiffs rely on the fact that Hillebrand signed off on the settlement agreement and made public statements in 2008 regarding the settlements. Therefore, argue Plaintiffs, he has unique knowledge that similar misconduct continued in regard to the Dobles' claims, as well as the unreasonableness of the conduct, and the company's knowledge for purposes of punitive damages.

To the contrary, the Court asks that, if the company had settled claims resulting from investigations which occurred prior to Hillebrand's employment with MEGA, what else was Hillebrand supposed to do, once the culmination was taking place on his watch? His signature [*9] at that point was more ceremonial than substantive, and did not represent any unique personal knowledge, of either MEGA's wrongdoing, the unreasonableness of its conduct, or the company's knowledge. All these issues emerged and were fully manifest prior to his employment with MEGA. For the same reasons, his public statements were part of his job as the public face of the company, and did not represent any personal participation by him in the process of negotiating the settlement.

Although Plaintiffs have perhaps not obtained the answers they wanted from lower level employees, that failure does not automatically justify their reaching higher, without the requisite showing of the higher-level official's unique personal knowledge.

### III. Conclusion and Order

Accordingly, due to Plaintiffs' failure to establish good cause for taking the deposition of MEGA CEO Phillip Hillebrand, Defendant's motion for a protective order prohibiting that deposition is granted.

IT IS SO ORDERED.

DATED: May 18, 2010

/s/ James Larson

JAMES LARSON

United States Magistrate Judge

**Citation #7**
**2009 U.S. Dist. LEXIS 83755**

LEXSEE



Positive
As of: Jun 07, 2013

**DR SYSTEMS, INC., Plaintiff, v. EASTMAN KODAK CO., Defendant. And Related Counter-Claims**

**Case No. 08cv669-H (BLM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**2009 U.S. Dist. LEXIS 83755**

**September 14, 2009, Decided**
**September 14, 2009, Filed**

**SUBSEQUENT HISTORY:** Summary judgment denied by, Partial summary judgment granted by, Motion to strike denied by DR Sys. v. Eastman Kodak Co., 2009 U.S. Dist. LEXIS 104080 (S.D. Cal., Nov. 9, 2009)

**PRIOR HISTORY:** DR Sys. v. Eastman Kodak Co., 2009 U.S. Dist. LEXIS 75549 (S.D. Cal., Aug. 24, 2009)

**CORE TERMS:** deposition, discovery, notice, depose, protective order, personal knowledge, apex, deponent, infringement, noticed, good cause, deposed, patent, conversation, burdensome, high-level, harass, relevant information, mere fact, high level, lower level, shareholder, repetitive, in-house, infringe, deposing, federal rules, relevant facts, undue burden, heavy burden

**COUNSEL:** [*1] For DR Systems, Inc., a California Corporation, Plaintiff: Allison H Goddard, John Christopher Jaczko, LEAD ATTORNEYS, Jaczko Goddard, San Diego, CA; Joseph A. Culig, LEAD ATTORNEY, PRO HAC VICE, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL; Dina M Hayes, Frederick C Laney, Raymond P Niro, Sr, PRO HAC VICE, Niro, Scavone, Haller & Niro, Chicago, IL; Matthew G McAndrews, Niro Scavone Haller and Niro, Chicago, IL.

For Eastman Kodak Company, Defendant, Counter Claimant: Mark E. Ashton, Sailesh K. Patel, LEAD ATTORNEYS, PRO HAC VICE, Schiff Hardin LLP, Chicago, IL; Stephen Maxwell Hankins, LEAD ATTORNEY, Schiff Hardin LLP, San Francisco, CA.

For DR Systems, Inc., a California Corporation, Counter Defendant: Allison H Goddard, John Christopher Jaczko, LEAD ATTORNEYS, Jaczko Goddard, San Diego, CA; Joseph A. Culig, LEAD ATTORNEY, PRO HAC VICE, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL; Frederick C Laney, Raymond P Niro, Sr, PRO HAC VICE, Niro, Scavone, Haller & Niro, Chicago, IL; Matthew G McAndrews, Nicholas M Dudziak, Niro Scavone Haller and Niro, Chicago, IL.

**JUDGES:** BARBARA L. MAJOR, United States Magistrate Judge.

**OPINION BY:** BARBARA L. MAJOR

**OPINION**

**ORDER (1) DENYING DR SYSTEMS' MOTION FOR PROTECTIVE ORDER [*2] AND (2) GRANTING IN PART AND DENYING IN KODAK'S MOTION FOR PROTECTIVE ORDER**

[Doc. Nos. 99, 110]

On July 9, 2009, DR Systems, Inc. ("DR Systems") moved this Court for a Protective Order under Federal Rule of Civil Procedure 26(b) to quash Eastman Kodak Company's ("Kodak") deposition notice for Leo Zuckerman, a shareholder and Board member of DR Systems. Doc. No. 99. Similarly, on July 14, 2009, Kodak filed a Motion for Protective Order and Motion to Quash DR Systems' deposition notices for Antonio Perez, Kodak's Chairman and Chief Executive Officer ("CEO"), and

Peter Cody, Kodak's in-house Director of Patent Litigation and Vice President. Doc. No. 110. Subsequently, the parties timely opposed and replied to the respective motions. Doc. Nos. 116, 120, 121, 128. The Court took the matters under submission pursuant to Civil Local Rule 7.1(d)(1). Doc. Nos. 101, 108. Having reviewed the briefing submitted, and for the reasons set forth below, DR Systems' motion is **DENIED** and Kodak's motion is **GRANTED IN PART** and **DENIED IN PART**.

## Background

On April 14, 2008, DR Systems filed a Complaint for declaratory judgment, asking the Court to declare Kodak's patent, U.S. Patent No. 5,414,811 (hereinafter [*3] "the '811 patent"), [1] invalid and to find that DR Systems did not infringe the '811 patent. Doc. No. 1. Kodak previously had mailed DR Systems a warning of possible infringement. Id. On May 7, 2008, Kodak answered and counterclaimed for declarations of the '811 patent's validity and DR Systems' infringement. Doc. No. 9. The current disputes arise from Kodak's Notice of Deposition for Leo Zuckerman, dated June 25, 2009 and DR Systems' Notices of Deposition for Peter Cody and Antonio Perez, both dated July 9, 2009. Doc. Nos. 99, 110.

1   The '811 patent concerns technology for displaying digital images. Doc. No. 1.

## Legal Standard

### I. Scope of Discovery

The scope of discovery is defined by Federal Rule of Civil Procedure 26(b). Pursuant to that rule, litigants may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense." Rule 26(b)(1). Relevant information for discovery purposes includes any information "reasonably calculated to lead to the discovery of admissible evidence." Id.

District courts enjoy broad discretion both to determine relevancy for discovery purposes, see Hallett v. Morgan, 296 F.3d 732, 751 (9th Cir. 2002), and to limit discovery [*4] to prevent its abuse. See Rule 26(b)(2) (instructing that courts may limit discovery where it is "unreasonably cumulative or duplicative," or obtainable "from some other source that is more convenient, less burdensome, or less expensive," or where its burden or expense "outweighs its likely benefit").

### II. Motion for Protective Order

Upon a showing of good cause, the Court "may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Rule 26(c). "For good cause to exist, the party

seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." Phillips ex rel. Estates of Byrd v. General Motors Corp., 307 F.3d 1206, 1210-11 (9th Cir. 2002), citing Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir. 1992) (holding that "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test"); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (Under liberal discovery principles of the federal rules, those opposing discovery are required to carry a heavy burden of showing why discovery [*5] should be denied).

The court has wide discretion to determine what constitutes a showing of good cause and to fashion a protective order that provides the appropriate degree of protection. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). However, courts should not bar a deposition "absent extraordinary circumstances" as such a prohibition would "likely be in error." Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979); see also Blankenship, 519 F.2d at 429; ("A strong showing is required before a party will be denied entirely the right to take a deposition."); United States EEOC v. Caesars Entm't, Inc., 237 F.R.D. 428, 432 (D.Nev. 2006) ("As a general rule, courts will not grant protective orders that prohibit the taking of deposition testimony.").

### III. Apex Depositions

As discussed above, a party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied. Nevertheless, when a party seeks to take the deposition of an official at the highest level or "apex" of a corporation, the court may exercise its authority under the federal rules to limit discovery. WebSideStory, Inc. v. NetRatings, Inc., 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567, *2 (S.D. Cal. Apr. 6, 2007); Celerity, Inc. v. Ultra Clean Holdings, Inc., 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, *3 (N.D. Cal. Jan. 25, 2007) [*6] ("Virtually every court that has addressed deposition notices directed at an official at the highest level or "apex" of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment.") (citing Mulvey v. Chrysler Corp., 106 F.R.D. 364 (D.C.R.I. 1985)).

In deciding whether to allow an apex deposition, courts often consider: (1) whether the high-level deponent has unique, non-cumulative knowledge of the facts at issue; and (2) whether there are other, less burdensome discovery methods. WebSideStory, 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567, at *2; Celerity, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, at *3. "When a high-level corporate executive lacks unique or superior knowledge of the facts in dispute, courts have found that

good cause exists to prohibit the deposition." Web-SideStory, 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567, at *2. "However, when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." Id.

**Discussion**

**I. DR Systems' Motion for Protective Order**

DR Systems asks the Court to prohibit Kodak from deposing Mr. Leo Zuckerman because, as a shareholder and Board member of DR Systems, Mr. Leo Zuckerman is at the "apex" of the corporate management [*7] and does not have "unique personal knowledge" of the issues in dispute in this litigation. Doc. No. 100 at 4. DR Systems further argues that any factual information Mr. Leo Zuckerman may possess would duplicate other discovery already obtained by Kodak and/or which could have been obtained through other, less-intrusive methods. Id.; Doc. No. 99 at 2-3. Finally, DR Systems asserts that the deposition notice is designed to harass DR Systems and does not seek relevant facts. [2] Doc. No. 99 at 2-3.

> 2    DR Systems also argues that the notice of deposition was improperly served because "litigation counsel for DR Systems is not authorized to accept service of any discovery for Leo Zuckerman." Doc. No. 100 at 2. "Under Rule 30(b)(1), it is well recognized that 'if the corporation is a party, the notice compels it to produce any 'officer, director or managing agent' named in the deposition notice. It is not necessary to subpoena such individual. The corporation risks sanctions-including default or dismissal-if the designated individual fails to appear.'" Cadent, Ltd. v. 3M Unitek Corp., 232 F.R.D. 625, 628 n.1 (C.D. Cal. 2005). Mr. Leo Zuckerman currently is one of DR Systems' directors. Doc. No. [*8] 100 at 2. As such, the Court finds that service on DR Systems' counsel was proper and reviews DR Systems' Motion for Protective Order on its merits.

Kodak responds that Mr. Leo Zuckerman is "much more than an 'apex' witness - he is a percipient witness and controlling agent for DR on the topic of willful infringement." Doc. No. 118 at 2. Kodak argues that "even as an 'apex deponent' Kodak is entitled to depose Mr. Leo Zuckerman because he has "unique, personal knowledge that can be obtained only from him." Id. at 4. Kodak further argues that such knowledge is directly relevant to the central issues in this case, including willful infringement. Id. Therefore, Kodak asks that it be allowed to proceed with the properly noticed deposition of Mr. Leo Zuckerman. Id. at 6.

The Court finds that DR Systems has not met its burden for the issuance of a protective order. First, Kodak has established that Mr. Leo Zuckerman has direct, personal knowledge of facts relevant to this action. During his deposition, Mr. Chip Zuckerman, Mr. Leo Zuckerman's son and DR Systems' Chief Financial Officer, testified that after receiving Kodak's October 2007 letter regarding the '811 Patent, he discussed it with [*9] several people, including Mr. Leo Zuckerman. Doc. No. 119 (Deposition of Charles Zuckerman at 22-23). While Mr. Chip Zuckerman testified that he "did not go into the detail [sic] of the claims with [Mr.] Leo Zuckerman," he acknowledged that he did discuss it with him and Mr. Leo Zuckerman did not direct him to conduct any investigation into the allegation. Id. at 41. While DR Systems quotes testimony that its Rule 30(b)(6) deponent did not discuss the investigation of Kodak's claims with Mr. Leo Zuckerman (doc. no. 120 at 22), it does not contradict Mr. Chip Zuckerman's testimony that a conversation occurred. As such, the Court finds that Mr. Leo Zuckerman has direct, personal knowledge of topics that are relevant to the claims and defenses at issue in this case.

DR Systems argues that even if Mr. Leo Zuckerman has such personal knowledge, the desired information can be obtained from "less burdensome" sources. While that may be true for some information, Mr. Chip Zuckerman was unable to provide specific details regarding their conversation and Mr. Leo Zuckerman's response. Moreover, the mere fact that one person testified about a conversation does not make any additional testimony about [*10] the conversation repetitive. As one court stated, "[t]he mere fact ... that other witnesses may be able to testify as to what occurred at a particular time or place does not mean that a high level corporate officer's testimony would be 'repetitive.' Indeed, it is uncommon for different witnesses to an event to have differing recollections of what occurred." First National Mortgage Co. v. Federal Realty Investment Trust, 2007 U.S. Dist. LEXIS 88625, 2007 WL 4170548, *3 (N.D. Cal. 2007).

Second, DR Systems is a small, family-run corporation. While neither party specifies the number of people on DR System's Board of Directors, Mr. Chip Zuckerman testified that Ms. Emma Zuckerman, Leo's wife and Chip's step-mother, is a member of the board, and two of Chip's brothers, Scott and Fred, have served as directors. Doc. No. 119 (Declaration of Lisa C. McCurdy at P 5). Kodak has not deposed any of these other family members, nor is it seeking to depose all of the board members. Doc. No. 118 at 3. Rather, Kodak appears to be targeting the individuals it believes possess personal knowledge of relevant facts. Id. Moreover, the Court notes that Kodak has deposed several of DR Systems' employees [*11] and managing agents, including two Rule 30(b)(6) witnesses. Doc. No.

99 at 2-3; see First Nat'l Mortgage Co. v. Fed. Realty Inv. Trust, 2007 U.S. Dist. LEXIS 88625, 2007 WL 4170548, *2 (N.D. Cal. 2007) (allowing the depositions of high-level executives *after* depositions of lower-level employees suggested that they might have at least some relevant personal knowledge); Google v. Am. Blind & Wallpaper Factory, Inc., 2006 U.S. Dist. LEXIS 67284, 2006 WL 2578277, *3 (N.D. Cal. 2006) (allowing deposition of corporate founder only *after* taking from 30(b)(6) witnesses that he may have relevant first hand information). These facts establish that Kodak's deposition notice is not designed to harass DR Systems, but to elicit personal knowledge from the deponent.

Because Kodak has deposed several other witnesses and completed all other discovery, the Court believes Kodak can limit questioning in a manner to avoid unreasonable duplication. See Kelley v. Microsoft Corp., 2008 U.S. Dist. LEXIS 97340, 2008 WL 5000278, *2 (W.D. Wash. Nov. 21, 2008). Indeed, to safeguard against undue burden or repetition, the Court will impose a three hour time limit on the deposition. Id.

Accordingly, the Court finds that DR Systems has not shown that Kodak noticed Mr. Leo Zuckerman's deposition solely [*12] to "harass and annoy" DR Systems. Nor has DR Systems demonstrated that an examination of Mr. Leo Zuckerman would be unduly burdensome, cause specific harm, or result in prejudice. Rule 26(c); Rivera v. Nibco, Inc., 364 F.3d 1057, 1063 (9th Cir. 2004); Blankenship, 519 F.2d at 429. Accordingly, DR Systems has failed to establish good cause for an order precluding the deposition of Mr. Leo Zuckerman and its motion is **DENIED**.

## II. Kodak's Motion for Protective Order

Kodak asks the Court to prohibit DR Systems from deposing Antonio Perez, Kodak's Chairman and CEO, and Peter Cody, Kodak's in-house Director of Patent Litigation and Vice President. Doc. No. 113 at 2. Kodak argues that DR Systems noticed these depositions "solely in an effort to harass Kodak" and "in blatant retaliation against Kodak for having noticed the deposition of Mr. [Leo] Zuckerman." Id. at 4. Kodak further argues that the notices are "procedurally and substantively defective" and therefore should be quashed. Id. The Court will address each deponent below.

### a. Antonio Perez

Kodak moves to quash the deposition notice issued to Mr. Perez because, as the Chairman and CEO of a multi-billion dollar company, Mr. Perez is an "apex" [*13] deponent who has "no connection to this litigation" or "relevant information of any kind." Id. Kodak asserts that unlike its request to depose Mr. Leo Zuckerman, there is no evidence that Mr. Perez has "percipient

knowledge" relevant to this case as Mr. Perez "has not been identified in this litigation by any witness or in any document as having relevant information." Id. at 6.

DR Systems responds that it is entitled to depose Mr. Perez because Kodak "broadened the scope of discovery to uncover this exact same information from DR Systems" when it noticed Mr. Leo Zuckerman's deposition. Doc. No. 125 at 2. DR Systems suggests that Kodak has now made "what is or is not the proper conduct of the principal of an organization regarding claims and allegations of patent infringement" an issue in this case. Id. at 3. Therefore, DR Systems argues that

> it would be fundamentally unfair and prejudicial to DR Systems if this Court were to allow Kodak to depose the principal shareholder of DR Systems to discover his knowledge and actions related to this matter without allowing DR Systems to also discover the knowledge and actions of Kodak's principal, Mr. Perez.

Id. In effect, DR Systems' position is [*14] that it should be allowed to depose Mr. Perez if Kodak is allowed to depose Mr. Leo Zuckerman because "only through a direct comparison" of Mr. Leo Zuckerman's and Mr. Perez's knowledge and actions would a jury be able to "evaluate whether or not Leo Zuckerman's knowledge and actions are appropriate." Id.

Although the scope of discovery is broad, it is not unlimited. As explained above, the Court may act to limit discovery when a party seeks to depose an official at the "apex" of a corporation who lacks "unique or superior knowledge of the facts in dispute." WebSideStory, 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567, at *2. The Court finds this to be the case here. Essentially, DR Systems argues that it is entitled to depose Mr. Perez because Kodak requested to depose Mr. Leo Zuckerman. The Court agrees with Kodak and finds that "[t]his is not a proper ground for requesting a deposition of any witness, let alone of an '[a]pex' witness." Doc. No. 130 at 2. Importantly, DR Systems has not established, nor can the Court discern, what "unique or superior knowledge" Mr. Perez may possess that would be relevant to this case. WebSideStory, 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567, at *2 ("When a high-level corporate executive lacks unique or [*15] superior knowledge of the facts in dispute, courts have found that good cause exists to prohibit the deposition."). Notably, Mr. Zuckerman is a controlling member of a small, family-run corporation, while Mr. Perez is the Chairman and CEO of a multi-billion dollar corporation. Thus, unlike Mr. Leo Zuckerman, Mr. Perez is likely "removed from the daily subjects of the

litigation" and therefore lacks direct, personal knowledge of the claims and defenses at issue in this case. Celerity, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, at *3 (citing Baine v. General Motors Corp., 141 F.R.D. 332, 334 (M.D. Ala. 1991). In fact, unlike Mr. Leo Zuckerman, who was identified as having relevant, personal knowledge by DR Systems' CFO, DR Systems has not identified any witness or document indicating that Mr. Perez has personal involvement in, or direct knowledge of, facts at issue in this case.

To the extent that DR Systems argues that it is entitled to depose Mr. Perez to assess the companies' respective "reasonableness," its argument is flawed. First, DR Systems has failed to point to a comparable claim or defense where Kodak's conduct or its "reasonableness" is at issue. Second, even if it is at issue, DR Systems has not identified [*16] Mr. Perez's involvement in that conduct or what "unique or superior" knowledge he may have regarding that conduct. Therefore, because Mr. Perez lacks direct, personal knowledge of the facts at issue in this case and the Court can discern no legitimate purpose for allowing his deposition to go forward, Kodak's Motion for Protective Order is **GRANTED** and the deposition notice of Mr. Perez is **QUASHED**.

**b. Peter Cody**

DR Systems also seeks to depose Mr. Cody, Kodak's in-house Director of Patent Litigation and Vice President. Doc. No. 113 at 4. Kodak asks that the deposition notice be quashed because "the only topic identified by DR for deposition concerns the letters sent by [Mr. Cody on behalf of Kodak] to DR in 2007 regarding DR's infringement" and "there is no legitimate reason for DR to notice Mr. Cody's deposition on this topic at this late date in the litigation, and with only five days' notice." Id. Kodak argues that DR Systems has "known about the 2007 letters and their authorship since receipt" and therefore had "numerous prior opportunities to seek information on [this] topic." Id. at 7. Kodak further argues that the fact that DR Systems waited to notice Mr. Cody's deposition until [*17] "less than one week before fact discovery was set to close and only after Kodak noticed the deposition of Mr. Zuckerman ... is indicative of the harassing nature of the notice." Id.

As DR Systems points out, Kodak does not argue that Mr. Cody does not have direct, personal knowledge or that his deposition would not yield relevant information. Doc. No. 125 at 4. Rather, Kodak takes issue with the short timing of the deposition notice and the fact that it was not issued until July 9, 2009, less than one week before fact discovery was set to close and after Kodak issued a deposition notice for Mr. Leo Zuckerman. Doc. No. 113 at 7-8. The Court finds that although the timing of the noticed deposition is less than ideal, it

was not unreasonable in this situation because DR Systems did not realize it would have to depose Mr. Cody until it deposed Terrence O'Toole, a Rule 30(b)(6) deponent, on June 24, 2009. Doc. No. 125 at 4. DR Systems sought to depose Mr. O'Toole on the following topics related to its laches and unclean hands defenses: (25) the date when Kodak first learned of the Accused Products; (26) the facts and circumstances relating to Kodak's first knowledge of the Accused Products;   [*18] (27) the date when Kodak first believed the Accused Products infringe the '811 patent; and (28) the facts and circumstances relating to Kodak's first belief that the Accused Products infringe the '811 patent. Id. When DR Systems inquired about these topics, Mr. O'Toole simply directed DR Systems to Mr. Cody's October 2007 letter:

> Q. Is it Kodak's position that Kodak first became aware of DR Systems' accused products at or around October of 2007?
>
> A. So the only information I have that I can relay is this document that's Peter Cody's letter.
>
> * * *
>
> Q. Other than reviewing the October 2007 letter and speaking to counsel, did you take any effort or make any effort in order to determine when Kodak first learned of DR Systems' products?
>
> A. I don't recall doing anything else.

Id. at 5.

"Courts generally refuse to allow the immediate deposition of a high level executive, often given the sobriquet 'apex deponent," before the testimony of lower level employees with more intimate knowledge of the case has been secured." Upjohn, 593 F.2d at 651 (granting protective order for executive where plaintiff had sought to depose the president of the company before deposing lower level executives). Here, before   [*19] noticing Mr. Cody's deposition, DR Systems attempted to acquire this information from Mr. O'Toole, a lower level Kodak employee. However, Mr. O'Toole was not able to provide the requested information to DR Systems' satisfaction. [3] Moreover, both Mr. O'Toole's testimony and the documentary evidence reveal that Mr. Cody has relevant, first-hand information regarding the defenses at issue in this case. Therefore, the Court finds that DR Systems is entitled to depose Mr. Cody about his non-privileged knowledge of the above-mentioned topics, specifically the letters he authored and sent to DR Systems regarding DR Systems' alleged infringement,

including the October 2007 letter. Thus, Kodak's Motion for Protective Order and Motion to Quash Mr. Cody's deposition notice is **DENIED.** However, because the Court limits the deposition to those topics listed above, the Court imposes a three hour time limit on this deposition as well.

> 3   In its Reply, Kodak argues that DR already has deposed a Kodak witness, Mr. O'Toole, regarding the letters and therefore, other than to obtain privileged information, there is no need to depose Mr. Cody. Doc. No. 130 at 3. However, as stated above, "[t]he mere fact ...   [*20] that other witnesses may be able to testify as to what occurred at a particular time or place does not mean that a high level corporate officer's testimony would be 'repetitive.' Indeed, it is not uncommon for different witnesses to an event to have differing recollections of what occurred." First National Mortgage Co., 2007 U.S. Dist. LEXIS 88625, 2007 WL 4170548, at *3. Certainly, Mr. O'Toole's knowledge of the letters is not the same as Mr. Cody's, the letters' author. Moreover, to the extent that DR Systems seeks privileged information, Kodak is free to object during the deposition.

**Conclusion**

For the reasons set forth above, DR Systems' Motion for Protective Order is **DENIED** and Kodak's Motion for Protective Order and Motion to Quash the deposition notices of Mr. Perez and Mr. Cody is **GRANTED IN PART** and **DENIED IN PART.** Accordingly, the Court **ORDERS** as follows:

(1) DR Systems may not depose Mr. Perez;

(2) Kodak may depose Mr. Leo Zuckerman and DR Systems may depose Mr. Cody for no more than three (3) hours each;

(3) The depositions must take place within twenty (20) days of this Order at a time and place of the respective deponents' convenience; and

(4) The discovery deadline is extended twenty (20) days from the   [*21] date of this order for the sole purpose of taking these two depositions.

**IT IS SO ORDERED.**

DATED: September 14, 2009

/s/ Barbara L. Major

BARBARA L. MAJOR

United States Magistrate Judge

**Citation #8**
**2012 U.S. Dist. LEXIS 12684**

LEXSEE



Caution
As of: Jun 07, 2013

**GROUPION, LLC., Plaintiff, vs. GROUPON, INC., et al., Defendants.**

**No. 11-0870 MEJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2012 U.S. Dist. LEXIS 12684**

**February 2, 2012, Decided**
**February 2, 2012, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by, As moot Groupion, LLC. v. Groupon, Inc., 2012 U.S. Dist. LEXIS 13782 (N.D. Cal., Feb. 6, 2012)

**PRIOR HISTORY:** Groupion, LLC v. Groupon, Inc., 826 F. Supp. 2d 1156, 2011 U.S. Dist. LEXIS 136129 (N.D. Cal., Nov. 28, 2011)

**CORE TERMS:** groupon, deposition, discovery, trademark, apex, citation omitted, deponent, interrogatories, acquisition, exhausted, intrusive means, non-repetitive, senior, domain, ethics, merchant, software, privileged, intrusive, firsthand, interview, noticed, discovery methods, requested information, terminated, domestic, team, trademark infringement, personal knowledge, requisite knowledge

**COUNSEL:** [*1] For Groupion, LLC, a California limited liability company, Plaintiff: Jack Russo, LEAD ATTORNEY, Christopher Joseph Sargent, Computer-Law Group LLP, Palo Alto, CA; Clifford Charles Webb, Fenwick West, San Francisco, CA; Jedediah Wakefield, Fenwick & West LLP, San Francisco, CA.

For Groupion, Inc., a Delaware corporation, Defendant: Christopher Joseph Sargent, Jack Russo, Computerlaw Group LLP, Palo Alto, CA; Clifford Charles Webb, Fenwick West, San Francisco, CA; Jedediah Wakefield, Fenwick & West LLP, San Francisco, CA.

For The Point, Inc., a Delaware corporation, Defendant: Jedediah Wakefield, Fenwick & West LLP, San Francisco, CA.

For Google, Inc., a Delaware corporation, Defendant: Margret Mary Caruso, LEAD ATTORNEY, Attorney at Law, Redwood Shores, CA.

**JUDGES:** MARIA-ELENA JAMES, United States Magistrate Judge.

**OPINION BY:** MARIA-ELENA JAMES

**OPINION**

**ORDER RE: DISCOVERY DISPUTE**

**Re: Docket No. 98**

Before the Court is the parties' Joint Letter Brief Regarding Deposition Discovery Dispute, filed January 17, 2012. Dkt. No. 98. The parties dispute whether Plaintiff Groupion, LLC ("Groupion") should be permitted to take the depositions of Defendant Groupon, Inc.'s ("Groupon") CEO, Chairman, and four Senior Vice Presidents. [*2] The parties further dispute whether Groupion is entitled to a second Rule 30(b)(6) deposition of Groupon. For the reasons set forth below, the Court DENIES Groupion's deposition requests.

**BACKGROUND**

This case is an action for alleged trademark infringement and unfair competition based upon the named

Page 1

Defendants having improperly and willfully used a mark nearly identical to Groupion's trademark, GROUPION, without permission, thereby causing customer confusion, and unfairly competing with Groupion by the improper use of its trademark. First Am. Compl. ¶ 1, Dkt. No. 10. Groupion describes itself as a web-based Business Groupware and Customer Relations Management ("CRM") platform which helps companies and project teams work together and execute different tasks within one integrated working environment, including coupon management. *Id.* at ¶ 3. Groupon is a "deal of the day" website that connects merchants to consumers by offering goods and services at a discount. Cioffi Decl. ¶ 2, Dkt. No. 51.

On May 31, 2011, Groupion noticed the deposition of Groupon pursuant to Federal Rule of Civil Procedure ("Rule") 30(b)(6), to take place on July 19, 2011. Dkt. No. 98, Ex. 1. Groupon subsequently produced [*3] Nick Cioffi, a founding member of Groupon and current Vice President of Sales and Operation Strategy, for deposition on November 15, 2011. *Id.* at 2, 5. Groupion contends that Mr. Cioffi was unprepared and unable to answer questions essential to the case. *Id.* at 5. Although Groupon contends that Mr. Cioffi was available to continue testifying that day, Groupion terminated the deposition after six-and-a-half hours of testimony. *Id.* at 3. Three days after the deposition, on November 18, Groupion noticed a second Rule 30(b)(6) deposition, which included 22 new topics, to take place on December 13, 2011. *Id.* at Ex. 2. The second Rule 30(b)(6) deposition has yet to occur. *Id.* at 4.

Also on November 18, 2011, Groupion noticed the depositions of six high-ranking Groupon employees -- its CEO, Executive Chairman, and four Senior Vice Presidents. *Id.* at Ex. 4. Although the depositions for these named employees were scheduled to occur between December 9 and December 14, 2011, none of the depositions have taken place. *Id.* at 4.

**DISCUSSION**

In their joint letter, the parties dispute whether Groupion should be permitted to take depositions of Defendant's CEO, Chairman, and four Senior Vice Presidents. [*4] *Id.* at 1. Groupon contends these employees are protected by the "apex" doctrine. *Id.* The parties also dispute whether Plaintiff is entitled to a second Rule 30(b)(6) deposition. *Id.* The Court shall consider each argument in turn.

**I. APEX DEPOSITIONS**

As to the apex depositions, Groupon argues that Groupion has failed to identify any relevant facts uniquely in the possession of the named deponents. *Id.* at

2. Groupon further argues that it has identified numerous other witnesses, including its Rule 30(b)(6) deponent, Nick Cioffi, who possess the requested information, and the fact that Groupion does not like the answers it got from Mr. Cioffi does not prove that Groupon's senior management has unique knowledge on this subject. *Id.*

In response, Groupion argues that Mr. Cioffi was completely unprepared to address most of the pivotal issues in this case and wholly unable to testify as to the issues within Groupon's CEO's knowledge. *Id.* at 5. Specifically, Groupion contends that Mr. Cioffi lacked knowledge regarding the following issues: (1) whether Groupon offers or plans to offer CRM software; (2) whether any domestic or international search was conducted by Groupon in 2008 regarding potential [*5] trademark or domain-name conflicts with the mark "Groupon"; (3) the identity of or the substance of any communications with the original owner of "www.groupon.com" and the acquisition of this domain name; (4) Groupon's iPhone application; and (5) Groupon's ethics policy. *Id.* at 5.

**A. Legal Standard**

"A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." *Affinity Labs of Texas v. Apple, Inc.*, 2011 U.S. Dist. LEXIS 53649, 2011 WL 1753982, at *15 (N.D. Cal. May 09, 2011) (citation omitted). Absent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition. *Id.* (citation omitted). However, "[w]hen a party seeks the deposition of a high-level executive (a so-called "apex" deposition), the court may exercise its discretion under the federal rules to limit discovery." *Id.* (citations omitted). "In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Id.* (citation omitted). A claimed lack of knowledge, by itself, is insufficient [*6] to preclude a deposition. *Id.* (citation omitted). "Moreover, the fact that the apex witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *Id.* (citation omitted). Additionally, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *Id.* (citation omitted).

"That said, 'Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment.'" *Id.* (citing *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, at *3 (N.D. Cal., Jan. 25, 2007)). "For that

reason, parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and (2) that other less intrusive means of discovery, such as interrogatories and depositions of other employees, have been exhausted without success." *Id.* (citing *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir.1979)). "Where a high-level decision maker 'removed from the [*7] daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *Id.* (citation omitted). "This is especially so where the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue." *Id.* (citing *Salter*, 593 F.2d at 651).

**B. Application to the Case at Bar**

Groupion has the burden of showing that Groupon's apex employees have unique knowledge of the five topics identified in the parties' joint letter. *See* Dkt. 98 at 5. Accordingly, the Court shall consider each topic in turn.

1. Groupon's Plans to Offer CRM Services

In his deposition, Mr. Cioffi stated that Groupon had "[no] plan to offer CRM software." Dkt. 98, Ex. 3 at 86:22-25. He also confirmed an earlier statement from his declaration that "Groupon does not offer CRM software of any kind," and that "[w]hile we are constantly improving our deal-related services, we have no plan to offer commercial software such as CRM or business groupware in the future." *Id.*, Ex. 3 at 111:21-112:4. Mr. Cioffi acknowledged that he gave [*8] these statements without interviewing or confirming the information with Defendant's CEO, other Board of Directors, or any of the Senior Vice Presidents. *Id.*, Ex. 3 at 112:15-113:1.

As the Vice President of Sales and Operation Strategy, and as one of Groupon's founders, it appears that Mr. Cioffi would be privy to information regarding Groupon's future plans as a company, including its plans to offer CRM software. Furthermore, Mr. Cioffi's most recent declaration confirms that he has intimate knowledge of the products and services that Groupon plans to offer in the coming months, including Groupon's services currently in trial mode. Dkt. 101 at 1-3. However, Groupion focuses on the fact that Mr. Cioffi did not interview the other members of Groupon's Board or Senior Vice Presidents when referencing its future plans. Dkt. 98 at 5. For this reason, Groupion infers that these employees must have additional, unique, knowledge of Groupon's future plans regarding CRM services. This inference is misguided. Simply because Mr. Cioffi failed to interview or confirm information with his colleagues

does not mean that these other employees have unique knowledge of the topic. Thus, Groupion has [*9] failed to establish that the apex deponents have unique, non-repetitive, firsthand knowledge of the facts related to CRM services. Moreover, even if they did have such knowledge, Groupion has not established that other less intrusive means of discovery, such as interrogatories, have been exhausted without success. Accordingly, the Court DENIES Groupion's request with respect to Groupon's plans to offer CRM.

2. Groupon's Trademark Search

In his deposition, Mr. Cioffi acknowledged that he was unaware of any trademark searches for conflicting marks in the calendar year of 2008. Dkt. 98, Ex. 3 at 30:20-31:3. He also testified that he did not know if any law firm was retained to conduct a trademark search for Groupon, (*Id.*, Ex. 3 at 31:5-7), and that he did not interview any lawyers who did trademark work for Groupon or had any communication on Groupon's behalf with the U.S. Patent and Trademark Office in the calendar years of 2008, 2009, and 2010 (*Id.*, Ex. 3 at 60:25-61:7). Finally, Mr. Cioffi stated he did not know if Groupon's CEO had any interactions with the U.S. Patent and Trademarks Office. *Id.*, Ex. 3 at 61:10-13.

Considering the trademark infringement nature of this case, the Court [*10] finds that information regarding Groupon's domestic and international trademark search is likely relevant to Groupion's claims. Yet it is clear from the record that at the time of his deposition, Mr. Cioffi had little knowledge related to Groupon's trademark searches. It is likely that other founding members, including Groupon's CEO, would have unique knowledge of this undertaking.

Despite this potential relevancy, Groupion asserts that the requested information is privileged. Dkt. 98 at 3. Groupion cites *Flagstar Bank, FSB v. Freestar Bank, N.A.*, as its authority for classifying a company's trademark search material, and any deposition of the topic, as privileged. 2009 U.S. Dist. LEXIS 76842, 2009 WL 2706965, at *4-5 (N.D. Ill. Aug. 25, 2009). But, while the court in *Flagstar* did hold that trademark search reports in that case were privileged, it recognized that the Seventh Circuit counseled against the adoption of "a bright-line rule regarding trademark searches," and that "the privilege must be made and sustained on a document-by-document basis." 2009 U.S. Dist. LEXIS 76842, [WL] at 4 (quoting *United States v. White*, 970 F.2d 328, 334 (7th Cir.1992)). Furthermore, Groupon has not cited any authority in the Ninth Circuit that suggests a blanket [*11] privilege covering a company's international and domestic trademark searches. At this point, there is nothing in the record before this Court that would indicate that Defendant's trademark searches were

intended to be conducted in confidence. Accordingly, the Court finds that, without such a showing, the trademark search reports are not privileged. Thus, Groupion should be entitled to discovery regarding Groupon's trademark search.

However, Groupion has not established that the apex deponents have unique, non-repetitive, firsthand knowledge of the facts related to the acquisition of the Groupon domain name. More than likely, other employees and non-employees would be involved in such a search. Indeed, Groupion has not shown that it even attempted less intrusive means of discovery, such as interrogatories or depositions of lower-ranking employees. Accordingly, the Court DENIES Groupion's request with respect to Groupon's trademark search.

### 3. Groupon's Domain Name Acquisition

In his deposition, Mr. Cioffi testified that he did not personally conduct the negotiations for the acquisition of the Groupon.com domain name. Dkt. 98, Ex. 3 at 62:5-8. He also testified that he did not interview [*12] those that were involved in the acquisition. *Id.*, Ex. 3 at 62:9-18. Thus, the Court finds that Mr. Cioffi did not have the requisite knowledge on this topic for the Rule 30(b)(6) deposition and it is possible that the apex deponents have unique, non-repetitive, firsthand knowledge of the facts related to the acquisition of the Groupon domain name. However, even if they did have such knowledge, Groupion has not established that other less intrusive means of discovery, such as interrogatories, have been exhausted without success. Accordingly, the Court finds that any depositions taken from an apex employee regarding Groupon's acquisition of the domain name should not be permitted.

### 4. Groupon's iPhone merchant application

In his deposition, Mr. Cioffi testified that he did not know when Groupon's merchant application was first made available for the iPhone, iPad, and Android platform machines, nor did he know who was responsible for developing the application. Dkt. No. 98, Ex. 3 at 83:2-7. Mr. Cioffi stated that this information would be known "within the merchant services team." *Id.*, Ex. 3 at 83:9-11. Based on this testimony, the Court finds that Mr. Cioffi did not have the requisite knowledge [*13] on this topic for the Rule 30(b)(6) deposition. However, Groupion has not shown that it attempted to obtain this information from a deposition of one or more employees on the merchant services team, let alone whether other less intrusive means of discovery, such as interrogatories, have been exhausted without success. Accordingly, the Court finds that any depositions taken from an apex employee regarding Groupon's iPhone application should not be permitted.

### 5. Groupon's Ethics Policy

Finally, Mr. Cioffi testified that he did not know if Groupon's ethics policy required employees to act honestly and deal in good faith, nor if Groupon's CEO had signed off on the ethics policy. Dkt. 98, Ex. 3 at 237:12-238:17. However, while his testimony establishes that Mr. Cioffi was not knowledgeable on this topic, the Court finds that Groupion has failed to establish how discovery related to Groupon's ethics policy is relevant to trademark and unfair competition claims before this Court. And, even if the Court were to find this information relevant, Groupion has not shown that other less intrusive means of discovery, such as interrogatories, have been exhausted without success. Accordingly, the Court [*14] finds that any depositions taken from an apex employee regarding Groupon's ethics policy should not be permitted.

### 6. Summary

In sum, Groupion has failed to establish the need for apex depositions in this case. Specifically, Groupion has failed to establish that the deponents have unique first-hand, non-repetitive knowledge of facts at issue in the case, and that it has exhausted other less intrusive discovery methods. Accordingly, Groupion's request is DENIED.

## II. RULE 30(B)(6) DEPOSITION

Groupion also seeks a second Rule 30(b)(6) deposition on new topics. Groupion does not address this issue directly in its portion of the joint letter, but Groupon argues that it failed to seek leave to take a second 30(b)(6) deposition. Dkt. No. 98 at 3. Groupon further argues that any such request should be denied because Groupion terminated Mr. Cioffi's deposition, even though he was available to continue testifying on the day of his Rule 30(b)(6) deposition. *Id.*

As a preliminary matter, the Court agrees with Groupon that, under Rule 30(a)(2), Groupion should have requested leave of the presiding judge to take a second 30(b)(6) deposition, having already noticed and taken one 30(b)(6) deposition. *See* [*15] Fed. R. Civ. P. 30(a)(2)(A)(ii) (providing that leave must be granted to take the deposition of a deponent who "has already been deposed in the case"). The question thus becomes whether, under Rule 30(a)(2), the Court should now give leave to Groupion to take a second 30(b)(6) deposition. Rule 30(a)(2) provides that a "court must grant leave to the extent consistent with Rule 26(b)(2)." Fed. R. Civ. P. 30(a)(2). Rule 26(b)(2) in turn provides that a court must limit discovery where, *e.g.*, "the discovery sought is unreasonably cumulative or duplicative," "the party seeking

discovery has had ample opportunity to obtain the information by discovery in the action," or "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C).

Here, the Court finds that the presiding judge granted Groupion ample opportunity to obtain the requested information during the discovery phase of this case and, as discussed above, Groupion has failed to establish that [*16] it even attempted to obtain the requested discovery through less intrusive methods. Moreover, Groupion voluntarily terminated the first 30(b)(6) deposition, and it has not established in its portion of the joint letter that new evidence has become available since that time. Accordingly, the Court DENIES Groupion's request for leave to take a second 30(b)(6) deposition.

## CONCLUSION

Based on the analysis above, the Court DENIES Groupion's request for further depositions.

**IT IS SO ORDERED.**

Dated: February 2, 2012

/s/ Maria-Elena James

MARIA-ELENA JAMES

United States Magistrate Judge

**Citation #9**
**2010 U.S. Dist. LEXIS 21500**

LEXSEE


Positive
As of: Jun 07, 2013

**HCP LAGUNA CREEK CA, LP; HCP DARTMOUTH MA, LP; HCP TOWSON MD, LP; HCP CAMARILLO CA, LP; and HRA MANAGEMENT CORPORA-TION, Plaintiffs/Counter-Defendants v. SUNRISE SENIOR LIVING MANAGE-MENT, INC., Defendant/Counter-Plaintiff/Third-party Plaintiff v. HCP, INC., Third-party Defendant**

**No. 3-10-0220**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TEN-NESSEE, NASHVILLE DIVISION**

**2010 U.S. Dist. LEXIS 21500**

**March 8, 2010, Filed**

**CORE TERMS:** deposition, subpoena, apex, protective order, undue burden, conversation, scheduled, telephone conference, discovery, questioning, lower level, personal knowledge, non-party, participated, recollection, normally, deposed, movant's, depose, busy, deposition testimony, deadline, good cause, high level, confidential, disclosure, high-level, remember, modify, failure to provide

**COUNSEL:** [*1] For HCP Laguna Creek CA, LP, HCP Darthmouth MA, LP, HCP Towson MD, LP, HCP Camarillo CA, LP, HRA Management Corporation, Plaintiffs: Gregory Lynn Murphy, Kara Deniene Lehman, LEAD ATTORNEYS, Vorys, Sater, Seymour & Pease LLP, Alexandria, VA; Stephen Michael Nickelsburg, LEAD ATTORNEY.

For Sunrise Senior Living Management, Inc., Defendant, Counter Plaintiff, Third Party Plaintiff: John A.C. Keith, William Boyle Porter, LEAD ATTORNEYS, Blankingship & Keith PC, Fairfax, VA.

For HCP, Inc., HCP Laguna Creek CA, LP, HCP Dartmouth MA, LP, HCP Towson MD, LP, HCP Camarillo CA, LP, HRA Management Corporation, Counter Defendants: Gregory Lynn Murphy, Kara Deniene Lehman, LEAD ATTORNEYS, Vorys, Sater, Seymour & Pease LLP, Alexandria, VA; Stephen Michael Nickelsburg, LEAD ATTORNEY.

For HCP, Inc., Third Party Defendant: Gregory Lynn Murphy, Kara Deniene Lehman, LEAD ATTORNEYS, Vorys, Sater, Seymour & Pease LLP, Alexandria, VA; Stephen Michael Nickelsburg, LEAD ATTORNEY.

For Bill Sheriff, Deponent: Christy Tosh Crider, LEAD ATTORNEY, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC-Nashville, Nashville, TN.

**JUDGES:** JULIET GRIFFIN, United States Magistrate Judge.

**OPINION BY:** JULIET GRIFFIN

**OPINION**

*ORDER*

Pursuant to the order entered [*2] February 19, 2010 (Docket Entry No. 4), counsel for the parties called the Court on February 26, 2010, at which time the motions of movant Bill Sheriff to quash subpoena and for protective order (Docket Entry Nos. 1 and 7) were DE-NIED to the extent that Mr. Sheriff sought to preclude his deposition and GRANTED to the extent that he sought limitations on his deposition in the alternative relief sought in his second motion.

The defendant served or attempted to serve a sub-poena to take the deposition of Mr. Sheriff, the CEO of Brookdale Senior Living ("Brookdale"), on January 29,

2010, for purposes of discovery in the case pending in the Eastern District of Virginia, No. 09-00824 (the "Virginia action"). In his initial motion, Mr. Sheriff sought to quash the subpoena on a number of grounds, including improper service of the subpoena, the defendant's failure to provide witness and travel fees with the subpoena, and failure to provide a reasonable time to comply. In addition, Mr. Sheriff argued that the subpoena created an undue burden on him because the subpoena directed him to produce documents listed on Attachment A and there was no Attachment A and, more significantly, because he would  [*3] have to take time away from his busy work schedule and end-of-quarter activities. Thus, Mr. Sheriff argued that, in balancing the relevance and potential alternative sources of information with the burden on him, the subpoena should be quashed.

After a telephone conference with counsel for the parties and by order entered February 12, 2010 (Docket Entry No. 3), Mr. Sheriff's motion to quash was granted to the extent that the Court ruled that the deposition, scheduled on February 12, 2010, would not be taken. [1] The Court did not decide whether or not Mr. Sheriff's deposition should be taken at a later date, but instead scheduled another telephone conference call with counsel on February 18, 2010, to address the defendant's basis for believing that Mr. Sheriff and Jay Flaherty, the CEO of third-party defendant HCP, Inc. had discussions about Brookdale Senior Living taking over the management of assisted living facilities, and to address whether the Eastern District of Virginia was willing to extend the discovery deadline to allow Mr. Sheriff's deposition to be taken, if ordered by this Court.

> 1   During the February 11, 2010, conference call, defendant's counsel clarified that  [*4] the defendant was not seeking production of any documents and represented that the deposition would not last longer than two (2) hours.

On February 18, 2010, counsel for the parties advised that the discovery deadline had been extended to allow Mr. Sheriff's deposition, if ordered. It was also undisputed that Mr. Sheriff and Mr. Flaherty had engaged in one or more conversations. The parties did, however, disagree about the testimony of Mr. Flaherty in his deposition taken on February 17, 2010, and none of the attorneys participating in the conference call were present at his deposition. In addition, it appeared that Mr. Flaherty's deposition testimony included information covered under a protective order entered in the Eastern District of Virginia and the parties were reluctant to share that testimony with counsel for Mr. Sheriff or the Court. Therefore, a third telephone conference call was scheduled on February 26, 2010, to address Mr. Flaher-

ty's deposition and to allow Mr. Sheriff the opportunity to further brief his motion to quash.

An agreed protective order was entered on February 26, 2010, to allow filings under seal (Docket Entry No. 12), and Mr. Sheriff filed an additional motion,  [*5] memoranda, and affidavit (Docket Entry Nos. 7-10).

In the most recent motion (Docket Entry No. 7), Mr. Sheriff again moved to quash the subpoena or, in the alternative, for a protective order limiting Mr. Sheriff's deposition to one hour and limiting the scope of the questioning to one specific topic. [2] Mr. Sheriff sets out the relevant testimony from the deposition of Mr. Flaherty, showing that the questioning on the topic at issue consisted essentially of only five questions. To two of those questions Mr. Flaherty responded that he did not "recall" making certain statements. Mr. Sheriff argues that, since the defendant failed to ask any follow-up questions and that the defendant's own CEO, Mark Ordan, attended the meeting at issue, the defendant has available to it the needed information from other sources. Thus, Mr. Sheriff argues that, balanced against the burden to him, as a non-party, in having to prepare for and attend a deposition, his deposition should be precluded. Mr. Sheriff also indicated his willingness to provide a further affidavit.

> 2   Although, in this order and the order entered February 12, 2010 (Docket Entry No. 3), the Court alluded generally to the issue about which  [*6] the defendant seeks Mr. Sheriff's deposition testimony, the Court has not set forth in any detail the topic at issue in light of the February 26, 2010, protective order and the concern that any proprietary, confidential information should not be disclosed, particularly because both parties in the Virginia action are direct competitors of Brookdale.

Approximately two and a half hours after filing the above-described motion and approximately one hour before the scheduled telephone conference call on February 26, 2010, Mr. Sheriff filed a supplemental memorandum (Docket Entry No. 9) and affidavit (Docket Entry No. 10). In his affidavit, Mr. Sheriff attested that Mr. Flaherty did not "say those things" that were the subject of the questions in Mr. Flaherty's deposition. Therefore, Mr. Sheriff argues that, since Mr. Sheriff has now answered the same questions asked of Mr. Flaherty, there is no need for Mr. Sheriff's deposition.

In the instant motions, Mr. Sheriff seeks to quash the subpoena issued to him. Therefore, the provisions of Rule 45(c)(3)(A)-(C) of the Federal Rules of Civil Procedure apply. Specifically, Rule 45(c)(3)(A)(iv) allows a Court to quash or modify a subpoena if it subjects  [*7]

a person to undue burden. Rule 45(c)(3)(B)(i) also allows a Court to quash or modify a subpoena if the subpoena requires disclosure of a "trade secret or other confidential research, development, or commercial information," or, pursuant to Rule 45(c)(3)(C), instead of quashing or modifying a subpoena, the Court may order "appearance of production under specified conditions if the serving party: (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship . . . ."

Although in Mr. Sheriff's most recent motion (Docket Entry No. 7), he sought, in the alternative, a protective order, that alternative motion sought to limit the time and scope of his deposition. Therefore, Mr. Sheriff has not expressly invoked Rule 26(c), which permits the Court, for good cause shown, to issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including precluding the discovery sought. In addition, Mr. Sheriff does not rely upon Rule 45(c)(3)(C) to support his motion to quash, although he does rely upon Rule 45(c)(3)(C) in his alternative motion for a protective order.

A movant has the burden of establishing [*8] good cause for entry of a protective order under Rule 26(c) to quash the deposition subpoena, and he must show a "clearly defined and serious injury." See Nix v. Sword, 11 Fed.Appx. 498, 501, 2001 WL 599707 (6th Cir. 2001). See also Underwood v. Riverview of Ann Arbor, 2008 U.S. Dist. LEXIS 107323, 2008 WL 5235992, *2 (E.D. Mich. Dec. 15, 2008). Whether a motion is filed under Rule 26(c) or Rule 45(c)(3)(A), the Court must balance the movant's need to be protected from undue burden against the defendant's need for the deposition. Once the defendant shows that Mr. Sheriff's testimony would be relevant to the claims or defenses in this case, [3] Mr. Sheriff must establish that his deposition would impose an undue burden on him. In determining whether there is an undue burden, the Court must consider not only the burden to Mr. Sheriff but also the necessity for the deposition and whether the same information can be obtained from other sources. See Allen v. Howmedica Leibinger, 190 F.R.D. 518, 525 (W.D. Tenn. 1999). Mr. Sheriff's status as a non-party is a factor to consider in addressing the burden his deposition might have. Katz v. Batavia Marine & Sporting Supplies, Inc., 984 F.2d 422, 424 (Fed. Cir. 1993); [*9] Hansen Beverage Co. v. Innovation Ventures, LLC, 2009 U.S. Dist. LEXIS 65358, 2009 WL 2351769 (E.D. Mich. July 29, 2009); Musarra v. Digital Dish, Inc., 2008 U.S. Dist. LEXIS 110003, 2008 WL 4758699, *1 (S.D. Ohio Mar. 24, 2008);; American Elec. Power Co. v. United States, 191 F.R.D. 132 (S.D. Ohio 1999); Allen, 190 F.R.D. at 521.

3   Although Mr. Sheriff argues that his testimony must not be particularly relevant because defendant's counsel spent little time in Mr. Flaherty's deposition on the issue, based on the discussion on February 26, 2010, the Court found that the matters upon which the defendant seeks to depose Mr. Sheriff are relevant, although the Court will not elaborate herein. See n.2 supra.

Mr. Sheriff refers to his deposition as an "apex deposition," a categorization that defendant disputes. To the extent that he is at the "apex" of his corporation, it cannot be disputed that his deposition would be an "apex deposition." [4] The seminal case involving a request to take a deposition of a high level employee of the defendant was Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979), in which the Court affirmed the District Court's denial of the plaintiff's request to take the deposition of Dr. William Hubbard, the president of defendant [*10] Upjohn. The denial was based on the fact that Dr. Hubbard had given testimony before a Senate Committee, which contained essentially the same information the plaintiff sought, and because depositions of lower level employees with the most direct knowledge of the facts were scheduled to be deposed. The trial court found that it was likely that the plaintiff would not consider it necessary to take Dr. Hubbard's deposition after the other depositions unless the other employees did not have "more personal knowledge" of the facts or their testimony was inconsistent with Dr. Hubbard's previous Senate testimony. The Court of Appeals for the Fifth Circuit noted that "if after taking the other deposition, plaintiff was not satisfied and again properly gave notice of or requested taking Dr. Hubbard's deposition, the judge probably should have allowed the deposition." 593 F.2d at 652. [5]

4   The Court notes that the term "apex deposition" has not been used by the Court of Appeals for the Sixth Circuit or any district courts in the Sixth Circuit. Cf. Zoroufie v. Lance, Inc., 2008 U.S. Dist. LEXIS 31384, 2008 WL 1767729 (W.D. Tenn. Apr. 15, 2008) (quoting a case from the Northern District of California in which the term "apex [*11] deponent" was used). However, this Circuit and the District Courts within this Circuit have used the same analysis without using the specific term.

5   The plaintiff did, in fact, attempt to schedule Dr. Hubbard's deposition on two subsequent occasions, but the District and Appellate Courts found that she had failed to properly reassert her request.

The "apex doctrine" has been defined to protect high-level corporate officials from discovery unless "(1)

the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information sought have been exhausted." *Wal-Mart Stores, Inc. v. Vidalakis,* 2007 U.S. Dist. LEXIS 95696, 2007 WL 4591569, *1 (W.D. Ark. Dec. 28, 2007); *Van Den Eng v. Coleman Co., Inc.,* 2005 U.S. Dist. LEXIS 40720, 2005 WL 3776352, *2 (D. Kan. Dec. 14, 2005). *See also Bush v. Dictaphone Corp.,* 161 F.3d 363, 367 (6th Cir. 1999); *El Camino Resources, Ltd. v. Huntington Nat'l Bank,* 2009 U.S. Dist. LEXIS 36704, 2009 WL 1228680, *3-4 (W.D. Mich. Apr. 30, 2009); *Marsico v. Sears Holding,* 2007 U.S. Dist. LEXIS 22757, 2007 WL 1006168, *2 (E.D. Mich. Mar. 29, 2007). Normally, "apex deposition" issues are raised in the context of one party seeking to depose the "apex" employee, e.g., CEO, President, and/or Chair of Board of Directors, of [*12] the other party. That is understandable because a party may well be able to discover facts from lower level employees of the opposing party who actually participated in the matters at issue in the case. *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 894 (6th Cir. 1991); *Lewelling v. Farmers Ins. Co. of Columbus, Inc.,* 879 F.2d 212, 218 (6th Cir. 1989). [6]

> 6   The Court notes that only one of the cases that the Court has found or that Mr. Sheriff cited involved a non-party whose deposition was sought. *See Nix v. Sword,* 11 Fed. Appx. 498, 2001 WL 599707 (6th Cir. 2001). Most of the cases in which non-parties challenge subpoenas involve subpoenas for production of documents.

Since "apex" employees frequently are uninvolved in the actions about which a party complains, taking the deposition of a high level employee can be considered harassing and unnecessary, imposing an undue burden on such an employee, who normally is very busy attending to matters of his or her business. As a result, the standard has developed that such an employee must have "unique personal" knowledge of the facts before his or her deposition is permitted. *See Wagner v. Novartis Pharmaceuticals Corp.,* 2007 U.S. Dist. LEXIS 83212, 2007 WL 3341845, *1 (E.D. Tenn. Nov. 8, 2007). [*13] Although the requisite knowledge has been described as both "unique" *and* "personal," the Apex doctrine is "intended to protect busy, high-level executives who lack unique *or* personal knowledge." *Minter v. Wells Fargo Bank, N.A.,* 258 F.R.D. 118, 125 (D. Md. 2009) (emphasis added). If an "apex" employee has had no role in the matters at issue, or was only generally aware of or aware after the fact of the decision or conduct of lower level employees, such a deposition is generally not permitted. Similarly, as in *Salter,* if lower level employees have at least the same knowledge, if not more, of the matters at issue than the "apex" employee, such a deposition may not be permit-

ted. *See also Baine v. General Motors Corp.,* 141 F.R.D. 332, 335 (M.D. Ala. 1991).

The knowledge of other, lower-level employees is not an issue in this case. The matter at issue is conversations in which Mr. Sheriff himself participated. Clearly, Mr. Sheriff has personal knowledge of the matter at issue. *See Bush v. Dictaphone Corp.,* 161 F.3d 363 (6th Cir. 1998); *Kelley v. Microsoft Corp.,* 2008 U.S. Dist. LEXIS 97340, 2008 WL 5000278 (W.D. Wash. Nov. 21, 2008). Mr. Sheriff's counsel acknowledged during the February 18, 2010, telephone conference [*14] call that Mr. Sheriff had participated in a conversation with Mr. Flaherty and Mr. Ordan. However, Mr. Sheriff urged that the defendant take Mr. Flaherty's deposition before determining whether Mr. Sheriff should be deposed.

After Mr. Flaherty's deposition, Mr. Sheriff now argues that defendant's counsel did not take an opportunity to ask follow up questions of Mr. Flaherty when he expressed an inability to "recall," and that Mr. Sheriff has now answered those questions himself in his affidavit (Docket Entry No. 10).

Mr. Sheriff contends that he does not have "unique" knowledge since Mr. Flaherty and the defendant's CEO were also present. However, that is not the type of non-unique knowledge that is normally at issue. When three people are present during a conversation, one may remember or choose to remember certain portions of the conversation that conflict with the memory of one or two of the other participants. *See DR Sys., Inc. v. Eastman Kodak Co.,* 2009 U.S. Dist. LEXIS 83755, 2009 WL 2973008, *3 (S.D. Cal. Sept. 14, 2009) ("[t]he mere fact that one person testified about a conversation does not make any additional testimony about the conversation repetitive."). The defendant seeks testimony from Mr. Sheriff [*15] about his recollection, which may or may not mirror Mr. Flaherty's recollection. To the extent that Mr. Flaherty could "not recall," Mr. Sheriff may be well be better able to relate his own recollection.

Mr. Sheriff's proposals to supplement his affidavit, to provide an additional affidavit responding to questions from the defendant, to be deposed by written questions, or to be provided with the deposition questions in advance are not adequate substitutes for taking his deposition testimony in the usual manner. In addition, the parties are under time constraints imposed in the Virginia action. To allow any alternative form of obtaining additional information from Mr. Sheriff and reevaluating thereafter will, in the Court's opinion, inevitably delay the process. Although the Virginia Court has extended the time for Mr. Sheriff's deposition to be taken, if ordered, in deference to this Court, this Court has an obligation to the Virginia Court to attempt to reach a resolution of the issue as quickly as possible.

2010 U.S. Dist. LEXIS 21500, *

Therefore, the motions of Mr. Sheriff to quash the deposition in its entirety are denied, but the motion of Mr. Sheriff for a protective order is granted to the extent that the defendant's [*16] questioning of Mr. Sheriff shall not exceed one (1) hour, allowing counsel for the plaintiff to depose Mr. Sheriff for an additional half hour.

The deposition shall be scheduled no later than March 26, 2010. [7]

> 7   The Court neglected to note the date by which the parties agreed the deposition would be taken. If March 26, 2010, is not the correct deadline that was addressed, the parties shall schedule the deposition based on their agreement during the February 26, 2010, conference call.

The Court is, however, persuaded by Mr. Sheriff that the defendant could unnecessarily delve into proprietary matters to its competitive advantage. The scope of the questioning in his deposition shall be limited to the general topic alluded to in this order and in the order entered February 12, 2010, and articulated by defendant's counsel in the telephone conference calls with the Court. The parties shall advise the Court when Mr. Sheriff's deposition is scheduled and the Court will try, as much as possible, to be available for the parties and counsel for Mr. Sheriff to call if concerns arise about the scope of the questioning. Defendant's counsel has represented to the Court that he understands the concerns [*17] of the Court and counsel for Mr. Sheriff and, except as necessary to establish context, will not delve into unrelated areas.

To the extent that Mr. Sheriff seeks a specific protective order relating to disclosure of his deposition testimony, the Court will be willing to consider any such proposal.

Any party desiring to appeal this order of the Magistrate Judge may do so by filing a motion for review no later than fourteen (14) days from the date of service of this order. The motion for review must be accompanied by a brief or other pertinent documents to apprise the District Judge of the basis for the appeal. *See* Rule 72.02(b) of the Local Rules of Court.

It is so ORDERED.

/s/ Juliet Griffin

JULIET GRIFFIN

United States Magistrate Judge

**Citation #10**
**2013 U.S. Dist. LEXIS 20105**

LEXSEE



Analysis
As of: Jun 07, 2013

**DAVID N. KLUNGVEDT, Plaintiff, vs. UNUM GROUP and PAUL REVERE LIFE INSURANCE COMPANY, Defendants.**

**2:12-cv-00651- JWS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

**2013 U.S. Dist. LEXIS 20105**

**February 13, 2013, Decided**
**February 13, 2013, Filed**

**PRIOR HISTORY:** Klungvedt v. Unum Group, 2012 U.S. Dist. LEXIS 156627 (D. Ariz., Oct. 31, 2012)

**CORE TERMS:** discovery, deposition, termination, personal knowledge, initiative, apex, disability, deceptive, protective order, burdensome, strategic, intrusive, drafting, good cause, executive vice presidents, high-level, notice, disability insurance, believing, insurance policies, language used, vice presidents, plain language, broad discretion, order to prevent, high-ranking, protective, confusing, deposing, discover

**COUNSEL:** [*1] For David N Klungvedt, Plaintiff: Edward O Comitz, Patrick Thomas Stanley, LEAD ATTORNEYS, Comitz Beethe PLLC, Scottsdale, AZ.

For Unum Group, a Delaware corporation, Paul Revere Life Insurance Company, a Maine corporation, Defendants: Jason M Porter, Stephen M Bressler, LEAD ATTORNEYS, Lewis & Roca LLP, Phoenix, AZ.

**JUDGES:** JOHN W. SEDWICK, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOHN W. SEDWICK

**OPINION**

**ORDER AND OPINION**

**[Re: Motion at Docket 59]**

**I. MOTION PRESENTED**

At docket 59, defendants Unum Group ("Unum") and Paul Revere Life Insurance Company ("Paul Revere"; collectively, "defendants") move this court to preclude plaintiff David Klungvedt ("Klungvedt" or "plaintiff") from deposing Mr. Jack McGarry ("McGarry") because he is a high-ranking corporate official without any personal or relevant knowledge regarding the issues in this case. Plaintiff opposes at docket 67, and defendants reply at docket 77. Oral argument was not requested and would not assist the court.

**II. BACKGROUND**

Klungvedt purchased a disability insurance policy from Paul Revere in 1988. Unum is the parent company of Paul Revere. Plaintiff submitted a claim for disability benefits in March of 2006 after he was diagnosed with a cyst on his brain. [*2] Paul Revere accepted the claim and paid monthly benefits until December 2008, at which time it terminated Klungvedt's benefits, asserting that the medical records did not support Klungvedt's claim of disability.

Klungvedt filed this lawsuit against defendants in state court. Defendants removed the case to this court. Klungvedt's second amended complaint sets forth a breach-of-contract claim and an insurance bad faith claim against defendants. Additionally, the complaint sets forth a claim for declaratory relief, asking the court to declare that ERISA does not apply to plaintiff's individual disability insurance policy and that the appeals language Unum uses in its termination letters, including the one plaintiff received on December 2, 2008, is de-

ceptive and inconsistent with Unum's obligations of good faith and fair dealing and is deceptive and inconsistent with the policy itself. The language plaintiff contends is deceptive is as follows:

> If you do not have additional information, disagree with our determination, and want to appeal this claim decision, you must submit a written appeal. This appeal must be received by us within 180 days of the date of this letter. . . . If we do not   [*3] receive your written appeal within 180 days of the date of this letter, our claim determination will be final.

Plaintiff asserts that this language purposefully misleads denied claimants into believing that their policies are governed by ERISA and misleads them into believing that they may not be entitled to further relief if they do not submit to Unum's appeal process. He asserts that the language does not adequately and clearly set forth a claimant's rights and remedies.

Defendants subsequently admitted that ERISA does not apply to plaintiff's policy, and the court therefore disposed of that issue at docket 62. The only remaining issue for declaratory relief relates to the appeals language in the termination letter plaintiff received on December 2, 2008; namely, whether that language is deceptive and inconsistent with plaintiff's policy and with Unum's obligation of good faith and fair dealing.

On September 24, 2012, plaintiff filed a notice of deposition of McGarry, who is currently Unum's Executive Vice President of Individual Disability and Long Term Care Closed Block Operations, one of four executive vice presidents in the company with only Unum's President/CEO ranking above him.   [*4] Defendants filed this motion for a protective order to prevent the deposition from taking place under Rule 26(c) of the Federal Rules of Civil Procedure, arguing that the deposition of McGarry, a high-ranking or "apex" corporate official, is burdensome and unwarranted in that McGarry does not have any personal or relevant knowledge about the information sought and such information can be obtained through less burdensome methods, such as deposing a designated corporate representative under Rule 30(b)(6). Plaintiff disagrees and argues that McGarry has information relevant to: (1) the drafting or use of the appeals language used in benefit termination letters; (2) the decision whether to correct the appeals language used in termination letters once put on notice that it was confusing; (3) Unum's initiative to use plain language in its products; and (4) the strategic decisions related to improving the company's performance in the realm of individual insurance policies.

## III. STANDARD OF REVIEW

Trial courts have broad discretion in matters related to discovery. [1] While generally any matter relevant to a claim or defense is discoverable, Rule 26(b)(2) of the Federal Rules of Civil Procedure   [*5] grants district courts the power to limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." [2] Furthermore, under Rule 26(c) a party from whom discovery is sought may move for a protective order, and if good cause is found, the court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The party seeking the protective order has the burden of showing good cause by demonstrating harm or prejudice that will result from the requested discovery. [3]

> 1  Hallett v. Morgan, 296 F.3d 732, 751 (9th Cir. 2002) (noting that broad discretion is vested in the trial court to permit or deny discovery).
> 2  Fed. R. Civ. P. 26(b)(2)(C)(i).
> 3  Rivera v. NIBCO, Inc., 364 F.3d 1057, 1063 (9th Cir. 2004).

## IV. DISCUSSION

Defendants argue that the court should issue a protective order to prevent the deposition of McGarry because he is a high-level or "apex" executive without personal knowledge of the issues in this case whom plaintiff seeks to depose in order to discover general strategic corporate information   [*6] that could more appropriately be obtained using less burdensome methods of discovery, like a Rule 30(b)(6) deposition. Based on the affidavits of McGarry, the court concludes that he is clearly a high-level executive because he is one of the top five executives in the company. [4] "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." [5] This potential for abuse presents the court with a situation where it may be appropriate for it to exercise its discretion to limit discovery under the federal rules. In considering whether to allow a deposition of an apex executive, the court considers whether the executive has unique, first-hand, non-repetitive knowledge of the facts at issue in the case and whether the party seeking the deposition has exhausted other less intrusive discovery methods. [6]

4  *See, e.g.*, *Groupion, LLC v. Groupon, Inc.*, 2012 U.S. Dist. LEXIS 12684, 2012 WL 359699, at *3 (N.D. Cal. Feb. 2, 2012) (referring to a company's senior vice presidents as "apex deponents").

5  *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007).

6  *Affinity Labs of Texas v. Apple, Inc.*, 2011 U.S. Dist. LEXIS 53649, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011).

As [*7] for McGarry's unique personal knowledge, plaintiff does not dispute that McGarry was not involved in the handling of plaintiff's disability claim or the decision to terminate his benefits. Thus, McGarry has no personal knowledge about plaintiff's individual claim.

Plaintiff does, however, assert that McGarry will have information about Unum's institutional practices related to termination decisions and to the appeals language in benefit termination letters. But the court is not convinced that McGarry's knowledge on these subjects will be unique and personal. There is no reason to believe McGarry had a role in drafting the allegedly deceptive language in termination letters or in any subsequent decision to clarify confusing language in its products, if any such decision has in fact been made, especially given McGarry's affidavits that show he has no personal knowledge about such matters. Also, even assuming McGarry had a personal role in the plain language initiative described in plaintiff's response, other than being a corporate spokesperson, the relevance of this initiative is unclear to the court given that this initiative occurred years after plaintiff received his termination letter. [*8] Indeed, McGarry's affidavit states that the initiative was related to Unum UK's income protection products, not disability insurance. As for plaintiff's assertion that McGarry's role as Executive Vice President of Individual Disability and Long Term Care necessarily means he will have information regarding the company's strategic decisions related to the improvement of the company's performance in the area of its "closed block" individual insurance policies is not well-taken given that McGarry has only held this position since September of 2012 and plaintiff's benefit termination occurred in 2008. To the extent plaintiff argues that McGarry's role as Senior Vice President of Unum's U.S. Risk Management Organization during the time his benefits were terminated necessarily implies he would know whether Unum had a strategic plan that improperly influenced the decision in his specific insurance case, the court concludes that such knowledge is not unique to McGarry and other less intrusive means of discovery are available to plaintiff on this front. [7]

7  *See id.* ("Where a high-level decision maker removed from the daily subjects of the litigation has no unique personal knowledge of the facts [*9] at issue, a deposition of the official is improper." (internal quotations omitted)).

As for plaintiff's exhaustion of other methods of discovery, plaintiff had not undertaken other methods of discovery before noticing the deposition of McGarry. Other less intrusive methods, such as a Rule 30 (b)(6) deposition, should have been undertaken if plaintiff wanted to discover evidence related to the drafting of the language in the termination letter or evidence related generally to termination of benefits under individual policies. Without having conducted other means of discovery first, plaintiff's request to depose McGarry was made without a solid basis for believing McGarry had some *unique* and personal knowledge related to these issues which makes his deposition more than marginally relevant and enough to outweigh the burden. While discovery may currently be ongoing, plaintiff has not filed any supplement to suggest that some evidence has been discovered to support his argument that McGarry has unique knowledge related to the issues at hand.

In sum, defendants have made the requisite showing of good cause for a protective order by suggesting that the proposed deponent, an "apex" executive, [*10] has no unique and personal knowledge of the issues involved in this case and by noting that plaintiff has not conducted less intrusive means of discovery to obtain the general corporate information he seeks.

## V. CONCLUSION

For the foregoing reasons, defendants' motion for protective order is GRANTED. Plaintiff is precluded from taking the deposition of McGarry at this time. However, in the event plaintiff develops a *detailed and specific basis* upon completion of other discovery, including a Rule 30(b)(6) deposition, to suggest that McGarry has *unique, relevant, personal knowledge*, he can renew his request for a deposition. The court notes that a valid basis for such a request seems unlikely given the affidavits of Mr. McGarry, which suggest he was not involved in the drafting or inclusion of the appeals language at issue or in any initiative to rewrite or clarify language in benefit termination letters.

DATED this 13th day of February 2013

/s/ JOHN W. SEDWICK

UNITED STATES DISTRICT JUDGE

**Citation #11**
**2006 U.S. Dist. LEXIS 4909**

LEXSEE

⚠
Caution
As of: Jun 07, 2013

**JEANETTE McMAHON, as Personal Representative of the Estate of Michael Mcmahon; TRACY GROGAN, as Personal Representative of the Estate of Travis Grogan; and SARAH MILLER, as Personal Representative of the Estate of Harley Miller, Plaintiffs, -vs- PRESIDENTIAL AIRWAYS, INC., AVIATION WORLDWIDE SERVICES, LLC, STI AVIATION, INC., AIR QUEST, INC., BLACKWATER LODGE & TRAINING CENTER, INC., Defendants.**

Case No. 6:05–cv–1002–Orl–28JGG

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

2006 U.S. Dist. LEXIS 4909

January 18, 2006, Decided
January 18, 2006, Filed

**SUBSEQUENT HISTORY:** Motion denied by McMahon v. Presidential Airways, 410 F. Supp. 2d 1189, 2006 U.S. Dist. LEXIS 4919 (M.D. Fla., Jan. 24, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, personal representatives of the estates of the deceased, filed an action against defendant companies for claims arising out of a plane crash. Plaintiffs sought to depose five witnesses as part of the discovery proceedings. Plaintiffs also sought to reopen the deposition of a sixth witness. Plaintiffs claimed that defendants were not cooperating with the scheduling and filed a motion to compel.

**OVERVIEW:** Plaintiffs moved to compel the depositions of five witnesses that they claimed worked for defendants and they asserted that defendants had not cooperated in the scheduling of the depositions. Plaintiffs had not noticed the depositions or subpoenaed the witnesses, as contemplated by Fed. R. Civ. P. 30, 37, and 45. The court held that there was no basis for an order compelling attendance at a deposition because plaintiffs had never issued notices. Further, if the witnesses were not officers, directors, or managing agents of defendants, subpoenas were necessary. Defendants were ordered to provide plaintiffs with dates indicating when four of the witnesses would be in the United States, to provide plaintiffs with an address where process could be served, and to provide plaintiffs with dates when defense counsel was available. Plaintiffs had not made a showing that they needed information about the flow of profits from one of defendants' executive officers at the current juncture of the litigation. Plaintiffs could reopen the deposition of one witness, pursuant to M.D. Fla. Gen. R. 3.04 on two issues where the errata sheet materially changed the deponent's answer.

**OUTCOME:** The court denied without prejudice plaintiffs' motion to compel depositions of five witnesses. The court granted the motion to reopen a deposition on two of the three specific issues presented by plaintiffs in their motion.

**CORE TERMS:** deposition, notice, protective order, subpoena, errata, sheet, managing agent, discovery, materially alters, incomplete, reopen, depose, debt service, personal knowledge, attendance, precluding, correction, deponent, chairman, responded, underlying facts, executive officer, subject matter, material changes, subordinate, declaration, designating, compelled, incorrect, deposed

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > Motions to Compel*
*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN1]Fed. R. Civ. P. 30(a)(1) provides that the attendance of witnesses may be compelled by subpoena as provided in Fed. R. Civ. P. 45. Fed. R. Civ. P. 30(b) requires a party desiring to take a deposition to give written notice of the deposition. Further, the court may enter an order compelling attendance of a party or an officer, director, or managing agent of a party who fails to appear for a deposition after being served with proper notice. Fed. R. Civ. P. 37(d).

*Civil Procedure > Discovery > Disclosures > Motions to Compel*
*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Pretrial Matters > Subpoenas*
[HN2]No subpoena is unnecessary to require officers, directors or managing agents of a corporate party to attend a deposition. Although most corporate litigants voluntarily produce subordinate employees, if the corporate party refuses to produce the person, the person must be subpoenaed. Only a party to the litigation may, of course, be compelled to give testimony pursuant to a notice of deposition. If an examining party fails to meet its burden of proving that a deponent is a managing agent, it must resort to Fed. R. Civ. P. 45 for subpoenas on non-party witnesses.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN3]A courteous lawyer is normally expected to accommodate the schedules of opposing lawyers. In doing so, the attorney should normally pre-arrange a deposition with opposing counsel before serving the notice. If this is not possible, counsel may unilaterally notice the deposition while at the same time indicating a willingness to be reasonable about any necessary rescheduling.

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Protective Orders*
[HN4]A protective order precluding the deposition of a high-ranking executive officer will be granted where the officer possesses no unique knowledge regarding the underlying facts of the action and files a declaration stating his or her lack of knowledge. An officer at the apex of the corporation can only be deposed if he or she has unique knowledge or the subject matter requested in deposition was pursued unsatisfactorily through less intrusive means.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN5]M.D. Fla. Gen. R. 3.04(a) requires the moving party seeking to reopen a deposition to quote in full the deposition question and answer at issue in the motion, and the court's review is limited to the specific changes identified in the motion.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN6]A requirement that the party noticing a deposition under Fed. R. Civ. P. 30(b)(6) describe with reasonable particularity the matters on which the examination is requested does not limit the scope of the deposition to the contents of the notice.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN7]A deponent may object on the record that questions beyond the scope of the Fed. R. Civ. P. 30(b)(6) designation are not intended as the answers of the designating party and do not bind the designating party.

**COUNSEL:** [*1] For Jeanette McMahon, as Personal Representative of the Estate of Michael McMahon, Tracy Grogan, as Personal Representative of the Estate of Travis Grogan, Sarah Miller, as Personal Representative of the Estate of Harley Miller, Plaintiffs: Robert B. Guild, Robert F. Spohrer, Sean B. Cronin, Spohrer, Wilner, Maxwell & Matthews, P.A., Jacksonville, FL.

For Presidential Airways, Inc., a Florida corporation, Aviation Worldwide Services, LLC, a Florida limited liability company, STI Aviation, Inc., a Florida corporation, Air Quest, Inc., a Florida corporation, Defendants: Douglas R. Beam, Douglas R. Beam, P.A., Melbourne, FL; J. Denny Shupe, Tracey L. Dolin, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA; Jonathan M. Stern, Schnader Harrison Segal & Lewis, LLP, Washington, DC; Mark P. Schnapp, Sabrina R. Ferris, Greenberg Traurig, P.A., Miami, FL; Michael P. Socarras, Greenberg Traurig LLP, Washington, DC.

For Blackwater Lodge & Training Center, Inc., a foreign corporation, Defendant: Douglas R. Beam, Douglas R. Beam, P.A., Melbourne, FL; J. Denny Shupe, Tracey L. Dolin, Schnader Harrison Segal & Lewis LLP, Philadel-

phia, PA; Jonathan M. Stern, Schnader Harrison Segal & [*2] Lewis, LLP, Washington, DC.

For United States, Intervenor: Carolyn J. Adams, U.S. Attorney's Office Middle District of Florida, Orlando, FL; Justin Chretien, Aviation & Admiralty Litigation Torts Branch, Civil Division Department of Justice, Washington, DC.

**JUDGES:** JAMES G. GLAZEBROOK, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES G. GLAZEBROOK

**OPINION**

**ORDER**

This cause came on for consideration without oral argument on the following motion:

> **MOTION: PLAINTIFF'S MOTION TO COMPEL DISCOVERY (Doc. No. 39)**
>
> **FILED: December 12, 2005**
>
> **THEREON it is ORDERED that the motion is GRANTED in part and DENIED in part without prejudice.**

Plaintiffs move to compel the depositions of Robert Gamache, Kevin McBride, Hans Nobles, Rick Furby, and Erik Prince. Plaintiffs have not issued a notice of deposition or subpoenas for any of these individuals. Rather, Plaintiffs complain that Defendants have not cooperated in scheduling the depositions. Plaintiffs also move to reopen the deposition of Timothy Childrey due to changes made to his deposition testimony by submission of an errata sheet. For the reasons set forth below, Plaintiffs' motion to compel is granted in part [*3] and denied in part without prejudice.

**1. Plaintiffs Failure to Notice the Depositions or Subpoena Witnesses**

Plaintiffs move to compel pursuant to Fed. R. Civ. P. 30 and 37. [HN1]Rule 30(a)(1) provides that the attendance of witnesses may be compelled by subpoena as provided in Rule 45. Rule 30(b) requires a party desiring to take a deposition to give written notice of the deposition. Further, the Court may enter an order compelling attendance of a party or an officer, director, or managing agent of a party who fails to appear for a deposition after being served with proper notice. Fed. R. Civ. P. 37(d).

[HN2]No subpoena is unnecessary to require officers, directors or managing agents of a corporate party to attend a deposition. Although most corporate litigants voluntarily produce subordinate employees, if the corporate party refuses to produce the person, the person must be subpoenaed. *See. e.g., In re Honda Am. Motor Co., Inc. Dealership Relations Litig.,* 168 F.R.D. 535, 540 (D. Md. 1996) ("Only a party to the litigation may, of course, be compelled [*4] to give testimony pursuant to a notice of deposition. . . . If an examining party fails to meet its burden [of proving that a deponent is a managing agent], it must resort to Fed. R. Civ. P. 45 for subpoenas on non-party witnesses."); *Colonial Capital Co. v. Gen. Motors Corp.,* 29 F.R.D. 514 (D. Conn. 1961) (granting motion to vacate deposition notices to subordinate employees).

Defendants claim that four of the five individuals Plaintiffs wish to depose (Gamache. McBride, Nobles, and Furby) are independent contractors, whom Defendants do not "control." Plaintiffs contend that these individuals are "employees," but do not specifically assert that the individuals are officers, directors or managing agents of the corporate defendants. The Court has been provided with no information to determine whether the persons are independent contractors or employees.

In this case, there is no basis for an order compelling attendance at a deposition because no notices of deposition were ever issued. Further, if the individuals are not officers, directors or managing agents of Defendants subpoenas are necessary. The motion to compel, therefore [*5] is denied without prejudice.

It appears, however that Defendants may be hiding witnesses by refusing to disclose when they will be in the United States and where process may be served. Also, Defendants apparently are being uncooperative in scheduling depositions of these individuals. [1] No later than February 1, 2006, Defendants are ordered to provide to Plaintiffs the dates when Gamache, McBride, Nobles, and Furby will be in the United States, where process may be served if Defendants are unwilling or unauthorized to accept service of process, and dates that defense counsel is available for deposition during a time when these individuals are in the United States.

---

1    *See Middle District Discovery Handbook* (9/4/01) at 5 [HN3]("A courteous lawyer is normally expected to accommodate the schedules of opposing lawyers. In doing so, the attorney should normally pre-arrange a deposition with opposing counsel before serving the notice. If this is not possible, counsel may unilaterally notice the deposition while at the same time indicating a willingness to be reasonable about any necessary rescheduling.").

[*6] **2. Deposition of Erik D. Prince**

Plaintiffs move to depose Erik Prince. Defendants' reply opposes the motion and requests a protective order. Erik Prince is the President of EPI Investments, LLC ("EPI"). EPI is not a party to the complaint, however, EPI is the sole owner of Defendant Aviation World Services ("AWS"). Prince also is Chairman *&* CEO of Blackwater Lodge and Training Center, Inc. ("Blackwater"). Blackwater is the "sole manager" of Defendant AWS, though it is uninvolved in AWS's daily operations or management. Prince also serves on the Board of Directors for Defendants Presidential Airways, Air Quest, Inc. and STI Aviation (all subsidiaries of AWS). Prince has filed a declaration in which he avers that he is not personally involved in the daily operations or management of any of the defendants, and that he has no first-hand knowledge of the underlying facts at issue in the litigation.

[HN4]A protective order precluding the deposition of a high-ranking executive officer will be granted where the officer possesses no unique knowledge regarding the underlying facts of the action and files a declaration stating his or her lack of knowledge. *See. e.g., Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995) [*7] (affirming the grant of a protective order precluding the deposition of the chairman of the Board of Directors of IBM because the chairman had no knowledge of the employee claiming age discrimination or knowledge of the employee's work and signed an affidavit to that effect); *Evans v. Allstate Ins. Co.*, 216 F.R.D. 515, 519 (N.D. Okla. 2003) (granting protective order precluding depositions of executive officers where they filed affidavits disavowing any personal knowledge of the facts of the action). An officer at the apex of the corporation can only be deposed if he or she has unique knowledge or the subject matter requested in deposition was pursued unsatisfactorily through less intrusive means. *See, e.g., Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) (affirmed protective order because the plaintiff sought to depose the president in the first instance before lower level employees, and because the trial court had provided that plaintiff could take the deposition if the testimony of other Upjohn employees with more knowledge proved unsatisfactory); *In re Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985) (protective [*8] order preventing deposition of Chrysler president, Lee Iacocca, was granted because Iacocca signed an affidavit expressing ignorance of the facts sought by the plaintiff; prior to allowing deposition, plaintiff would have to serve interrogatories to determine the true state of Iacocca's knowledge).

Plaintiffs apparently want to depose Prince to obtain information regarding the flow of profits from Defendant AWS and other financial dealings between EPI and AWS. (Docket 39 at 8-10.) Plaintiffs make no showing how such information is relevant to a claim or defense in the action and Plaintiffs appear to seek discovery in furtherance of a judgment they have not yet obtained. If true, the discovery is improper at this stage of the litigation. *See Auto-Owners Ins. Co. v. Southeast Floating Docks. Inc.*, 231 F.R.D. 426 (M.D. Fla. 2005).

In addition to Plaintiffs failure to notice Prince's deposition or to serve him with a subpoena, Plaintiffs have failed to demonstrate that Prince possesses relevant information or that the information cannot be obtained less intrusively. Therefore, the motion to compel is denied without prejudice.

**3. Reopening Childrey's Deposition**

[*9] Timothy Childrey, President of Defendants AWS and Airquest. was deposed pursuant to Plaintiff's Rule 30(b)(6) deposition notice. Plaintiffs seek to reopen Childrey's deposition, claiming that Childrey made material changes to his testimony through the errata sheet. Although Plaintiffs claim that the changes on the errata sheet are "sweeping, material changes," only three specific examples are provided in the motion. Because [HN5]Local Rule 3.04(a) requires the moving party to quote in full the deposition question and answer at issue in the motion, the Court's review is limited to the three specific changes identified in the motion. Defendants oppose the motion, arguing that the changes were insubstantial, the questions involve irrelevant matters and matters outside the scope of the deposition notice.

a. Amount of Debt Service Payment

Childrey was questioned regarding the amount of monthly debt service on the aircraft. Childrey responded that the amount was approximately $ 600,000 per year, but he did not recall whether that amount was before or after the amended lease. On the errata sheet, Childrey stated, "My recollection was incorrect, it is not $ 600,000."

Defendants argue that [*10] because Childrey expressed doubt at the time of his deposition, correction in the errata sheet is favored. While Defendants are correct regarding this general precept, they are incorrect in its application. First, Childrey did not express doubt about the amount, only when the amount was paid. Second, Childrey's change materially alters his answer and renders that portion of the deposition incomplete. *See Bay State HMO Mgmt. v. Tingley Sys.*, 152 F. Supp. 2d 95, 121 (D. Mass. 1995).

Defendants alternately argue that the amount of debt service is irrelevant to any claim or defense in the case. Defendants did not object at the time the question was asked nor seek a protective order prior to Plaintiffs filing

this motion. The Court does not condone untimely objections raised in response to a motion to compel. The objection for purposes of this deposition, therefore, has been waived.

The Court grants the motion to reopen Childrey's deposition on the limited issue of the basis for the change in his testimony and the amount of the debt payment.

b. Profit Flow

Childrey was asked whether profits from Presidential Airways would flow to AWS, and Childrey responded "I'm [*11] not sure, but I think generally, yes." Childrey's errata sheet states, "This answer was not correct because we have never moved Presidential's profits to AWS." Unlike the prior question regarding debt service, Childrey's correction here does not materially alter his testimony given his clear expression of doubt at the time of his deposition nor is the correction incomplete. Childrey is not required to provide additional deposition testimony regarding this question.

c. Defendants' Investigation

Plaintiffs asked Childrey, "Did Presidential Airways or Aviation Worldwide Services conduct any investigation into the circumstances of the crash?" Childrey responded, "no." Childrey's errata sheet states "My answer no' was based on my understanding that Presidential did not formally conduct an investigation. However Presidential did send personnel to Afghanistan to assist the military in its investigation and also provided personnel and resources to the NTSB to assist with their official investigation."

Although Defendants did not object at the time of the deposition, Defendants now object that the subject matter of the investigation is outside the scope of the Rule 30(b)(6) deposition [*12] notice. [HN6]The requirement that the party noticing the deposition "describe with reasonable particularity the matters on which the examination is requested" does not limit the scope of the deposition to the contents of the notice. *See Detoy v. City & County of San Francisco*, 196 F.R.D. 362, 366 (N.D. Cal.2000); *Cabot Corp. v. Yamulla Enterprises, Inc.*, 194 F.R.D. 499, 500 (M.D. Pa.2000); *Overseas Private Inv. Corp. v. Mandelbaum*, 185 F.R.D. 67, 68 (D.D.C.1999); *King v. Pratt & Whitney*, 161 F.R.D. 475 (S.D. Fla. 1995). Once the deponent has satisfied his or her minimum obligation by responding to questions on matters set forth in the notice of deposition, then the scope of the deposition is determined solely by relevance. *Detoy*, 196 F.R.D. at 366; *King*, 161 F.R.D. at 476. [2]

> 2   Of course,[HN7] the deponent may object on the record that questions beyond the scope of the Rule 30(b)(6) designation are not intended as the answers of the designating party and do not bind the designating party. *See Detoy*, 196 F.R.D. at 367.

[*13]  Any investigations conducted regarding the crash clearly could lead to the discovery, of admissible evidence, and Plaintiffs were allowed to ask Childrey about his personal knowledge of any investigations. The issue to be determined by this motion, however, is whether Childrey's change materially alters his answer and renders that portion of the deposition incomplete.

Childrey's change materially alters his testimony and renders that portion of his deposition incomplete. Childrey's deposition may be reopened and Childrey may be questioned on the limited issue of the basis for the change in his testimony and his personal knowledge of the investigations in which Presidential Airways or Aviation Worldwide Services participated.

**CONCLUSION**

Plaintiffs' motion to compel the depositions of Robert Gamache, Kevin McBride, Hans Nobles, Rick Furby, and Erik Prince is denied without prejudice. Plaintiffs' motion to reopen the deposition of Timothy Childrey is granted in part and denied in part.

**DONE and ORDERED** in Orlando, Florida on January 18, 2006.

JAMES G. GLAZEBROOK

UNITED STATES MAGISTRATE JUDGE

**Citation #12**
**2010 U.S. Dist. LEXIS 144172**

LEXSEE



Analysis
As of: Jun 07, 2013

**MEDIMMUNE, LLC, Plaintiff, v. PDL BIOPHARMA, INC., Defendant.**

**No. C08-05590 JF (HRL)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

**2010 U.S. Dist. LEXIS 144172**

**June 30, 2010, Decided**
**June 30, 2010, Filed**

**NOTICE:**   NOT FOR CITATION

**SUBSEQUENT HISTORY:** Objection overruled by MedImmune, LLC v. PDL Biopharma, Inc., 2010 U.S. Dist. LEXIS 83187 (N.D. Cal., July 22, 2010)

**PRIOR HISTORY:** MedImmune, LLC v. PDL Biopharma, Inc., 2010 U.S. Dist. LEXIS 65433 (N.D. Cal., June 10, 2010)

**CORE TERMS:** deposition, subpoena, discovery, Walsh Act, apex, appearance, exhausted, issuance, busy

**COUNSEL:** [*1] For Martin Quinn, Special Master: Martin Quinn, JAMS, San Francisco, CA.

For Medimmune, LLC, Plaintiff: Aaron P. Maurer, Gerson Avery Zweifach, LEAD ATTORNEYS, PRO HAC VICE, David Isaac Berl, LEAD ATTORNEY, Jessamyn Sheli Berniker, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; Elliot M Olstein, LEAD ATTORNEY, Carella Byrne Bain Gilfillan Cecchi Stewart & Olstein, PC, Roseland, NJ; Jeffrey E. Faucette, LEAD ATTORNEY, Skaggs Faucette LLP, San Francisco, CA; Josephine Ko, LEAD ATTORNEY, Drinker Biddle & Reath, LLP, San Francisco, CA; Paul B. Gaffney, LEAD ATTORNEY, PRO HAC VICE, Thomas S Fletcher, Williams & Connolly, Washington, DC; Joshua H. Lerner, Durie Tangri LLP, San Francisco, CA; Kimberly Linnell Taylor, Carr, McClellan, Ingersoll, Thompson & Horn, Burlingame, CA.

For PDL Biopharma, Inc., Defendant: Matthew Douglas Powers, LEAD ATTORNEY, Tensegrity Law Group, LLP, Redwood Shores, CA; Peter Michael Hart, LEAD ATTORNEY, Matthew Kevin Wisinski, LeClairRyan LLP, San Francisco, CA; Peter Sandel, Rebecca Fett, LEAD ATTORNEYS, PRO HAC VICE, Elizabeth Stotland Weiswasser, PRO HAC VICE, Weil, Gotshal & Manges LLP, New York, NY; Vernon Michael Winters, LEAD ATTORNEY, Greenberg Traurig, [*2] LLP, San Francisco, CA; Aaron Y Huang, Weil Gotshal Manges, Redwood Shores, CA; Dana Johannes Finberg, Sonnenschein Nath & Rosenthal LLP, Palo Alto, CA; David Isaac Gindler, Jason George Sheasby, ESQ., Michael Henry Strub, Jr., Irell & Manella LLP, Los Angeles, CA; David E. Moore, PRO HAC VICE, Wilmington, DE; Gregory Hull, Jacqueline T. Harlow, PRO HAC VICE, Weil, Gotshal & Manges LLP, Redwood Shores, CA; James L. Messenger, PRO HAC VICE, John W. Moran, PRO HAC VICE, LeClairRyan, PC, Boston, MA; Joshua P. Davis, PRO HAC VICE, Weil Gotshal & Manges LLP, Houston, TX; Michael George Ermer, Irell & Manella, Newport Beach, CA; Paullette Christine Deruelle, PRO HAC VICE, Weil, Gotshal and Manges LLP, Miami, FL; Raymond Angelo LaMagna, Irell and Manella, Los Angeles, CA; Richard L. Horwitz, PRO HAC VICE, Wilmington, DE; T. Ray Guy, Weil Gotshal & Manges LLP, Dallas, TX; Travis W. Bliss, PRO HAC VICE, Wilmington, DE.

For Doug Ebersole, Glen Sato, Jim Cornett, Miscellaneous: David Isaac Gindler, Irell & Manella LLP, Los Angeles, CA.

For David Mott, Michael Richma, Leslie Sydnor Johnson, James Young, Miscellaneous: Eric R. Delinsky, PRO HAC VICE, Zuckerman Spaeder LLP, Washington, DC.

For Genentech, [*3] Inc., City of Hope, Intervenors: Joshua H. Lerner, LEAD ATTORNEY, Durie Tangri LLP, San Francisco, CA.

For PDL Biopharma, Inc., Counter-claimant: Peter Michael Hart, LEAD ATTORNEY, LeClairRyan LLP, San Francisco, CA; Peter Sandel, Rebecca Fett, LEAD ATTORNEYS, Weil, Gotshal & Manges LLP, New York, NY; Vernon Michael Winters, LEAD ATTORNEY, Greenberg Traurig, LLP, San Francisco, CA; Aaron Y Huang, Weil Gotshal Manges, Redwood Shores, CA; David Isaac Gindler, Irell & Manella LLP, Los Angeles, CA; David E. Moore, PRO HAC VICE, Wilmington, DE; Gregory Hull, Jacqueline T. Harlow, PRO HAC VICE, Weil, Gotshal & Manges LLP, Redwood Shores, CA; James L. Messenger, PRO HAC VICE, John W. Moran, PRO HAC VICE, LeClairRyan, PC, Boston, MA; Joshua P. Davis, PRO HAC VICE, Weil Gotshal & Manges LLP, Houston, TX; Paullette Christine Deruelle, PRO HAC VICE, Weil, Gotshal and Manges LLP, Miami, FL; Raymond Angelo LaMagna, Irell and Manella, Los Angeles, CA; Richard L. Horwitz, PRO HAC VICE, Wilmington, DE; T. Ray Guy, Weil Gotshal & Manges LLP, Dallas, TX; Travis W. Bliss, PRO HAC VICE, Wilmington, DE.

For Medimmune, LLC, Counter-defendant: Elliot M Olstein, PRO HAC VICE, Carella Byrne Bain Gilfillan Cecchi [*4] Stewart & Olstein, PC, Roseland, NJ; Jeffrey E. Faucette, Skaggs Faucette LLP, San Francisco, CA; Jessamyn Sheli Berniker, PRO HAC VICE, Williams & Connolly LLP, Washington, DC.

For PDL Biopharma, Inc., Counter-claimant: Peter Michael Hart, LEAD ATTORNEY, LeClairRyan LLP, San Francisco, CA; Peter Sandel, Rebecca Fett, LEAD ATTORNEYS, Weil, Gotshal & Manges LLP, New York, NY; Vernon Michael Winters, LEAD ATTORNEY, Greenberg Traurig, LLP, San Francisco, CA; Aaron Y Huang, Weil Gotshal Manges, Redwood Shores, CA; David Isaac Gindler, Irell & Manella LLP, Los Angeles, CA; David E. Moore, Wilmington, DE; Gregory Hull, Jacqueline T. Harlow, PRO HAC VICE, Weil, Gotshal & Manges LLP, Redwood Shores, CA; James L. Messenger, PRO HAC VICE, John W. Moran, PRO HAC VICE, LeClairRyan, PC, Boston, MA; Joshua P. Davis, PRO HAC VICE, Weil Gotshal & Manges LLP, Houston, TX; Michael George Ermer, Irell & Manella, Newport Beach, CA; Paullette Christine Deruelle, PRO HAC VICE, Weil, Gotshal and Manges LLP, Miami, FL;

Raymond Angelo LaMagna, Irell and Manella, Los Angeles, CA; Richard L. Horwitz, Wilmington, DE; T. Ray Guy, Weil Gotshal & Manges LLP, Dallas, TX; Travis W. Bliss, Wilmington, DE.

For Medimmune, [*5] LLC, Counter-defendant, Counter-claimant: Aaron P. Maurer, David Isaac Berl, Gerson Avery Zweifach, LEAD ATTORNEYS, Jessamyn Sheli Berniker, Williams & Connolly LLP, Washington, DC; Jeffrey E. Faucette, LEAD ATTORNEY, Skaggs Faucette LLP, San Francisco, CA; Paul B. Gaffney, LEAD ATTORNEY, Williams & Connolly, Washington, DC.

For PDL Biopharma, Inc., Counter-defendant: Peter Michael Hart, LEAD ATTORNEY, LeClairRyan LLP, San Francisco, CA; Peter Sandel, Rebecca Fett, LEAD ATTORNEYS, Elizabeth Stotland Weiswasser, PRO HAC VICE, Weil, Gotshal & Manges LLP, New York, NY; Vernon Michael Winters, LEAD ATTORNEY, Greenberg Traurig, LLP, San Francisco, CA; Aaron Y Huang, Weil Gotshal Manges, Redwood Shores, CA; David Isaac Gindler, Irell & Manella LLP, Los Angeles, CA; David E. Moore, PRO HAC VICE, Wilmington, DE; Gregory Hull, Jacqueline T. Harlow, PRO HAC VICE, Weil, Gotshal & Manges LLP, Redwood Shores, CA; James L. Messenger, PRO HAC VICE, John W. Moran, PRO HAC VICE, LeClairRyan, PC, Boston, MA; Joshua P. Davis, PRO HAC VICE, Weil Gotshal & Manges LLP, Houston, TX; Paullette Christine Deruelle, Weil, Gotshal and Manges LLP, Miami, FL; Raymond Angelo LaMagna, Irell and Manella, Los Angeles, [*6] CA; Richard L. Horwitz, Wilmington, DE; T. Ray Guy, Weil Gotshal & Manges LLP, Dallas, TX; Travis W. Bliss, Wilmington, DE.

For PDL Biopharma, Inc., Counter-claimant: Peter Michael Hart, LEAD ATTORNEY, LeClairRyan LLP, San Francisco, CA; Peter Sandel, Rebecca Fett, LEAD ATTORNEYS, Weil, Gotshal & Manges LLP, New York, NY; Vernon Michael Winters, LEAD ATTORNEY, Greenberg Traurig, LLP, San Francisco, CA; Aaron Y Huang, Weil Gotshal Manges, Redwood Shores, CA; David Isaac Gindler, Irell & Manella LLP, Los Angeles, CA; David E. Moore, Wilmington, DE; Gregory Hull, Jacqueline T. Harlow, PRO HAC VICE, Weil, Gotshal & Manges LLP, Redwood Shores, CA; James L. Messenger, PRO HAC VICE, John W. Moran, PRO HAC VICE, LeClairRyan, PC, Boston, MA; Joshua P. Davis, PRO HAC VICE, Weil Gotshal & Manges LLP, Houston, TX; Paullette Christine Deruelle, PRO HAC VICE, Weil, Gotshal and Manges LLP, Miami, FL; Raymond Angelo LaMagna, Irell and Manella, Los Angeles, CA; Richard L. Horwitz, Wilmington, DE; T. Ray Guy, Weil Gotshal & Manges LLP, Dallas, TX; Travis W. Bliss, Wilmington, DE.

For PDL Biopharma, Inc., Counter-claimant: Peter Michael Hart, LEAD ATTORNEY, Matthew Kevin Wisinski, LeClairRyan LLP, San [*7] Francisco, CA; Peter Sandel, Rebecca Fett, LEAD ATTORNEY, Weil, Gotshal & Manges LLP, New York, NY; Vernon Michael Winters, LEAD ATTORNEY, Greenberg Traurig, LLP, San Francisco, CA; Aaron Y Huang, Weil Gotshal Manges, Redwood Shores, CA; Dana Johannes Finberg, Sonnenschein Nath & Rosenthal LLP, Palo Alto, CA; David Isaac Gindler, Jason George Sheasby, ESQ., Irell & Manella LLP, Los Angeles, CA; David E. Moore, Wilmington, DE; Gregory Hull, Jacqueline T. Harlow, PRO HAC VICE, Weil, Gotshal & Manges LLP, Redwood Shores, CA; James L. Messenger, PRO HAC VICE, John W. Moran, PRO HAC VICE, LeClairRyan, PC, Boston, MA; Joshua P. Davis, PRO HAC VICE, Weil Gotshal & Manges LLP, Houston, TX; Paullette Christine Deruelle, Weil, Gotshal and Manges LLP, Miami, FL; Raymond Angelo LaMagna, Irell and Manella, Los Angeles, CA; Richard L. Horwitz, Wilmington, DE; T. Ray Guy, Weil Gotshal & Manges LLP, Dallas, TX; Travis W. Bliss, Wilmington, DE.

For Medimmune, LLC, Counter-defendant: Aaron P. Maurer, David Isaac Berl, Gerson Avery Zweifach, LEAD ATTORNEYS, Jessamyn Sheli Berniker, Williams & Connolly LLP, Washington, DC; Jeffrey E. Faucette, LEAD ATTORNEY, Skaggs Faucette LLP, San Francisco, CA; Josephine [*8] Ko, LEAD ATTORNEY, Drinker Biddle & Reath, LLP, San Francisco, CA; Paul B. Gaffney, LEAD ATTORNEY, Thomas S Fletcher, Williams & Connolly, Washington, DC.

**JUDGES:** HOWARD R. LLOYD, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** HOWARD R. LLOYD

**OPINION**

**ORDER DENYING MARK D. MCDADE'S MOTION TO QUASH SUBPOENA**

**[Re: Docket No. 539]**

Recently, plaintiff MedImmune LLC (MedImmune) moved this court under the Walsh Act, 28 U.S.C. § 1783, for an order directing the issuance of a deposition subpoena for non-party Mark McDade. McDade, who was the CEO of defendant PDL Biopharma, Inc. (PDL) from 2002 to 2007, now lives in Belgium, where he is the Chief Operating Officer of a Belgian biopharmaceutical company.

Under the Walsh Act, the court "may order the issuance of a subpoena requiring the appearance as a witness before it . . . a national or resident of the United States who is in a foreign country" where the testimony sought "is necessary in the interest of justice" and "it is not possible to obtain his testimony in admissible form without his personal appearance." 28 U.S.C. § 1783(a); Securities & Exch. Comm'n v. Sabhlok, No. C08-04238CRB (JL), 2009 U.S. Dist. LEXIS 105194, 2009 WL 3561523 *3 (N.D. Cal., Oct. 30, 2009). "The decision to issue a subpoena under [*9] this statute is left to the sound discretion of the court." Klesch & Co. Ltd. v. Liberty Media Corp., 217 F.R.D. 517, 523 (D. Col. 2003).

Plaintiff filed the Walsh Act motion because McDade had turned down a request that he voluntarily submit to a deposition in Belgium, and--given the exigencies of time--there was no other practical way to obtain his testimony.

McDade was given notice of that motion, but chose not to oppose it.

On the record offered in the motion papers, this court found that MedImmune satisfied both prongs of the Walsh Act and granted the motion for the deposition subpoena. (See Docket No. 528).

Now, McDade moves to quash that subpoena. He tells the court that he is a busy, high-ranking executive with precious little time to travel to the United States to sit for a deposition in a case in which he has no interest. He says he remembers very little about the matters in issue and suggests that lower ranking officers and managers of PDL would know as much as him, and probably more.

"A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." Websidestory, Inc. v. Netratings, Inc., C06cv408, 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567 *2 (S.D. Cal., Apr. 6, 2007). [*10] When a party seeks the deposition of a high-level executive (a so-called "apex" deposition), the court may exercise its discretion under the federal rules to limit discovery. See id.; FED. R. CIV. P. 26(b)(1)-(b)(2). In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. Websidestory, Inc., 2007 U.S. Dist. LEXIS 20481, 2007 WL 1120567 at *2. Absent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition. Id. Additionally, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." Id. A claimed lack of knowledge, by itself, is insufficient to preclude a deposition. Id. "Moreover,

the fact that the apex witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." Id.

In opposition to McDade's motion to quash, MedImmune convincingly argues that it has--so far, with no signal success--sought to obtain deposition testimony from the persons suggested by McDade.  [*11] And, with discovery set to close in less than a month, there is insufficient time to hold off on McDade until all other possible sources of relevant testimony have been exhausted.

More significantly, this court is persuaded from its review of certain PDL documents to and from McDade that he was much more than an observer of events going on around him. Instead, it appears that he was the guiding hand and actual participant in the discussions and events which are of concern in the current litigation. On the face of it, he may well be the best source of information on the topics of interest to MedImmune. McDade is not entitled to a "pass" on account of his present position or because of any inconvenience or burden he may encounter by presenting himself for deposition.

Accordingly, the motion to quash the subpoena for the McDade deposition is DENIED.

SO ORDERED.

Dated: June 30, 2010

/s/ Howard R. Lloyd

HOWARD R. LLOYD

UNITED STATES MAGISTRATE JUDGE

**Citation #13**
**2008 U.S. Dist. LEXIS 92821**

LEXSEE



Analysis
As of: Jun 07, 2013

**ROYLENE RAY, et al., Plaintiffs, v. BLUEHIPPO FUNDING, LLC, et al., Defendants.**

No. C-06-1807 JSW (EMC),(Docket No. 210)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2008 U.S. Dist. LEXIS 92821

November 6, 2008, Decided
November 6, 2008, Filed

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part Ray v. Bluehippo Funding, LLC, 2008 U.S. Dist. LEXIS 98339 (N.D. Cal., Nov. 25, 2008)

**PRIOR HISTORY:** Ray v. BlueHippo Funding, LLC, 2008 U.S. Dist. LEXIS 81058 (N.D. Cal., Aug. 11, 2008)

**CORE TERMS:** deposition, apex, amend, class certification, deponent, personal jurisdiction, discovery, notice, personal knowledge, lawsuit, protective order, personal liability, alter ego, venue, government official, taking place, individual capacity, percipient witness, responded, concede, confer

**COUNSEL:** [*1] For Roylene Ray, Kelly Cannon, individually and on behalf of others similarly situated, Plaintiffs: David John Marshall, Debra S. Katz, LEAD ATTORNEYS, Katz, Marshall & Banks, LLP, Washington, DC; Monique Olivier, LEAD ATTORNEY, The Sturdevant Law Firm, San Francisco, CA; Robert M. Bramson, LEAD ATTORNEY, Bramson, Plutzik, Mahler & Birkhaeuser LLP, Walnut Creek, CA; Gary Peller, Washington, DC; Maura J. Dundon, Katz, PRO HAC VICE, Marshall & Banks LLP, Washington, DC.

For Bluehippo Funding, LLC, Bluehippo Capital, LLC, Defendants: Morgan Todd Jackson, LEAD ATTORNEY, Anthony Paul Schoenberg, Carl Brandon Wisoff, Douglas R. Young, Farella Braun & Martel LLP, San Francisco, CA.

For Gateway, Inc., Defendant: Stan Karas, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA.

For Joseph K. Rensin, Miscellaneous: William N. Hebert, LEAD ATTORNEY, Calvo & Clark, LLP, San Francisco, CA.

**JUDGES:** EDWARD M. CHEN, United States Magistrate Judge.

**OPINION BY:** EDWARD M. CHEN

**OPINION**

**ORDER DENYING IN PART THIRD-PARTY AND DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

Currently pending before the Court is a discovery dispute related to the deposition of Joseph K. Rensin, the CEO of BlueHippo. Both Mr. Rensin and BlueHippo ask for, in effect, [*2] a protective order barring his deposition from taking place or, in the alternative, limiting the scope of his deposition, both in terms of subject matter and time. Having considered the parties' briefs and accompanying submissions, the oral argument of counsel, and all other evidence of record, the Court hereby **DENIES** the motion in part.

**I. FACTUAL & PROCEDURAL BACKGROUND**

Mr. Rensin is the CEO of BlueHippo. He allegedly has been with the company since its inception. When

Plaintiffs first initiated this class action, they sued not only BlueHippo but also Mr. Rensin in his individual capacity. *See* Docket No. 1 (complaint, filed on 3/8/2006). BlueHippo responded to the complaint with a motion to transfer venue to the District of Maryland; Mr. Rensin responded to the complaint with a motion to dismiss for lack of personal jurisdiction. *See* Docket Nos. 16-17 (motions, filed on 4/24/2006). Subsequently, Plaintiffs voluntarily dismissed Mr. Rensin from the case without prejudice. *See* Docket No. 23 (notice, filed on 5/9/2006). In a joint case management conference statement that was thereafter filed, Plaintiffs stated that they "intend[ed] to add Mr. Rensin [back in] as a defendant in the event [*3] discovery confirm[ed] that BlueHippo is his alter ego with regard to Plaintiffs' claims." Docket No. 56 (Statement at 8). Plaintiffs subsequently filed a motion to amend the complaint, seeking, *inter alia*, to add Mr. Rensin as a defendant. *See* Docket No. 178 (motion). That motion is still pending.

Prior to filing the motion to amend, Plaintiffs noticed the deposition of Mr. Rensin on June 18, 2008. *See* Docket No. 153 (Schoenberg Decl., F) (notice). In response, Mr. Rensin and BlueHippo moved for a protective order, asking that the Court bar the deposition from taking place. *See* Docket No. 161 (motion, filed on 8/11/2008). Mr. Rensin and BlueHippo argued that Plaintiffs sought to take his deposition "to try to collect information related to their new motion to add Mr. Rensin back into the complaint, not to collect information necessary for class certification." Docket No. 161 (Mot. at 6). Mr. Rensin and BlueHippo further argued that, since he is BlueHippo's CEO, the apex doctrine is applicable, and Plaintiffs should not be entitled to take his deposition until after they "exhausted other avenues of discovery." Docket No. 161 (Mot. at 8). Ultimately, the Court held that it would reserve [*4] ruling on the issue of the Rensin deposition until after the 30(b)(6) deposition of BlueHippo had taken place. *See* Docket No. 186 (order, filed on 8/22/2008). The Court specifically instructed the parties that, after the 30(b)(6) deposition, they were to "meet and confer to determine whether the Rensin deposition should proceed and, if so, what its scope should be in light of the what information [had] been provided at the 30(b)(6) deposition." Docket No. 186 (Order at 1). The Court noted that, given BlueHippo's small size and what appeared to be Mr. Rensin's central and active role in the company, it would take a liberal view of the apex doctrine. *See* Docket No. 186 (Order at 1-2).

Subsequently, the 30(b)(6) deposition took place, and the parties, as well as Mr. Rensin, continued to disagree as to whether the Rensin deposition should take place and, if so, whether there should be any limitations. The Court therefore instructed the parties and Mr. Rensin

to file cross-briefs to address the dispute, *see* Docket No. 207 (notice, filed on 10/30/08), and a hearing on the matter was held by telephone on November 5, 2008.

As of the date below, Judge White has not ruled on Plaintiffs' motion [*5] for leave to amend, and therefore Mr. Rensin, in his individual capacity, is currently not a party to the litigation. The parties do not dispute, however, that as an active CEO, he is a percipient witness to the case against BlueHippo.

## II. DISCUSSION

In the Court's previous order, it noted that Mr. Rensin -- BlueHippo's CEO -- appeared to have a central and active role in the company. Plaintiffs have made a sufficient proffer to support that Mr. Rensin did have such a role and further that, based on this role, he could provide either additional or different information from that provided by the 30(b)(6) deponent. For example, as indicated by the 30(b)(6) deposition, Mr. Rensin had a primary role in the Gateway relationship. In addition, Mr. Rensin had what appears to be a significant role with respect to the call centers (*e.g.*, if problems arose with the centers). Plaintiffs have also indicated that Mr. Rensin may have direct knowledge about how the business models were actually put into place (*i.e.*, based on his technological knowledge).

The 30(b)(6) deponent was able to provide a substantial amount of information at his deposition. However, as outlined above, Plaintiffs have made a [*6] sufficient showing that Mr. Rensin could provide either additional or different information from that provided by the 30(b)(6) deponent. Importantly, Mr. Rensin and BlueHippo concede that he is a percipient witness who possesses relevant information. They further concede that Mr. Rensin's deposition may be taken now; they simply do not want his deposition to be taken now.

Ultimately, none of Mr. Rensin and BlueHippo's objections are availing. First, the Court has already stated that it will not allow any questions at his deposition related to alter ego given that, at this juncture in the proceedings, he is not a party in the case. Thus, by so limiting the scope of the deposition, Plaintiffs will not be permitted to use or exploit this deposition simply as a ruse to obtain evidence to support their motion to amend the complaint.

Second, the purpose behind the apex doctrine is to prevent harassment of a high-level corporate official where he or she has little or no knowledge. *See* 6-26 Moore's Fed. Prac. -- Civ. § 26.105[2][a] (noting that "courts often are reluctant to permit 'apex' depositions of highest-level corporate officers or managers who are unlikely to have personal knowledge of the [*7] facts sought by the deposing party"); *see also Liberty Mut. Ins.*

*Co. v. Superior Court*, 10 Cal. App. 4th 1282, 1287, 13 Cal. Rptr. 2d 363 (1992) (noting that "[t]he head of a large national corporation will generally not have knowledge of a specific incident or case handled several levels down the corporate pyramid"). As noted above, Mr. Rensin does have personal knowledge, which is not surprising given that BlueHippo is a relatively small company, not a large national corporation. Moreover, Mr. Rensin and BlueHippo have admitted that there is no burden in having his deposition take place -- *e.g.*, although he is the CEO, his deposition would not disrupt BlueHippo's business. *Cf.* Moore's § 26.05[2][a] ("A party seeking the testimony of a highly placed government official may be required to demonstrate some extraordinary circumstance or special need for the witness's testimony. The policy behind this rule is that a government official who has greater duties and time constraints than other witnesses should be protected from the constant distraction of testifying in lawsuits."). Since Mr. Rensin appears to have substantial personal knowledge of relevant facts and his deposition would impose no business hardship, [*8] the apex doctrine should be liberally applied, if at all, in favor of permitting the deposition. As Plaintiffs have made some showing why information might be obtained from Mr. Rensin which is beyond or different from the 30(b)(6) deposition, the apex doctrine is not a bar here.

Third, although Mr. Rensin [1] has voiced concerns about criminal liability based on alleged threats made by Plaintiffs' counsel to contact government authorities, that is not a reason to prevent the deposition from going forward at all. But he can assert whatever rights he has (*e.g.*, under the Fifth Amendment) in the deposition.

    1   Although Mr. Rensin is not currently a party
    to the action, Mr. Rensin's personal counsel ap-
    peared at the hearing to make arguments on his
    behalf.

Fourth, Mr. Rensin's contention that he is not subject to personal jurisdiction in this forum, and therefore the deposition should be put off until after Judge White has ruled on Plaintiffs' motion to amend, is without merit. First, personal jurisdiction is irrelevant because Mr. Rensin is being deposed as a corporate witness. In any event, if Judge White denies Plaintiffs' motion to amend, such that Mr. Rensin cannot be added as a party to [*9] this case, there is nothing to bar Plaintiffs from initiating a separate lawsuit against Mr. Rensin, perhaps in a different venue. Likewise, if Judge White grants Plaintiffs' motion and Mr. Rensin then moves to dismiss for lack of personal jurisdiction (or, alternatively, moves to transfer), Mr. Rensin may be sued at another venue. In other words, there is no guarantee that his personal liability will be eliminated. Judge White's ruling on the motion to

amend will not obviate the concern Mr. Rensin has posed in seeking to delay the deposition. It is not uncommon for an individual such as a CEO to be at risk of personal liability in these kinds of cases. That fact alone does not stop discovery from proceeding and is no reason to ban or delay Mr. Rensin's deposition here.

Finally, Mr. Rensin and BlueHippo suggest that it would impose an undue burden for the deposition to go forward because Mr. Rensin would have to be specially prepared given the risk of personal liability. Apart from the fact that delay will not resolve that risk as noted above, the Court finds this assertion factually without merit. Mr. Rensin has been on notice since mid-June 2008 that Plaintiffs wish to take his deposition. [*10] Moreover, since late August 2008, Mr. Rensin has been aware that the Court might well allow the deposition to proceed because, under the circumstances, it was taking a liberal view of the apex doctrine. While many documents may have been produced by BlueHippo, there is no evidence that Mr. Rensin cannot be prepared for a deposition on November 14, 2008, particularly as his counsel and counsel for BlueHippo appear to be working collaboratively and Mr. Rensin appears to be playing a role in this case, even if not a direct party to the lawsuit.

To be sure, BlueHippo has raised substantial questions about the efficiency of the proposed deposition. The Court notes that, based on its review of the transcript excerpts cited, Plaintiffs appear to be looking into issues that are marginally relevant to class certification or looking for a level of detail that may not be realistic given that Mr. Rensin does not have a duty to prepare as did the 30(b)(6) deponent. The answer to this concern is that a deposition now will diminish time available for any further deposition after class certification is ruled on.

Plaintiffs shall have, consistent with the Federal Rules of Civil Procedure, a total of [*11] seven hours to depose Mr. Rensin for all purposes in this case (*i.e.*, class certification and merits), *see* Fed. R. Civ. P. 30(d)(1) (providing that a deposition is limited to seven hours), and the time spent on this class certification deposition shall be counted towards the total seven-hour limit. Should Plaintiffs later seek permission to exceed the seven hour limit, *see* Fed. R. Civ. P. 30(d)(2) (providing that a "court must allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination"), they are forewarned that this Court will not consider any inefficiency that occurs during this deposition.

### III. CONCLUSION

The Court therefore orders that the deposition of Mr. Rensin proceed on November 14, 2008. The deposition

2008 U.S. Dist. LEXIS 92821, *

shall take place in Baltimore. The parties shall meet and confer as to the precise location for the deposition, as well as the time.

The scope of the deposition shall be limited to class certification issues. No questions related to alter ego may be asked.

This order disposes of Docket No. 210.

IT IS SO ORDERED.

Dated: November 6, 2008

/s/ Edward M. Chen

EDWARD   [*12] M. CHEN

United States Magistrate Judge

**Citation #14**
**2012 U.S. Dist. LEXIS 182355**

LEXSEE



Analysis
As of: Jun 07, 2013

**JOHN SIMMONS, Plaintiff, vs. MORGAN STANLEY SMITH BARNEY, LLC, Defendant.**

**Case No. 11cv2889-WQH (MDD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**2012 U.S. Dist. LEXIS 182355**

**December 27, 2012, Decided**
**December 27, 2012, Filed**

**SUBSEQUENT HISTORY:** Motion denied by Simmons v. Morgan Stanley Smith Barney, LLC, 2013 U.S. Dist. LEXIS 10524 (S.D. Cal., Jan. 25, 2013)

**PRIOR HISTORY:** Simmons v. Morgan Stanley Smith Barney, LLC, 872 F. Supp. 2d 1002, 2012 U.S. Dist. LEXIS 72871 (S.D. Cal., 2012)

**CORE TERMS:** deposition, discovery, apex, protective order, personal knowledge, former employer, high-level, highest level, lower level, relevance, subpoena, federal rules, broad discretion, admissible, cumulative, notice, depose, discrimination claims, job performance, legal challenge, circumstances surrounding, declaration, termination, region, talent, team

**COUNSEL:** [*1] For John Simmons, Plaintiff: Donald Robert McKillop, Sr., LEAD ATTORNEY, Law Offices of Donald R. McKillop, San Diego, CA; Guy A Ricciardulli, LEAD ATTORNEY, Law Offices of Guy A Ricciardulli, San Diego, CA.

For Morgan Stanley Smith Barney, LLC, a Delaware corporation, Defendant: Trish M. Higgins, LEAD ATTORNEY, Orrick Herrington and Sutcliffe LLP, Sacramento, CA; Erin M Connell, Orrick Herrington and Sutcliffe, San Francisco, CA.

**JUDGES:** Hon. Mitchell D. Dembin, U.S. Magistrate Judge.

**OPINION BY:** Mitchell D. Dembin

**OPINION**

ORDER GRANTING DEFENDANT'S MOTION FOR PROTECTIVE ORDER REGARDING THE DEPOSITION OF RICK SKAE

[ECF NO. 46]

Before the Court is Defendant's ex parte motion for a protective order regarding the deposition of Mr. Rick Skae, filed on December 11, 2012. (ECF No. 46). Plaintiff responded in opposition on December 19, 2012. (ECF No. 48). As set forth below, Defendant's motion is **GRANTED**.

Background

For a detailed exposition of the facts, see the Order issued by the Hon. William Q. Hayes on May 24, 2012, granting in part and denying in part Defendant's motion to compel arbitration. (ECF No. 37). As a consequence of that Order, the only claims pending before the Court at this time are Plaintiff's claims for [*2] employment discrimination in violation of 42 U.S.C. § 2000e and Cal.Gov.Code § 12940(a). Plaintiff asserts that he was discriminated against by Defendant in his employment due to his membership in the Church of Jesus Christ of Latter Day Saints.

The instant dispute stems from a notice of deposition issued by Plaintiff to Defendant for Rick Skae. Defendant has sought protection on the grounds that Mr. Skae is

a member of Defendant's Global Wealth Management Group's Senior Management Team and, as such, is a "highly placed executive." All four members of the team were noticed; Defendant agreed to produce the other three but asserts that Mr. Skae has no personal knowledge of any facts supporting the remaining claims. (ECF No. 46-1 at 6). In his declaration, Mr. Skae states that he supervises the Northeast Division of Defendant and that Plaintiff has always served in the southern California region. (ECF No. 46-2). He says that he never had responsibility for that region, never had supervisory authority over Plaintiff and did not review or evaluate Plaintiff's performance. *Id.* He claims to have had no role regarding Plaintiff's compensation nor termination and has no knowledge of Plaintiff's [*3] job performance at Defendant. *Id.* Mr. Skae admits that he did work with Plaintiff at a former employer. *Id.*

Plaintiff claims that Mr. Skae supervised Plaintiff at the former employer and assisted in recruiting Plaintiff to Defendant. According to Plaintiff, Mr. Skae was present at "talent reviews" during which Plaintiff's job performance and ranking were discussed. Plaintiff primarily relies upon the fact that Defendant issued a third party subpoena to the former employer for records of Plaintiff's performance in claiming that Mr. Skae's deposition testimony may be relevant.

Legal Standard

The Federal Rules of Civil Procedure generally allow for broad discovery, authorizing parties to obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Also, "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* Relevant information for discovery purposes includes any information "reasonably calculated to lead to the discovery of admissible evidence," and need not be admissible at trial to be discoverable. *Id.* There is no requirement that the information sought [*4] directly relate to a particular issue in the case. Rather, relevance encompasses any matter that "bears on" or could reasonably lead to matter that could bear on, any issue that is or may be presented in the case. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 354, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978). District courts have broad discretion to determine relevancy for discovery purposes. *See Hallett v. Morgan,* 296 F.3d 732, 751 (9th Cir. 2002). Similarly, district courts have broad discretion to limit discovery where the discovery sought is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). Limits also should be imposed where the burden or expense outweighs the likely benefits. *Id.*

Discussion

The Apex Doctrine

Courts consistently define apex employees as "high-level corporate executives." *See Apple Inc. v. Samsung Electronics Co., Ltd.* 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("the deposition of a high-level executive (a so-called apex deposition),"); *DR Sys., Inc. v. Eastman Kodak Co.,* 2009 U.S. Dist. LEXIS 83755, at *5, 2009 WL 2973008 at *2 (S.D. Cal. Sept. 14, 2009) ("an official at the highest level or apex of a corporation"); *Bank of the Ozarks v. Capital Mortg. Corp.,* 2012 U.S. Dist. LEXIS 99506, at *3, 2012 WL 2930479 at *1 (E.D. Ark. July 18, 2012) [*5] ("The apex doctrine protects high-level corporate officials . . .").

When a party seeks to take the deposition of an official at the highest level or "apex" of a corporation a stricter standard applies to the party seeking discovery, and the court may exercise its authority under the federal rules to limit discovery. Fed.R.Civ.P. 26(b)(1). *See, e.g., Mulvey v. Chrysler Corp.,* 106 F.R.D. 364 (D.C. R.I.1985) (Virtually every court that has addressed deposition notices directed at an official at the highest level or "apex" of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment.). Even when seeking the deposition of an apex official, "it is very unusual 'for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances.'" *Apple,* 282 F.R.D. at 263 (quoting *WebSideStory, Inc. v. NetRatings, Inc.,* 2007 U.S. Dist. LEXIS 20481, at *7, 2007 WL 1120567 at *2 (S.D. Cal. Apr. 6, 2007)). "When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition. A claimed lack of knowledge, by itself it is insufficient to preclude a deposition." *Id.*

When determining whether to allow an apex [*6] deposition, courts often consider: (1) whether or not the high-level deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods, such as interrogatories and depositions of lower level employees. *See Salter v. Upjohn,* 593 F.2d 649, 651 (5th Cir.1979) (granting protective order for executive where plaintiff had sought to depose the president of the company before deposing lower level executives); *Baine v. General Motors Corp.,* 141 F.R.D. 332 (M.D.Ala. 1991) (granting protective order for Vice President of General Motors where plaintiff had failed first to depose lower level employees).

Defendant asserts that Mr. Skae is a high level executive lacking in personal knowledge regarding the discrimination claims before the Court. Plaintiff has presented substantial evidence that Mr. Skae has personal knowledge regarding Plaintiff's employment with his former employer and regarding the recruitment of Plaintiff to Defendant. Plaintiff, however, has not presented sufficient evidence that Mr. Skae has any relevant, non-cumulative personal knowledge of the circumstances [*7] surrounding the alleged discrimination against Plaintiff or of the circumstances surrounding his termination. In his declaration, Plaintiff claims he regularly socialized and discussed business and work issues with Mr. Skae during his employment with Defendant. (ECF No. 46-2). Significantly, however, Plaintiff does not state that he told Mr. Skae that he believed he was the subject of religious discrimination. Plaintiff asserts that Mr. Skae was present at "talent reviews" when his conduct was discussed by Plaintiff's supervisor but does not suggest how the testimony of Mr. Skae in that regard would be anything but cumulative. *Id.*

Plaintiff places substantial reliance on the fact that Defendant issued a third party subpoena to Plaintiff's former employer for records of Plaintiff's employment. Because counsel for Defendant claimed those records to be relevant to this case in communications with counsel for Plaintiff, Plaintiff asserts that Mr. Skae's testimony regarding Plaintiff's former employment also must be relevant. Plaintiff, apparently, chose not to file any legal challenge to that subpoena. The relevance of Plaintiff's former employment records to the discrimination claims pending [*8] in this Court has not been litigated and is not before this Court. The fact that Defendant subpoenaed these records without legal challenge does not establish the general relevance of Plaintiff's former employment to the claims and defenses remaining in this case.

Conclusion

For the foregoing reasons, Defendant's motion for a protective order is **GRANTED.**

IT IS SO ORDERED.

DATED: December 27, 2012

/s/ Mitchell D. Dembin

Hon. Mitchell D. Dembin

U.S. Magistrate Judge

**Citation #15**
**2010 U.S. Dist. LEXIS 70542**

LEXSEE

⚠
Caution
As of: Jun 07, 2013

**SOFTWARE TREE, LLC v. RED HAT, INC., et al.**

NO. 6:09-CV-097

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, TYLER DIVISION

2010 U.S. Dist. LEXIS 70542

June 24, 2010, Decided
June 24, 2010, Filed

**PRIOR HISTORY:** Software Tree, LLC v. Red Hat,
Inc., 2010 U.S. Dist. LEXIS 53549 (E.D. Tex., May 28,
2010)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder
brought an infringement action against defendants, a
competitor and others. Pending before the court was the
competitor's motion to compel production of documents
regarding the holder's negotiations with licensees relating
the patent-in-suit. The holder had produced each license
agreement but withheld documents reflecting the negoti-
ations underlying the agreements.

**OVERVIEW:** The court had historically followed a
bright-line rule protecting settlement negotiations from
discovery under the common law settlement privilege
and Fed. R. Evid. 408, but the competitor contended that
a recent decision of the U.S. Court of Appeals for the
Federal Circuit had abrogated that rule. The court grant-
ed the competitor's motion in part and denied it in part.
The court found that the Federal Circuit's decision did
not upset case law regarding discoverability of settlement
negotiations because the discoverability of negotiations
underlying licenses was not before that court. Therefore,
the court continued to recognize the common law settle-
ment privilege. The court would permit discovery of
negotiations pertaining agreements and licenses entered
outside the context of litigation but not of negotiations
pertaining to agreements that settled law suits. Thus,
negotiation documents pertaining to license agreements

of two licensees, which occurred prior to litigation, were
discoverable, and the competitor was not entitled to such
documents relating to negotiations of other licensees
entered within the context of litigation.

**OUTCOME:** The court granted in part and denied in
part the competitor's motion. The court ordered the hold-
er to produce three exhibits to the agreement with one
licensee and documents relating to the negotiation of
agreements with two licensees which entered agreements
before any litigation was commenced.

**CORE TERMS:** negotiation, settlement, license, dis-
covery, settlement negotiations, settlement agreement,
license agreement, discoverability, entity, litiga-
tion-related, admissibility, discoverable, privileged, talks,
pertaining, advisory committee, confidential, bright-line,
probative, documents relating, recent decisions, public
policies, abuse of discretion, patent-in-suit,
co-defendant's, furtherance, reflecting, disposing, favor-
ably, excluding

**LexisNexis(R) Headnotes**

*Evidence > Relevance > Compromise & Settlement
Negotiations*
[HN1]Fed. R. Evid. 408 generally bars admission of set-
tlement agreements. The United States Court of Appeals
for the Sixth Circuit has found the fact that Rule 408
provides for exceptions to inadmissibility does not dis-
prove the concept of settlement privilege. The exceptions

2010 U.S. Dist. LEXIS 70542, *

have been used only to admit the occurrence of settlement talks or the settlement agreement itself for another purpose. That is, Rule 408 states the existence of the talks or the agreement may be admissible, but the content of the talks or agreement are not. The Sixth Circuit has concluded: in sum, any communications made in furtherance of settlement are privileged.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Settlements > General Overview*
*Evidence > Relevance > Compromise & Settlement Negotiations*
[HN2]The United States Court of Appeals for the Federal Circuit has called the "bright-line rule" of protecting settlement negotiations from discovery into considerable question. Recently, however, the United States District Court for the Eastern District of Texas has distinguished this decision and has held that it "has not altered the admissibility of agreements entered into under the threat of litigation.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Relevance > Compromise & Settlement Negotiations*
*Patent Law > Ownership > Conveyances > Licenses*
[HN3]The United States District Court for the Eastern District of Texas finds that a decision of the United States Court of Appeals for the Federal Circuit in ResQNet has not upset the district's case law regarding discoverability of settlement negotiations. In ResQNet, the litigation-related licenses are part of the record and their admissibility was not before the court. Likewise, the discoverability of negotiations underlying those licenses was not before the court. The court declines to upset its traditional approach to this issue absent clear precedent compelling a new tack. Continuing to exclude underlying negotiations is consistent with the court's past decisions and is most appropriate given the chilling effect such discovery would have on settlements.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Settlements > General Overview*
*Evidence > Relevance > Compromise & Settlement Negotiations*
*Patent Law > Ownership > Conveyances > Licenses*
[HN4]The United States District Court for the Eastern District of Texas recognizes a settlement privilege that applies to negotiations underlying licensing agreements arising out of litigation. The court permits discovery of

negotiations pertaining to agreements and licenses entered into outside the context of litigation, but not of negotiations pertaining to agreements that settle law suits.

*Civil Procedure > Discovery > Disclosures > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > General Overview*
*Contracts Law > Contract Interpretation > General Overview*
[HN5]Where an agreement incorporates multiple parts, each part is relevant and necessary for a full understanding of that agreement.

**COUNSEL:** [*1] For Robert W Faulkner, Mediator: Robert W Faulkner, LEAD ATTORNEY, JAMS Inc, Dallas, TX.

For Software Tree LLC, Plaintiff, Counter Defendant: Jeffrey Ray Bragalone, LEAD ATTORNEY, Ari Benjamin Rafilson, Glenn Edward Janik, Jennifer Marie Rynell, Michael Wayne Shore, Timothy Tiewei Wang, Winston Oliver Huff, Shore Chan Bragalone, Dallas, TX.

For Red Hat Inc., Defendant: Michael E Jones, LEAD ATTORNEY, Allen Franklin Gardner, Potter Minton PC, Tyler, TX; Candice C Decaire, Tiffany L Williams, William H Boice, PRO HAC VICE, Kilpatrick Stockton LLP - Atlanta, Atlanta, GA; Carl E Sanders, PRO HAC VICE, Kilpatrick Stockton LLP, Winston-Salem, NC; John C Alemanni, Michael T Morlock, PRO HAC VICE, Kilpatrick Stockton LLP NC, Winston-Salem, NC; Matthew M Lubozynski, PRO HAC VICE, Kilpatrick Stockton LLP, Atlanta, GA; Steven Gardner, Steven D Moore, Tonya R Deem, Kilpatrick Stockton LLP NC, Winston-Salem, NC.

For Software Tree LLC, Counter Defendants: Jeffrey Ray Bragalone, LEAD ATTORNEY, Shore Chan Bragalone, Dallas, TX.

For Red Hat Inc., Counter Claimant: Michael E Jones, LEAD ATTORNEY, Potter Minton PC, Tyler, TX; Michael T Morlock, PRO HAC VICE, Kilpatrick Stockton LLP NC, Winston-Salem, NC.

For [*2] Red Hat Inc., Counter Claimant: Michael E Jones, LEAD ATTORNEY, Potter Minton PC, Tyler, TX; John C Alemanni, Michael T Morlock, PRO HAC VICE, Kilpatrick Stockton LLP NC, Winston-Salem, NC; Steven Gardner, Tonya R Deem, Kilpatrick Stockton LLP NC, Winston-Salem, NC; William H Boice, PRO HAC VICE, Kilpatrick Stockton LLP - Atlanta, Atlanta, GA.

For Software Tree LLC, Counter Defendant: Jeffrey Ray Bragalone, LEAD ATTORNEY, Winston Oliver Huff, Shore Chan Bragalone, Dallas, TX.

For Red Hat Inc., Counter Claimant: Michael E Jones, LEAD ATTORNEY, Allen Franklin Gardner, Potter Minton PC, Tyler, TX; Candice C Decaire, Tiffany L Williams, William H Boice, Kilpatrick Stockton LLP - Atlanta, Atlanta, GA; Carl E Sanders, Kilpatrick Stockton LLP, Winston-Salem, NC; John C Alemanni, Steven Gardner, Steven D Moore, Tonya R Deem, Kilpatrick Stockton LLP NC, Winston-Salem, NC; Matthew M Lubozynski, Kilpatrick Stockton LLP, Atlanta, GA; Michael T Morlock, PRO HAC VICE, Kilpatrick Stockton LLP NC, Winston-Salem, NC.

**JUDGES:** JOHN D. LOVE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JOHN D. LOVE

**OPINION**

**MEMORANDUM OPINION & ORDER**

Before the Court is Defendant Red Hat, Inc.'s ("Defendant") motion to compel production of documents regarding [*3] its negotiations with licensees relating to the patent-in-suit (Doc. No. 182). The matter is fully briefed (Doc. Nos. 182, 195, 204, 216). Having considered the parties' submissions, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendant's motion.

**BACKGROUND**

Plaintiff Software Tree, LLC ("Plaintiff") has licensed U.S. Patent No. 6,136,776 ("the '776 Patent" or "the patent-in-suit") to six entities. Plaintiff entered into two of these licenses, with IBM Corp. ("IBM") and Kyrsagih Bros. LLC ("Kyrsagih Bros."), without filing suit. [1] The four other licenses were entered into within the context of litigation. Plaintiff's license with Oracle Corp. ("Oracle") was entered into as part of a settlement agreement disposing of an earlier-filed action, *Software Tree, LLC v. Oracle Corp.,* No. 6:08-cv-126 (E.D. Tex.). Plaintiff's licenses with Hewlett-Packard Company ("HP"), Dell Inc. ("Dell"), and Genuitec, LLC ("Genuitec") were entered into as part of settlement agreements disposing of allegations in the present case. HP, Dell, and Genuitec were co-defendants of Defendant, but each has been dismissed from this case a result of those settlement agreements. Plaintiff has produced copies of each license [*4] agreement [2] but with held documents reflecting the negotiations underlying those agreements.

1   The parties dispute whether the IBM and Kyrsagih Bros. licenses was entered into under the threat of litigation. *Compare* PL.'S RESP. at 9-10 (stating all licenses were "entered into either to resolve pending or potential litigation") *with* DEF.'S REPLY at 4 n.6 (disagreeing that all of the licenses are litigation licenses).
2   Plaintiff has produced only a portion of the Oracle agreement as discussed *infra.*

**PARTIES' CONTENTIONS**

Defendant acknowledges the Eastern District of Texas has historically followed a bright-line rule protecting settlement negotiations from discovery. DEF.'S MOT. at 6 (citing *Tyco Healthcare Grp. LP v. E-Z-EM, Inc.,* No. 2:07-cv-262, 2010 U.S. Dist. LEXIS 18253, 2010 WL 774848, at *2 (E.D. Tex. Mar. 2, 2010)* (Ward, J.)). Defendant argues, however, that this rule has been abrogated by the Federal Circuit's recent opinion in *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860 (Fed. Cir. 2010). *Id.* at 7 (citing *Tyco,* 2010 U.S. Dist. LEXIS 18253, 2010 WL 774848, at *2; *DataTreasury Corp. v. Wells Fargo & Co.,* No. 2:06-cv-72, 2010 U.S. Dist. LEXIS 25291, 2010 WL 903259, at *2 (E.D. Tex. Mar. 4, 2010)* (Folsom, C.J.)). Defendant contends it is now "clear" that documents relating [*5] to the negotiation of settlements and litigation licenses are discoverable. *Id.* Based upon *ResQNet* and *Tyco,* Defendant argues the Court should compel Plaintiff to produce documents reflecting the negotiations of each of the license agreements it has entered into. *Id.* at 7-9.

Defendant argues the recent decisions in this district are not alone. DEF.'S REPLY at 2 (citing *Phoenix Solutions, Inc. v. Wells Fargo Bank, N.A.,* 254 F.R.D. 568, 583 (N.D. Cal. 2008); *Trs. of Leland Stanford Junior Univ. v. Tyco Int'l,* 253 F.R.D. 521, 523 (C.D. Cal 2008); *In re Subpoena Issued to Commodity Futures Trading Comm's,* 370 F. Supp. 2d 201, 211 (D.D.C. 2005) (herein "CFTC"). Defendant relies primary on *Phoenix Solutions,* where defendant Wells Fargo sought discovery of negotiations between the plaintiff and a defendant in a related action. *Phoenix Solutions,* 254 F.R.D. at 581. The court held "the third-party negotiations could help Wells Fargo ascertain the extent of its liability to Phoenix and to formulate an appropriate litigation strategy." *Id.* at 582. Defendant argues the requested production is relevant for the reasons identified by the *Phoenix Solutions* court and asks this Court to likewise order [*6] production. DEF.'S REPLY at 3-4.

Plaintiff distinguishes *ResQNet,* noting it did not address the admissibility or discoverability of litigation-related licenses. PL.'S RESP. at 7-8, 10. Plaintiff also distinguishes *Tyco,* noting that decision permitted

discovery of negotiations underlying a settlement with a party from a *previous* case. *Id.* at 8-9 That is, the licensee was not a former party to that case. *Id.* Plaintiff, extensively quoting *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003), argues the need to keep settlement negotiations confidential weighs heavily against compelling production. *Id.* at 10-11. Moreover, Plaintiff contends granting this motion would set a "dangerous precedent" that will chill settlement and "run counter to this 'nation's strong judicial and public policies favoring out of court settlement.'" *Id.* at 13 (quoting *Desktop Direct, Inc. v. Digital Equip. Corp.*, 993 F.2d 755, 758 (10th Cir. 1993)). Finally, Plaintiff argues the Court's recent decision in *Fenner Investments, Ltd. v. Hewlett-Packard Co.*, No. 2010 U.S. Dist. LEXIS 41514, 2010 WL 1727916, at *3 (E.D. Tex. Apr. 28, 2010), undermines Defendant's reliance on *ResQNet.* PL.'S SUR-REPLY at 2.

## DISCUSSION

In  [*7] 2003, the Sixth Circuit considered "whether statements made in furtherance of settlement are privileged and protected from third-party discovery." *Goodyear*, 332 F.3d at 977. The court answered the question affirmatively, finding "a strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations." *Id.* at 980. The court continued:

> The ability to negotiate and settle a case without trial fosters a more efficient, more cost-effective, and significantly less burdened judicial system. In order for settlement talks to be effective, parties must feel uninhibited in their communications. Parties are unlikely to propose the types of compromises that most effectively lead to settlement unless they are confident that their proposed solutions cannot be used on cross examination, under the ruse of "impeachment evidence," by some future third party. Parties must be able to abandon their adversarial tendencies to some degree. They must be able to make hypothetical concessions, offer creative *quid pro quos,* and generally make statements that would otherwise belie their litigation efforts. Without a privilege, parties would more often forego negotiations for  [*8] the relative formality of trial. Then, the entire negotiation process collapses upon itself, and the judicial efficiency it fosters is lost.

*Id.* The court also considered the interplay of [HN1]Rule 408 of the Federal Rules of Evidence, which generally bars admission of settlement agreements. *Id.* at 981. The court found "[t]he fact that Rule 408 provides for exceptions to inadmissibility does not disprove the concept of settlement privilege. . . . [T]he exceptions have been used only to admit the occurrence of settlement talks or the settlement agreement itself for 'another purpose.'" *Id.* That is, Rule 408 states the existence of the talks or the agreement may be admissible, but the content of the talks or agreement are not. *Id.* at 981-82. Finally, the court favorably quoted the advisory committee note to Rule 408, which states one of the grounds for excluding settlement agreements is "[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position." [3] *Id.* at 983. The Sixth Circuit concluded: "[i]n sum, any communications made in furtherance of settlement are privileged." *Id.*

> 3    The advisory committee note continues: [*9] "a more impressive ground is promotion of the public policy favoring the compromise and settlement of disputes." Fed. R. Evid. 408 advisory committee's note P 1.

On at least three instances, this district has accepted the *Goodyear* rationale and protected settlement negotiations from discovery. In *Intergraph Hardware Techs. Co. v. Dell Computer Corp.*, No. 2:02-cv-312, slip op. (E.D. Tex. June 3, 2004), the court found settlement negotiations "are privileged as a matter of federal common law, as set forth by the court in [*Goodyear*]. In addition, HP has failed to show that the settlement negotiations and statements made during the course of those negotiations would be particularly relevant to any of the claims or defenses in this case." *Id.* at 1. In *Soverain Software LLC v. Amazon.com, Inc.*, No 6:04-cv-014, slip op. (E.D. Tex. Feb. 7, 2005), where a remaining defendant was seeking discovery of a former co-defendant's settlement agreement and the underlying negotiations, this Court echoed *Goodyear's* sentiments, finding "[i]f mediation and settlement negotiations are not kept confidential from other parties to the litigation, parties will be less forthright in their negotiations and less  [*10] likely to resolve their differences without the need for a trial." *Id.* at 2. Finally, in *Tessera, Inc. v. Micron Tech., Inc.*, No. 2:05-cv-094, slip op. (E.D. Tex. Apr. 13, 2006), this Court, again applying *Goodyear,* found negotiations that did not result in a license agreement outside of litigation were discoverable but negotiations conducted within the context of litigation were not. *Id.* at 3. Thus, as noted in Tyco, this district "has in the past followed *Goodyear* generally and adopted a bright-line rule that settlement negotiations are privileged while the resulting license

agreement is discoverable." 2010 U.S. Dist. LEXIS 18253, 2010 WL 774878, at *2.

[HN2]The Federal Circuit's decision in ResQNet has called this "bright-line rule" into considerable question. See Tyco, 2010 U.S. Dist. LEXIS 18253, 2010 WL 774878, at *2 (stating the decision "cause[d] the Court to shift its approach toward the discoverability of settlement negotiations" and holding "[t]he Goodyear privilege does not apply in light of the Federal Circuit's ruling in ResQNet"); see also DataTreasury 2010 U.S. Dist. LEXIS 25291, 2010 WL 903259, at *2 (finding "[i]n light of ResQNet, litigation-related licenses should not be excluded from" the trial and permitting discovery of the underlying negotiations). [*11] Recently, however, this Court distinguished ResQNet and held it "has not altered the admissibility of agreements entered into under the threat of litigation." Fenner, 2010 U.S. Dist. LEXIS 41514, 2010 WL 1727916, at *3. After chronicling the century-old tradition of trial and appellate court decisions excluding settlement license agreements, this Court noted admissibility of litigation-related agreements was not before the ResQNet panel. 2010 U.S. Dist. LEXIS 41514, [WL] at *1-3. The Court found "the potential for prejudice and jury confusion substantially outweigh[ed] any probative value" and excluded the agreements. 2010 U.S. Dist. LEXIS 41514, [WL] at *3.The same rationale supports finding ResQNet did not alter the law regarding discoverability.

As Defendant notes, some district courts have found settlement negotiations properly discoverable. In CFTC, the District Court for the District of Columbia declined to recognize the settlement privilege recognized by Goodyear. [4] 370 F. Supp. 2d at 207. Although the court acknowledged some courts had recognized the privilege, it found no broad consensus in support of it and declined to adopt it. Id. at 209-213. In Stanford, the Central District of California cited CFTC favorably and held "there is no federal privilege preventing [*12] the discovery of settlement agreements." 253 F.R.D. at 523. Likewise, in Phoenix Solutions, the Northern District of California distinguished Goodyear on the basis that in Goodyear "the parties held a legitimate and explicit expectation that the settlement agreement documents would remain confidential." 254 F.R.D. at 583. On the other hand, other district courts have recognized the settlement privilege as articulated in Goodyear and the Federal Circuit has found protecting settlement negotiations from discovery is not an abuse of discretion. See Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1308 (Fed. Cir. 2001) (holding "[i]n light of Medtronic's failure to show the materiality of the settlement agreement and, hence, the relevance of the evidence it would be seeking in discovery, we discern no abuse of discretion").

4   On appeal, the Court of Appeals for the District of Columbia affirmed the order to compel production based on alternative grounds and "therefore [did] not reach the merits of the district court's ruling that no federal settlement privilege exists under Fed. R. Evidence 501. That question remains open in this circuit." In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comms'n, 439 F.3d 740, 754-55, 370 U.S. App. D.C. 113 (D.C. Cir. 2006).

Consistent [*13] with the holding in Fenner, 2010 U.S. Dist. LEXIS 41514, 2010 WL 1727916 at *3, [HN3]the Court finds ResQNet has not upset this district's case law regarding discoverability of settlement negotiations. "In ResQNet, the litigation-related licenses were part of the record and their admissibility was not before the court." Id. (citing ResQNet, 594 F.3d at 872). Likewise, the discoverability of negotiations underlying those licenses was not before the court. The Court declines to upset its traditional approach to this issue absent clear precedent compelling a new tack. Continuing to exclude underlying negotiations is consistent with this Court's past decisions in Soverain and Tessera and is most appropriate given the chilling effect such discovery would have on settlements. While the Court recognizes internal settlement strategy may be protected by attorney-client privilege or work-product immunity, the possibility of some negotiation materials being discovered could hamper negotiation efforts and interfere with settlement discussions. Accordingly, continuing to recognize the common law settlement privilege is the most prudent course.

As set forth in Tessera, [HN4]this Court recognizes a settlement privilege that applies to [*14] negotiations underlying licensing agreements arising out of litigation. The Court permits discovery of negotiations pertaining to agreements and licenses entered into outside the context of litigation, but not of negotiations pertaining to agreements that settle law suits. This is particularly justified here, where the three of the four settlement agreements are between Plaintiff and former defendants in this case. Moreover, Defendant has not persuasively shown that such negotiations are particularly relevant. Litigation licenses, and the negotiations underlying them, are not probative of the fair value of a patent, but rather are probative of the value of settling a particular case. Likewise, Plaintiff's infringement and damages theories, and relevant prior art, are readily accessible by way of other discovery sources. Accordingly, Defendant is not entitled to discovery of the negotiations pertaining to Oracle, HP, Dell, and Genuitec. The parties dispute whether the IBM and Kyrsagih Bros. licenses agreements were entered into within the context of litigation. Plaintiff contends the

possibility of litigation against IBM was discussed prior to entering the agreement. Defendant argues [*15] those agreements do not reference litigation or the threat of litigation. Absent a stronger showing that the licenses were entered into within the context of litigation, the Court finds the IBM and Kyrsagih Bros. agreements are not subject to the settlement privilege because they were entered into before any litigation was commenced. Accordingly, Defendant is entitled to discovery of the negotiations pertaining to those agreements.

Finally, the parties dispute to what extent Plaintiff should produce the Oracle agreement. The Oracle agreement resolved litigation filed by Plaintiff, two other related entities, and a parent entity. The agreement consists of a master settlement agreement and four exhibits setting forth the terms between Oracle and each of the other entities. Plaintiff has produced the master agreement and the exhibit setting forth the terms between it and Oracle, but has not produced the other exhibits. Defendant argues it is entitled to a complete copy of the agreement to discover if the settlement sum was apportioned. DEF.'S MOT. at 5-6; DEF.'S REPLY at 1-2. Plaintiff argues the redacted exhibits are irrelevant be-cause they relate to different entities, different patents, [*16] and different technologies. PL.'S RESP. at 5-6. [HN5]Where an agreement incorporates multiple parts, each part is relevant and necessary for a full understanding of that agreement. Accordingly, the Court finds Defendant is entitled to a complete copy of the agreement.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendant's motion. The Court **ORDERS** Plaintiff to produce exhibits A, B, and D to the Oracle agreement and documents relating to the negotiation of the agreements with IBM and Kyrsagih Bros. by June 28, 2010.

**So ORDERED and SIGNED this 24th day of June, 2010.**

/s/ John D. Love

JOHN D. LOVE

UNITED STATES MAGISTRATE JUDGE

**Citation #16**
**2011 U.S. Dist. LEXIS 85608**

LEXSEE

⚠
Caution
As of: Jun 07, 2013

**IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION: This Order Relates to: All Indirect-Purchaser Plaintiff Class Actions**

**No. M 07-1827 SI, MDL No. 1827**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2011 U.S. Dist. LEXIS 85608**

**August 1, 2011, Decided**
**August 1, 2011, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Stay granted by, in part TFT-LCD (Flat Panel) Antitrust Litig. v. Sharp Corp., 2011 U.S. Dist. LEXIS 86193 (N.D. Cal., Aug. 3, 2011)

**PRIOR HISTORY:** In re TFT-LCD Antitrust Litig., 2011 U.S. Dist. LEXIS 84476 (N.D. Cal., July 28, 2011)

**CORE TERMS:** deposition, apex, personal knowledge, abuse of discretion, purchaser, indirect, price-fixing, conspiracy, discovery

**COUNSEL:** [*1] Martin Quinn, Special Master, Pro se, San Francisco, CA.

For Martin Quinn, Special Master: Martin Quinn, JAMS, San Francisco, CA.

For ATS Claim, LLC, Plaintiff: David Paul Germaine, LEAD ATTORNEY, Chicago, IL; David Paul Germaine, LEAD ATTORNEY, PRO HAC VICE, Chicago, IL; Jason C. Murray, Crowell & Moring LLP, Los Angeles, CA.

For Direct Purchaser Plaintiffs, Plaintiff: Daniel L. Warshaw, LEAD ATTORNEY, Pearson, Simon, Warshaw & Penny LLP, Sherman Oaks, CA; Eric B. Fastiff, LEAD ATTORNEY, Lieff, Cabraser, Heimann & Bernstein,LLP, San Francisco, CA; Hilary Kathleen Ratway, LEAD ATTORNEY, Hausfeld, LLP, Washington, DC; Andrew Scirica Kingsdale, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA; Brendan Patrick Glackin,

Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Bruce Lee Simon; Jessica L. Grant, Sher Leff LLP, San Francisco, CA.

For BellSouth Telecommunications, Inc., Plaintiff: Christopher T. Leonardo , Kenneth L. Adams, R. Bruce Holcomb , Adams Holcomb LLP, Washington, DC; Jason C. Murray, Crowell & Moring LLP, Los Angeles, CA; Jeffrey H. Howard, PRO HAC VICE, Crowell & Moring LLP, Washington, DC; Jerome A. Murphy, Joshua C. Stokes, Crowell & Moring LLP; Liaison [*2] Counsel for Direct Aciton Plaintiffs, Washington, DC; Joshua Courtney Stokes, Crowell & Moring, Los Angeles, CA.

For Pacific Bell Telephone Company, Southwestern Bell Telephone Company, Plaintiffs: Christopher T. Leonardo , Kenneth L. Adams, R. Bruce Holcomb , Adams Holcomb LLP, Washington, DC; Jason C. Murray, Jerome A. Murphy, Crowell & Moring LLP, Los Angeles, CA; Jeffrey H. Howard, PRO HAC VICE, Crowell & Moring LLP, Washington, DC; Joshua Courtney Stokes, Crowell & Moring, Los Angeles, CA; Joshua C. Stokes, Crowell & Moring LLP.

For Nokia Corporation, Nokia Inc., Plaintiffs: Brian Parker Miller, Donald MacKaye Houser, Joann Elizabeth Johnston, Alston & Bird LLP, Atlanta, GA; Lisa Kathleen Bojko, Alston & Bird, Atlanta, GA; Peter Konito, Donald M. Houser, Alston Bird LLP, Atlanta, GA; Randall Lee Allen, Alston and Bird, Menlo Park, CA; Richard W. Stimson, Alston & Bird LLP, Dallas, TX; Valarie

Cecile Williams , PRO HAC VICE, Alston & Bird LLP, Atlanta, GA.

For AT & T Corp., AT & T Datacomm, Inc., AT & T Mobility LLC, AT & T Operations, Inc., AT & T Services, Inc., Plaintiffs: Christopher T. Leonardo , Kenneth L. Adams, R. Bruce Holcomb , Adams Holcomb LLP, Washington, DC; Christopher [*3] H. Wood , Adams Holcomb LLP, Washington, DC; Jason C. Murray, Crowell & Moring LLP, Los Angeles, CA; Jeffrey H. Howard, PRO HAC VICE, Crowell & Moring LLP, Washington, DC; Jerome A. Murphy, Joshua C. Stokes, Crowell & Moring LLP; Joshua Courtney Stokes, Crowell & Moring, Los Angeles, CA.

For Motorola, Inc., Plaintiff: Jason C. Murray, Crowell & Moring LLP, Los Angeles, CA; Jeffrey H. Howard, PRO HAC VICE, Crowell & Moring LLP, Washington, DC; Jerome A. Murphy, Joshua C. Stokes, Crowell & Moring LLP; Joshua Courtney Stokes, Crowell & Moring, Los Angeles, CA.

For Electrograph Systems, Inc., Electrograph Technologies, Corp., Plaintiffs: Jason C. Murray, Crowell & Moring LLP, Los Angeles, CA; Philip J. Iovieno, Boies, Schiller & Flexner LLP, Albany, NY; William A. Isaacson, Boies Schiller & Flexner, Washington, DC.

For Dell Inc., Dell Products, L.P., Plaintiffs: Debra Dawn Bernstein, Elizabeth Helmer Jordan, Michael P. Kenny, Rodney J Ganske, ALSTON & BIRD LLP, Atlanta, GA; Matthew David Kent, Alston + Bird LLP, Atlanta, GA; Steven Daniel Hemminger, Alston & Bird LLP, Menlo Park, CA.

For Indirect Purchaser Plaintiffs, Plaintiff: Joseph M. Alioto , Sr., LEAD ATTORNEY, Alioto Law Firm, San Francisco, [*4] CA; Stephen Gerard Larson, Girardi & Keese, Los Angeles, CA; Gregory W. Landry, LaMarca & Landry, P.C.; Marvin A. Miller, Miller Law LLC.

For Direct Purchaser Plaintiffs, Plaintiff: Andrew Scirica Kingsdale, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA; Eric B. Fastiff, LEAD ATTORNEY, Lieff, Cabraser, Heimann & Bernstein,LLP, San Francisco, CA; Jessica L. Grant, Sher Leff LLP, San Francisco, CA.

For Tracfone Wireless, Inc., Plaintiff: David Bedford Esau, James Blaker Baldinger, Carlton Fields, P.A., West Palm Beach, FL; Robert L. Ciotti, Carlton Fields, Tampa, FL.

For LG Display Co., Ltd., (D, I, 09-1115) formerly known as LG Philips LCD Co., LTD., Defendant: Mi-

chael Robert Lazerwitz, LEAD ATTORNEY, Cleary Gottlieb Steen & Hamilton, Washington, DC; Jeremy James Calsyn, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC.

For Samsung Electronics Co. Ltd., Defendant: Simon J. Frankel, LEAD ATTORNEY, Covington & Burling LLP, San Francisco, CA; Daniel M Suleiman, Robert D. Wick , Covington & Burling LLP, Washington, DC; Derek Ludwin, Washington, DC; Jeffrey Michael Davidson, Covington & Burling LLP, San Francisco, CA; Timothy C. Hester, Covington & Burling, San Francisco, CA.

For [*5] Sharp Corporation, Defendant: Jacob R. Sorensen, LEAD ATTORNEY, Ryan Takemoto, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA; Alex Santana, Pillsbury Winthrop Shaw & Pittman, San Francisco, CA; Anne Benton Kaldor, Bingham McCutchen, San Francisco, CA; Colin C. West, McCutchen, Doyle, Brown & Enersen, LLP, San Francisco, CA; Erin Alysa Smart, Bingham McCutchen LLP, San Francisco, CA; John M. Grenfell, Pillsbury Winthrop Shaw PittmanLLP, San Francisco, CA; Kenneth I. Schacter , Bingham McCutchen LLP, New York, NY; Richard S. Taffet, Jon R. Roellke, Bingham McCutchen, New York, NY.

For Sharp Electronics Corporation, Defendant: Jacob R. Sorensen, LEAD ATTORNEY, Ryan Takemoto, August Orval Stofferahn, Susan Greenberg, Tara Michele Desautels, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA; Alex Santana, Pillsbury Winthrop Shaw & Pittman, San Francisco, CA; Anne Benton Kaldor, Bingham McCutchen, San Francisco, CA; Colin C. West, McCutchen, Doyle, Brown & Enersen, LLP, San Francisco, CA; Erin Alysa Smart, Bingham McCutchen LLP, San Francisco, CA; Fusae Nara, Pillsbury Winthrop LLP, San Francisco, CA; John M. Grenfell, Pillsbury Winthrop Shaw PittmanLLP, San Francisco, CA; Kenneth [*6] I. Schacter , Bingham McCutchen LLP, New York, NY; Richard S. Taffet, Jon R. Roellke, Bingham McCutchen, New York, NY.

For Toshiba Corporation, Defendant: Christopher M. Curran, LEAD ATTORNEY, White & Case, Washington, DC; John H. Chung, LEAD ATTORNEY, Wayne A. Cross, White & Case LLP, New York, NY.

For Toshiba Matsushita Display Technology Co., Ltd., Defendant: John H. Chung, LEAD ATTORNEY, Wayne A. Cross, White & Case LLP, New York, NY.

For Hitachi Ltd., Hitachi Displays, Ltd., Defendants: Kent Michael Roger, Michelle Minju Kim-Szrom, Morgan Lewis & Bockius LLP, San Francisco, CA.

For Hitachi America Ltd., Defendant: Kent Michael Roger, LEAD ATTORNEY, Morgan Lewis & Bockius LLP, San Francisco, CA.

For Hitachi Electronic Devices (USA), Inc., Defendant: Kent Michael Roger, LEAD ATTORNEY, Michelle Minju Kim-Szrom, Morgan Lewis & Bockius LLP, San Francisco, CA; Courtney Lynn Landis, Morgan, Lewis & Bockius, San Francisco, CA.

For NEC LCD Technologies, Ltd., (D, I), Defendant: Stephen Holbrook Sutro, Duane Morris LLP, San Francisco, CA.

For NEC Electronics America, Inc., (D, I), Defendant: Stephen Holbrook Sutro, LEAD ATTORNEY, Duane Morris LLP, San Francisco, CA; Edward G. Biester , III, Duane [*7] Morris LLP, Philadelphia, PA.

For AU Optronics Corporation, (D, I, 09-1115), Defendant: Christopher Alan Nedeau, LEAD ATTORNEY, Allison Marie Dibley , Esq., Carl Lawrence Blumenstein, Nossaman LLP, San Francisco, CA; Bryan B. Barnhart, Nossman LLP, San Francisco, CA.

For AU Optronics Corporation America, (D, I, 09-1115), Defendant: John C. McGuire, LEAD ATTORNEY, Sedgwick, Detert, Moran & Arnold, Newark, NJ; Matthew Clark Lovell, LEAD ATTORNEY, Sedgwick Detert Moran & Arnold, LLP, San Francisco, CA; Allison Marie Dibley , Esq., Carl Lawrence Blumenstein, Christopher Alan Nedeau, Nossaman LLP, San Francisco, CA; Bryan B. Barnhart, Nossman LLP, San Francisco, CA; Jason Haruo Wilson, Willenken Wilson Loh & Lieb LLP, Los Angeles, CA; Michael F. Healy , Esq., Sedwick Detert Moran & Arnold LLP, San Francisco, CA.

For Chi Mei Optoelectronics, Chi Mei Optoelectronics Corporation, (D, I, 09-1115), Defendants: Gordon Pearson, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC.

For Chi Mei Optoelectronics USA, Inc., (D, I, 09-1115), Defendant: Nathan Loy Walker, LEAD ATTORNEY, WilmerHale, Palo Alto, CA; Brent J. Gurney, PRO HAC VICE, Gordon Pearson, Cristina Carlucci Ashworth , Wilmer Cutler [*8] Pickering Hale and Dorr LLP, Washington, DC; Steven F. Cherry, Therese Lee, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC; Co-Liaison Counsel for defendants, Washington, DC,

DC; Wilmer Cutler, Hale and Dorr LLP, Washington, DC.

For Chunghwa Picture Tubes Ltd., (D, I, 09-1115), Defendant: Joel Steven Sanders, Gibson, Dunn & Crutcher LLP, San Francisco, CA; Rachel S. Brass, Gibson Dunn & Crutcher LLP, San Francisco, CA; Patrick J. Ahern, Baker & McKenzie; Robert W. Tarun, Roxane C. Busey, Baker & McKenzie LLP.

For Hannstar Display Corporation, (D, I, 09-1115), Defendant: Christoher M. Wyant , LEAD ATTORNEY, Hugh F. Bangasser, K&L Gates LLP, Seattle, WA; Hugh Frederick Bangasser, Julie Anne Halter , K&L Gates, Seattle, WA; Jeffrey L. Bornstein, K&L Gates LLP, San Francisco, CA; Ramona M. Emerson, K&L GATES, Seattle, WA.

For Samsung Semiconductor, Inc., (D, I, 09-1115), Defendant: Simon J. Frankel, LEAD ATTORNEY, Covington & Burling LLP, San Francisco, CA; Daniel M Suleiman, Robert D. Wick , Covington & Burling LLP, Washington, DC; Derek Ludwin, Washington, DC; Jeffrey Michael Davidson, Covington & Burling LLP, San Francisco, CA; Timothy C. Hester, Covington & Burling, San Francisco, [*9] CA; Tyler Mark Cunningham, Sheppard Mullin Richter & Hampton, San Francisco, CA.

For Epson Imaging Devices Corporation, (D), terminated on 1/15/08, Defendant: Stephen P. Freccero, LEAD ATTORNEY, Morrison & Foerster LLP, San Francisco, CA.

For CMO Japan Co., Ltd., (D, I, 09-1115), Defendant: Gordon Pearson, Cristina Carlucci Ashworth, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC.

For NEC Electronic America, Inc., Defendant: Stephen Holbrook Sutro, LEAD ATTORNEY, Duane Morris LLP, San Francisco, CA.

For Chi Mei Corporation, (D, I, 09-1115), Defendant: Gordon Pearson, Cristina Carlucci Ashworth , Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC.

For Nexgen Mediatech USA Inc, (D, 09-1115), Defendant: Caren K. Khoo, LEAD ATTORNEY, Wilmer Cutler Pickering Hale & Dorr, New York, NY; Brent J. Gurney, PRO HAC VICE, Gordon Pearson, Cristina Carlucci Ashworth , Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; Steven F. Cherry, Therese Lee, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC; Wilmer Cutler, Hale and Dorr LLP, Washington, DC.

For LG Electronics Inc., (D), Defendant: Samuel R. Miller, LEAD ATTORNEY, Robert Brooks Martin , III, Sidley Austin LLP, San  [*10] Francisco, CA; Ryan M. Sandrock, Sidley Austin, LLP, San Francisco, CA.

For Royal Phillips Electronics NV, Defendant: Garrard R. Beeney, LEAD ATTORNEY, Sullivan & Cromwell, New York, NY; Bradley P. Smith, Theodore Edelman, New York, NY.

For NEC Display Solutions of America, Inc., Defendant: Stephen Holbrook Sutro, LEAD ATTORNEY, George Dominic Niespolo, Duane Morris LLP, San Francisco, CA.

For Samsung Electronics America, Inc., (D, I, 09-1115), Defendant: Simon J. Frankel, LEAD ATTORNEY, Covington & Burling LLP, San Francisco, CA; Daniel M Suleiman, Robert D. Wick , Covington & Burling LLP, Washington, DC; Derek Ludwin, Washington, DC; Jeffrey Michael Davidson, Covington & Burling LLP, San Francisco, CA; Timothy C. Hester, Covington & Burling, San Francisco, CA.

For Phillips Consumer Electronics North America, Defendant: R. Dale Grimes , LEAD ATTORNEY, Bass Berry & Sims PLC, Nashville, TN; Brendan P. Cullen, Sullivan & Cromwell, Palo Alto, CA; Joshua Ray Denton , Bass, Berry & Sims, PLC, Nashville, TN.

For LG Electronics U.S.A.,Inc., (D), Defendant: A. Scott Ross, LEAD ATTORNEY, Neal & Harwell, Nashville, TN; Samuel R. Miller, LEAD ATTORNEY, Robert Brooks Martin , III, Sidley Austin LLP,  [*11] San Francisco, CA; Ryan M. Sandrock, Sidley Austin, LLP, San Francisco, CA.

For IPS Alpha Technology, LTD. , Defendant: Kent Michael Roger, Morgan Lewis & Bockius LLP, San Francisco, CA.

For Chungwa Picture Tubes Ltd. ("CPT"), Defendant: Patrick J. Ahern, Baker & McKenzie, Chicago, IL.

For Mitsubishi Electric & Electronics USA, Inc., Defendant: Donald R. Harris, Terrence Joseph Truax, Jenner & Block LLC, Chicago, IL; Kenneth E. Keller, Krieg Keller Sloan Reilley & Roman LLP, San Francisco, CA; Michael T. Brody, Jenner & Block LLP, Chicago, IL; Michael David Lisi, Krieg Keller Sloan Reilley & Roman, San Francisco, CA; Robert J. Blazejowski, Jenner & Block, LLP, Chicago, IL.

For IPS Alpha Technology, LTD., (D), dismissed from IP amended complaint on 2/21/08, Defendant: Kent Michael Roger, Morgan Lewis & Bockius LLP, San Francisco, CA.

For amsung Electronics Company, Ltd., Defendant: Jeffrey Michael Davidson, Covington & Burling LLP, San Francisco, CA.

For Seiko Epson Corporation, Defendant: Stephen P. Freccero, LEAD ATTORNEY, Morrison & Foerster LLP, San Francisco, CA.

For Epson Electronics America, Inc., (D, 09-1115), Dismissed as a indirect purchaser defendant on 4/1/08, Defendant: Kevin  [*12] C. McCann, LEAD ATTORNEY, Paul Hastings Janofsky & Walker LLP, San Francisco, CA; Chad A. Westfall, Sean David Unger, Paul, Hastings, Janofsky & Walker LLP, San Francisco, CA; Derek Francis Foran, Morrison & Foerster LLP, San Francisco, CA; Melvin R. Goldman, David Lawrence Meyer , Morrison & Foerster, San Francisco, CA; Stephen P. Freccero, Morrison & Foerster LLP, San Francisco, CA.

For Syntax-Brillian Corp., Defendant: Herman Samuel Palarz , LEAD ATTORNEY, Tyre Kamins Katz & Granof, Los Angeles, CA.

For Toshiba America, Inc., Toshiba Corp., Defendants: Wayne A. Cross, White & Case LLP, New York, NY.

For Nexgen Mediatech, Inc. ("Nexgen"), (D, 09-1115), Defendant: Gordon Pearson, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; Cristina Carlucci Ashworth , Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC.

For Tatung Company of America, Inc. ("Tatung America"), (D, 09-1115), Defendant: Bruce H. Jackson, LEAD ATTORNEY, Baker & McKenzie, San Francisco, CA; Karen Sewell, Roxane C. Busey, PRO HAC VICE, Baker & McKenzie LLP, Chicago, Il; Nancy Chung Allred , Robert Walter Tarun, Baker & McKenzie LLP, San Francisco, CA; Patrick J. Ahern, PRO HAC VICE, Baker & McKenzie, Chicago,  [*13] IL.

For Koninklijke Philips Electronics N.V. ("Philips"), (D), Defendant: Bradley P. Smith, Garrard R. Beeney, Theodore Edelman, LEAD ATTORNEYS, Sullivan & Cromwell LLP, New York, NY; Brendan P. Cullen, Sullivan & Cromwell, Palo Alto, CA.

For Toshiba America Electronics Components, Inc., (D, I, 09-1115), Defendant: Christopher M. Curran, LEAD ATTORNEY, White & Case, Washington, DC; John H.

Chung, Wayne A. Cross, Kristen J. McAhren, LEAD ATTORNEYS, White & Case LLP, New York, NY.

For Toshiba America Information Systems, Inc., (D, I, 09-1115), Defendant: Christopher M. Curran, LEAD ATTORNEY, White & Case, Washington, DC; John H. Chung, LEAD ATTORNEY, Wayne A. Cross, White & Case LLP, New York, NY.

For LG Display America, Inc., (D, I, 09-1115) formerly known as LG Philips LCD America, Inc., Defendant: Michael Robert Lazerwitz, LEAD ATTORNEY, Cleary Gottlieb Steen & Hamilton, Washington, DC; Jeremy James Calsyn, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC; Katerina S Colitti, PRO HAC VICE, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC.

For Toshiba Mobile Display Co., Ltd., Defendant: Christopher M. Curran, LEAD ATTORNEY, White & Case, Washington, DC; Wayne A. Cross, LEAD ATTORNEY, [*14] White & Case LLP, New York, NY.

For Au Optronics Corporation America, Inc, Defendant: Allison Marie Dibley , Esq., Carl Lawrence Blumenstein, Nossaman LLP, San Francisco, CA.

For Mitsui & Co. (Taiwan), Limited, (D), Defendant: Lisa Cox Ghannoum, Baker Hostetler, Cleveland, OH; Peter Wethrell James, Baker Hostetler, Los Angeles, CA; Ernest E. Vargo, Baker & Hostetler LLC; Tracy Lynn Cole, Baker & Hostetler LLP.

For Sanyo Consumer Electronics Co., Ltd., (D), Defendant: Allison Ann Davis, LEAD ATTORNEY, Sam N. Dawood, Davis Wright Tremaine LLP, San Francisco, CA; Nick Steven Verwolf, Davis Wright Tremaine LLP, Bellevue, WA.

For Samsung SDI America, Inc., Samsung SDI Co., Ltd., Defendant: Michael W. Scarborough, Sheppard Mullin Richter & Hampton LLP, San Francisco, CA.

For Chimei Innolux Corp., Defendant: Gordon Pearson, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; Cristina Carlucci Ashworth , Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC.

For Philips Electronics North America Corporation, Defendant: Brendan P. Cullen, Sullivan & Cromwell, Palo Alto, CA.

For Tatung Company, Defendant: Patrick J. Ahern, LEAD ATTORNEY, Baker & McKenzie.

For Apple Inc., Interested Party: [*15] Caroline Nason Mitchell, LEAD ATTORNEY, Jones Day, San Francisco, CA.

For Hewlett-Packard Company, Interested Party: Beatrice B. Nguyen, Gregory D. Call , Esq., LEAD ATTORNEYS, Crowell & Moring LLP, San Francisco, CA.

For State of California, Amicus: Emilio Eugene Varanini , IV, State Attorney General's Office, San Francisco, CA.

For United States Antitrust Division,Department of Justice, Intervenor: Peter K. Huston, LEAD ATTORNEY, Department of Justice, Antitrust Division, San Francisco, CA; Alexandra Jill Shepard, David J. Ward, Niall Edmund Lynch, U.S. Department of Justice, Antitrust Division, San Francisco, CA; U.S. Department of Justice, Antritrust Divsion, San Francisco Field Office, San Francisco, CA; Heather S. Tewksbury, United States Department of Justice, Antitrust Division, San Francisco, CA; Michael L. Scott, Antitrust Division, San Francisco, CA, U.S. Department of Justice, Antitrust Division, San Francisco, CA.

For State of Illinois, Intervenor: Blake Lee Harrop, LEAD ATTORNEY, Office of the Attorney General, Antitrust Bureau, Chicago, IL.

For State of Washington, Intervenor: Brady R. Johnson, LEAD ATTORNEY, Attorney General of Washington, Seattle, WA.

For State of Oregon, [*16] Intervenor: Michael E. Haglund, Michael K. Kelley, Haglund Kelley Horngren Jones & Wilder, LLP, Portland, OR.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER DENYING INDIRECT PURCHASER PLAINTIFFS' OBJECTION TO SPECIAL MASTER'S DENIAL OF MOTION TO COMPEL APEX DEPOSITIONS OF KATSUHIKO MACHIDA AND TERRY GOU**

The indirect purchaser plaintiffs have filed an objection to an order of the Special Master denying their motion to compel the depositions of Katsuhiko Machida and Terry Gou. [1] *See* Special Master's Order Re: Motion of Indirect Purchaser Plaintiffs to Compel Sharp Apex Depositions (June 20, 2011), Master Docket No. 2932 ("Order"). Pursuant to Civil Local Rule 7-1(b), the Court

finds this matter appropriate for disposition without oral argument and therefore VACATES the hearing currently scheduled for August 5, 2011. Having considered the papers of the parties, and for good cause appearing, the Court hereby DENIES plaintiffs' objection. [2]

  1   The Special Master's order states that plaintiffs withdrew their motion as to Gou. Order at 1 n.1 ("IPP's . . . have withdrawn the motion as to all defendants other than Sharp."). Both plaintiffs and defendants, however, address the issue [*17] of Gou's deposition in their papers. Accordingly, the Court will address the issue on the merits.

  2   The Court also DENIES plaintiffs' administrative request to file a late reply brief. (Master Docket No. 3187.)

Machida is the current Chairman and CEO of Sharp Corporation and served as Sharp's President between 1998 and 2007. Gou is the current Chairman of the Board of Directors for Hon Hai Precision Industry Co., which owns defendant Chimei Innolux. In May 2011, after defendants refused to produce these two individuals for deposition, plaintiffs filed a motion to compel with the Special Master. The Special Master denied the motion, finding that plaintiffs had not made an adequate showing that Machida and Gou possessed personal knowledge of the price-fixing conspiracy. Defendants now seek review of the Special Master's ruling.

The Special Master's order addresses a procedural matter, which this Court reviews for abuse of discretion. *See* Order Appointing Martin Quinn as Special Master (April 12, 2010), Master Docket No. 1679, at ¶18; Fed. R. Civ. P. 53(f)(3)-(5); *cf. Quinn v. Anvil Corp.*, 620 F.3d 1005, 1015 (9th Cir. 2010) ("We review district court rulings on discovery matters for abuse [*18] of discretion."). The Court finds no abuse of discretion here.

Numerous courts have concluded that so-called "apex depositions" should be carefully scrutinized to avoid the potential for abuse. *See, e.g., Celerity Inc. v. Ultra Clean Holding*, 2007 U.S. Dist. LEXIS 8295, 2007 WL 205067, at *3 (N.D. Cal., Jan. 25, 2007) ("Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment."). These courts have required that the party seeking to depose an apex executive demonstrate that he possesses some "unique personal knowledge" about the case. *Doble v. Mega Life and Health Ins. Co.*, 2010 U.S. Dist. LEXIS 56190, 2010 WL 1998904, at *4 (N.D. Cal., May 18, 2010) (granting protective order against deposition of defendant's CEO because plaintiffs could not show he had "unique personal knowledge").

Plaintiffs have not made any such showing in this case. The only mention of Gou in plaintiffs' papers consists of a *China Post* article in which Gou complains about the [#x20ac]300 million fine the European Union levied on Chimei Innolux. *See* Declaration of Russell F. Brasso in Support of IPP's Objection, [*19] Exh. C. Nothing in Gou's statements shows that he has "unique personal knowledge" about this case.

Plaintiffs have also made no showing that Machida is likely to have unique, first-hand knowledge about the price-fixing conspiracy. Plaintiffs have provided the Court with no evidence that Machida participated in or was otherwise aware of the conspiracy. Rather, plaintiffs' position boils down to the fact that Machida "must have known" of any price-fixing activities because of his position at Sharp during the relevant period. Adopting this argument, however, would eviscerate the apex doctrine.

Plaintiffs have provided nothing in support of their motion beyond speculation. As the Special Master found, "[n]o case with such a weak showing of personal involvement has allowed an Apex deposition to proceed." Order at 7. Accordingly, the Court DENIES plaintiffs' objection to the Special Master's order. (Master Docket Nos. 3013, 3187.)

**IT IS SO ORDERED.**

Dated: August 1, 2011

/s/ Susan Illston

SUSAN ILLSTON

United States District Judge

**Citation #17**
**2009 U.S. Dist. LEXIS 92230**

LEXSEE



Positive
As of: Jun 07, 2013

**DAVID TOURGEMAN, Plaintiff, v. COLLINS FINANCIAL SERVICES, INC., et al., Defendants.**

**Civil No. 08cv1392-JLS (NLS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**2009 U.S. Dist. LEXIS 92230**

**May 4, 2009, Decided**
**May 4, 2009, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Dismissed by, in part, Motion to strike granted by, in part, Motion to strike denied by, in part, Claim dismissed by, Dismissed without prejudice by Tourgeman v. Collins Fin. Servs., 2009 U.S. Dist. LEXIS 127542 (S.D. Cal., Aug. 6, 2009)

**CORE TERMS:** deposition, subpoena, deposition testimony, discovery, witness fees, discovery dispute, preparing, mileage, invalid, notice, time limit, monetary sanctions, prevailing party, substantially justified, attendance, harassment, compelled, tendered, opposing, finished, serving, forcing, unjust

**COUNSEL:** [*1] For David Tourgeman, Plaintiff: Daniel Peter Murphy, LEAD ATTORNEY, Law Offices of Daniel P Murphy, San Diego, CA; Derek J. Wilson, Francis A Bottini, Frank J Johnson, Jr, LEAD ATTORNEYS, Johnson Bottini, LLP, San Diego, CA.

For Collins Financial Services, Inc., a corporation, Nelson & Kennard, a partnership, Defendants: Jeffrey Alan Topor, Tomio B Narita, LEAD ATTORNEYS, Michael R Simmonds, Robin M. Bowen, Simmonds & Narita LLP, San Francisco, CA.

For Dell Financial Services, L.P., a limited partnership, CIT Financial USA, Inc, A Delaware limited partnership, Defendants: Lisa Amy Wegner, LEAD ATTORNEY, Call Jensen and Ferrell, Newport Beach, CA.

**JUDGES:** Hon. Nita L. Stormes, United States District Court Magistrate Judge.

**OPINION BY:** Nita L. Stormes

**OPINION**

ORDER DENYING DEFENDANTS' MOTION TO COMPEL DEPOSITION TESTIMONY AND REQUEST FOR SANCTIONS AND AWARDING SANCTIONS TO PLAINTIFF

**I. BACKGROUND AND INTRODUCTION**

Plaintiff David Tourgeman ("Plaintiff") alleges violations of the Fair Debt Collection Practices Act and California's Rosenthal Act against Defendant Collins Financial Services and Defendant Nelson & Kennard. Plaintiff also asserts claims against Defendants Collins Financial, Nelson & Kennard, Dell Financial [*2] Services, LLC, and CIT Financial USA, Inc. for violations of the California Unfair Business Practices Act, Business and Professions Code and Negligence. Plaintiff alleges Defendants falsely indicated the existence of a debt due to an error in processing Plaintiff's payments for the purchase of a Dell computer. (Complaint PP 19-23.)

In January 2009, Defendants noticed the deposition of Plaintiff's father and mother, Cesar and Rebecca Tourgeman ("Mr. and Mrs. Tourgeman") without serving subpoenas. Plaintiff informed Defendants that Mr. and Mrs. Tourgeman were third parties and would not voluntarily appear at the non-subpoenaed depositions unless

Defendants agreed to limit the depositions to one hour each. In February 2009, Defendants subpoenaed Mr. and Mrs. Tourgeman to appear for depositions on March 17 and March 18, 2009, but failed to tender the required witness and mileage fee at the time of service. (Weaver Decl. P 10.)

On March 12, 2009, Defendants Dell Financial Services, DFS Acceptance and DFS Production (collectively "Defendants") filed the motion presently before the Court to compel the depositions of Mr. and Mrs. Tourgeman without restricting the length of each deposition to [*3] less than seven hours. [Docket No. 25.] This motion is appropriate for adjudication on the papers submitted and the Court previously vacated the April 8, 2009 hearing date.

Having considered all of the arguments of the parties, IT IS HEREBY ORDERED that Defendants' Motion to Compel Deposition Testimony and Request for Sanctions is Denied and Plaintiff's request for sanctions is Granted.

## II. DISCUSSION

### A. The Validity of Subpoenas

Defendants admit that they failed to tender Mr. and Mrs. Tourgeman's witness fees with the deposition subpoenas. Defendants argue that, because the witness fees were promptly tendered when they received notice, "Plaintiff no longer has a legal leg to stand on." (Reply at 3.) Defendants are mistaken.

A subpoena is invalid when witness fees or mileage allowances are not tendered at the time the subpoenas are served. Federal Rule of Civil Procedure 45(b)(1) states: "Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law." Fed.R.Civ.P. 45(b)(1). A failure to tender fees at the time of service invalidates the subpoena and the deposition [*4] testimony will not be compelled. CF & I Steel Corp. v. Mitsui & Co., 713 F.2d 494, 495 (9th Cir. 1983) (finding tender 34 days after service and one week after notice of deficiency did not cure defect); Mirana v. Battery Tai-Shing Corp., 2009 U.S. Dist. LEXIS 12212, 2009 WL 290459, *1 (N.D.Cal. Feb. 5, 2009). In this case, Defendants did not tender the Tourgemans' witness fees at the time the deposition subpoenas were served. Accordingly, the Court will not compel the deposition testimony of Cesar and Rebecca Tourgeman.

### B. Request for Sanctions

Defendants ask for monetary sanctions against Plaintiff for preparing this motion in the amount of $

2,002.00. (Wegner Decl. P 8.) Plaintiff asks for monetary sanctions in the amount of $ 5,062.50 against Defendants for preparing its opposition to the motion. (Weaver Decl. P 13.) Rule 37 provides for the payment of sanctions to the prevailing party in a discovery dispute. Fed. R. Civ. P. 37(a)(5). As the Court is denying Defendants' motion, Plaintiff is the prevailing party. Accordingly, the Court must require Defendants to pay Plaintiff the "reasonable expenses incurred in opposing the motion, including attorney's fees" unless "the motion was substantially justified or other [*5] circumstances make an award of expenses unjust." Fed.R.Civ.P 37(a)(5)(B).

Defendants moved to compel based on invalid subpoenas. Moreover, Defendants insistence on moving to compel the depositions of Mr. and Mrs. Tourgeman without a prior time restriction would not have been substantially justified even if the subpoenas had been valid. Courts have authority to restrict the length of a deposition. Fed.R.Civ.P.30(d)(3)(B). Rule 26(c) provides that a court may, for good cause shown, "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c); see also Fed. R. Civ. P. 26(b)(2)(C) (Court must limit discovery when "the burden or expense of the proposed discovery outweighs its likely benefit."). Time limits are appropriate when there are a limited scope of the subjects to be addressed and a limited number of documents sought. Shum v. Intel Corp., Slip Copy, 2008 U.S. Dist. LEXIS 82919, 2008 WL 4104515 at *1 (N.D.Cal. Sep. 4, 2008). Additionally, non-parties are entitled to broader protection from harassment by discovery. Dart Industries Co., Inc. v Westwood Chemical Co., Inc., 649 F.2d 646, 649 (9th Cir. 1980).

In this case, the issues for which [*6] Defendants seek to depose Mr. and Mrs. Tourgeman are limited in scope and would warrant a limitation on the deposition. The documents identified in relation to the case are few in nature, and the subject matter to be discovered is narrow: a copy of a check for partial payment of the computer made out by Mrs. Tourgeman on behalf of the Plaintiff, and that Plaintiff was not living with his parents at the time a sheriff's deputy served a state-court summons at the Tourgemans' residence. (Opposition at 3.)

Moreover, no circumstances exist that would make an award of sanctions unjust. Defendants should have pursued the option of deposing Mr. and Mrs. Tourgeman within the proposed restricted time frame and attempted to obtain as much information as thought necessary. If Defendant finished questioning within the time limit, there would have been no need for preparing the present motion. And if time expired before Defendant finished the inquiries, and Plaintiff's counsel refused to allow more time, then a Motion to Compel Further Discovery would be appropriate and necessary. Instead, Defendants

chose to move to compel depositions for the full seven hours based on invalid subpoenas, forcing [*7] judicial intervention in this minor dispute. As another court aptly explained:

> At the expense of stating the obvious, the Court feels compelled to point out to counsel how this entire matter could have been handled with a modicum of common courtesy and professionalism, thereby avoiding unnecessary delay in the litigation, expense to the clients, and use of the Court's time.

*Klockner Namasco Holdings Corp. v. Daily Access. Com, Inc.,* 211 F.R.D. 685, 687 (N.D. Ga. 2002); *see also* Fed.R.Civ.P. 37 Notes of Advisory Committee (One of the primary purposes of FRCP 37 is to "deter the abuse implicit in carrying or forcing a discovery dispute to court when no genuine dispute exists.").

Plaintiff seeks $ 5,062.50 in sanctions, representing 12.5 hours spent opposing this motion at an hourly rate of $ 405. Plaintiff's counsel, however, must bear some of the blame for the failure of the parties to resolve this dispute. Plaintiff could have agreed to produce the Tourgemans for depositions without a prior time limit and placed Defendants on notice that Plaintiff would terminate the depositions if it appeared that Defendants continued the depositions for the sole purpose of harassment. Accordingly, the [*8] Court awards Plaintiff sanctions in the amount of $ 2,531.25, or half of the sought amount.

## III. CONCLUSION

For the foregoing reasons, It Is Hereby Ordered that:

1. Defendants' Motion for an Order Compelling Deposition Testimony of Cesar and Rebecca Tourgeman and Request for Sanctions is Denied;

2. Defendants Dell Financial Services, DFS Acceptance and DFS Production shall pay Plaintiff sanctions in the amount of $ 2531.25; and

3. To prevent future unnecessary discovery disputes from being brought before the Court, no party shall file a motion to compel discovery unless counsel have met in person to attempt in good faith to resolve the dispute without resort to Court intervention.

IT IS SO ORDERED.

DATED: May 4, 2009

/s/ Nita L. Stormes

Hon. Nita L. Stormes

U.S. Magistrate Judge

United States District Court

1

**PROOF OF SERVICE**

2

3

     I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause.  My business address is Novak Druce Connolly Bove + Quigg LLP, 333 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

4

5

     On June 6, 2013, I served the document(s) described as:

6

**APPENDIX OF UNPUBLISHED CASES**

7

on parties in this action at the email addressed as follows:

8

9

10

     Richard Krebs (RKrebs@irell.com);
     Matthew Werber (MWerber@seyfarth.com);
     pti.tessera@bakerbotts.com;
     tessera-pti@irell.com;
     Victoria Hao (vhao@sjclawpc.com); and
     Christine Yang (cyang@sjclawpc.com)

11

12

13

14

☒ <u>BY E-MAIL OR ELECTRONIC TRANSMISSION:</u> Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person(s) at the e-mail addresses listed on the attached service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

15

16

     I declare that I am employed in the office of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

17

     Executed on June 6, 2013 at Los Angeles, California.

18

19

20

      Claire Chon                             
      Print Name                           Signature

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

3      I, the undersigned, certify and declare that I am over the age of 18 years,
employed in the County of Los Angeles, State of California, and not a party to the
above-entitled cause.  My business address is Novak Druce Connolly Bove + Quigg
LLP, 333 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

4

5      On June 6, 2013, I served the document(s) described as:

6

### DECLARATION OF BRETON A. BOCCHIERI IN SUPPORT OF THIRD PARTY WITNESS DAVID SUN'S OPPOSITION TO TESSERA, INC.'S MOTION TO COMPEL HIS DEPOSITION

7

8   on parties in this action at the email addressed as follows:

9

10      Richard Krebs (RKrebs@irell.com);
      Matthew Werber (MWerber@seyfarth.com);
      pti.tessera@bakerbotts.com;
      tessera-pti@irell.com;
      Victoria Hao (vhao@sjclawpc.com); and
      Christine Yang (cyang@sjclawpc.com)

11

12

13   ☒ BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an
      agreement of the parties to accept service by e-mail or electronic transmission, I
      caused the documents to be sent to the person(s) at the e-mail addresses listed on
      the attached service list. I did not receive, within a reasonable time after the
      transmission, any electronic message or other indication that the transmission was
      unsuccessful.

14

15

16      I declare that I am employed in the office of a member of the State Bar of this
Court at whose direction the service was made. I declare under penalty of perjury
under the laws of the United States of America that the above is true and correct.

17

18      Executed on June 6, 2013 at Los Angeles, California.

19

20

21   _____          _____
        Claire Chon                              
        Print Name                            Signature

22

23

24

25

26

27

28